IN THE UNITED STATES  COURT OF
APPEALS FOR THE ELEVENTH
CIRCUIT

APPEAL NO. 15-14842-D

NAM DANG, by and through his
 Power of Attorney, VINA DANG,

                                        Plaintiff-Appellant,

            vs.

DONALD F. ESLINGER, in his official
capacity as the SHERIFF OF SEMINOLE
COUNTY; OLUGBENGA OGUNSANWO,
M.D.; SANDRA WILT, LPN; BRENDA
PRESTON-MAYLE, RN; ALECIA SCOTT,
LPN; SHARYLE ROBERTS, LPN; and
 MARTHA DENSMORE, RN,

                                        Defendants-Appellees,

On Appeal from the United States District
Court for the Middle District of Florida
Orlando Division
Case No.: 6:14-cv-37-Orl-31TBS
Gregory A. Presnell, United States District Judge

_____

**INITIAL BRIEF OF APPELLANT**
_____

Matthew P. Farmer, Esq.                Melissa H. Powers, Esq.
501 W. Whiting Street, Suite 501       631 W. Morse Blvd., Suite 200
Tampa, FL  33602                       Winter Park, FL 32789
(813)228-0095; FAX(813)224-0269        (407)839-0866; FAX(407)425-7968

COUNSEL FOR APPELLANT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES………………………………………………...…i

CERTIFICATE OF INTERESTED PERSONS………………….…………….. 1

STATEMENT OF JURISDICTION…………………………………………..

STATEMENT OF THE ISSUES……………………………………………..6

    I.    WHETHER THE TRIAL COURT ERRED IN
    GRANTING THE INDIVIDUAL DEFENDANTS'
    MOTIONS FOR SUMMARY JUDGMENT ON
    THEIR AFFIRMATIVE DEFENSES OF QUALIFIED
    IMMUNITY………………………………………………...6

    II.    WHETHER THE TRIAL COURT ERRED IN GRANTING
    SUMMARY JUDGMENT TO DONALD F. ESLINGER, IN
    HIS OFFICIAL CAPACITY AS THE SHERIFF OF
    SEMINOLE COUNTY ON THE 42 U.S.C. SECTION
    1983 MUNICIPAL LIABILITY CLAIM……………………...…….6

STATEMENT OF THE CASE

    I.    *Course of the Proceedings and Disposition in the Court Below*…. 8
    II.    *Statement of the Facts*………………………………….. 10
    III.    *Standard of Review*……………………………………….. 33

SUMMARY OF THE ARGUMENT………………………………………… 37

ARGUMENT……………………………………………………………… 38

I.

THE TRIAL COURT ERRED IN GRANTING THE INDIVIDUAL
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
ON THEIR AFFIRMATIVE DFENSES OF QUALIFIED
IMMUNITY…………………………………………………………… 38

II.

THE TRIAL COURT ERRED IN GRANTING
SUMMARY JUDGMENT TO DONALD F.
ESLINGER, in his official capacity as the
SHERIFF OF SEMINOLE COUNTY ON
THE 42 U.S.C. § 1983 MUNICIPAL LIABILITY
CLAIM…………...........................................................................62

CONCLUSION…………………………………………………………….63

CERTIFICATE OF COMPLIANCE………………………………………..64

CERTIFICATE OF SERVICE……………………………………………….65

# TABLE OF AUTHORITIES

Cases                                                              Page(s)

*Ancata v. Prison Health Services,* 769 F.2d 700
*(11th Cir. 1985)*                                               36,40,41,42,43,62

*Carswell v. Bay County,* 854 F.2d 454 (11th Cir. 1988)         36,40,41,42,43,44,
                                                                   62

*Castro v. County of Los Angeles,* 797 F.3d 654 (19th
Cir. 2015)                                                        38

*Claridy v. Golub*, __ F.3d ___, 2015 WL 7720312 (11th Cir. 2015)   34

*Collins v. Al-Shami,* 2015 WL 5098533 (S.D. Ind.,
August 31, 2015                                                   39

*Farrow v. West,* 320 F.3d 1235, 1243 (11th Cir. 2003)          38

*Goebert v. Lee County,* 510 F.3d 1312, 1327 (11th Cir. 2007)   40,50

*Hope v. Pelzer,* 536 U.S. 730 (2002)                             44

*Johnson v. Clafton*, 2015 WL 5729080 (E.D. Michigan,
September 30, 2015)                                               39

*Kingsley v. Hendrickson,* 576 U.S. __, 135 S. Ct. 2466 (2015)    8,37,38,39

*Mandel v. Doe,* 888 F.2d 783 (11th Cir. 1989)                  36,42,43,44,62

*McElligott v. Foley,* 182 F.3d 1248 (11th Cir. 1999)           36,42,44,45,
                                                                   49,62

*Rich v. Dollar,* 841 F.2d 1558, 1564 (11th Cir. 1988)          45

*Saetrum v. Raney,* 2015 WL 4730293 (D. Idaho, August 7, 2015)      39

*Skop v. City of Atlanta*, 485 F.3d 1130 (911th Cir. 2007)      33

*Tolan v. Cotton*, 572 U.S. ____ 134 S. Ct. 1861 (2014)      34,35

*Zeigler v. Jackson,* 716 F.2d 847 (11th Cir. 1983)      46

§§464.001-464.027, *Fla. Stat*. (Florida Nurse Practice Act)      8,22,24,46,47

# CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Eleventh Circuit Rule 28.1(b), the undersigned counsel certifies that the following persons have an interest in the outcome if this case:

1. Nam Dang, Plaintiff/Appellant

2. Vina Dang, Power of Attorney for Plaintiff/Appellant

3. Steven R. Maher, Attorney for Plaintiff/Appellant

4. Melissa H. Powers, Attorney Plaintiff/Appellant

5. The Maher Law Firm, P.A., Attorneys for Plaintiff/Appellant

6. Daniel W. Cotter, Attorney for Plaintiff/Appellant

7. Law Offices of Daniel W. Cotter, Attorneys for Plaintiff/Appellant

8. Matthew P. Farmer, Attorney for Plaintiff/Appellant

9. Farmer & Fitzgerald, P.A., Attorneys for Plaintiff/Appellant

10. Donald F. Eslinger, Sheriff of Seminole County, Florida, Defendant, Appellee

11. Seminole County Sheriff's Office, Defendant/Appellee

12. Sandra Wilt, LPN, Defendant/Appellee

13. Brenda Preston-Mayle, R.N., Defendant/Appellee

14. D. Andrew DeBevoise, Attorneys for Defendants/Appellees, Sheriff Eslinger, Sandra Wilt, LPN and Brenda Preston-Mayle, RN

1

15. Jeffrey K. Grant, Esq., Attorneys for Defendants/Appellees, Sheriff Eslinger, Sandra Wilt, LPN and Brenda Preston-Mayle, RN;

16. DeBevoise & Poulton, P.A., Attorneys for Defendants/Appellees, Sheriff Eslinger, Sandra Wilt, LPN and Brenda Preston-Mayle, RN;

17. Alecia Scott, LPN, Defendant/Appellee;

18. Sharyle Roberts, LPN, Defendant/Appellee;

19. Martha Densmore, RN, Defendant/Appellee;

20. John M. Green, Jr., Attorney for Defendants/Appellees, Alecia Scott, LPN, Sharyle Roberts, LPN and Martha Densmore, RN;

21. Linda L. Winchenbach, Attorney for Defendants/Appellees, Alecia Scott, LPN, Sharyle Roberts, LPN and Martha Densmore, RN;

22. John M. Green, Jr., P.A., Attorney for Defendants/Appellees, Alecia Scott, LPN, Sharyle Roberts, LPN and Martha Densmore, RN;

23. Olugbenga Ogunsanwo, M.D., Defendant/Appellee;

24. Bruce R. Bogan, Attorney for Defendant/Appellee, Olugbenga Ogunsanwo, M.D.;

25. Melissa J. Sydow, Attorney for Defendant/Appellee, Olugbenga Ogunsanwo, M.D.;

26. Hilyard, Bogan & Palmer, P.A., Attorneys for Defendant/Appellee,

Olugbenga Ogunsanwo, M.D.; and

27. Florida Sheriffs' Ris Management Fund, Insurer for Defendants/Appellees.

2.      The name of every other entity whose publicly-traded stock, equity, or debt may be substantially affected by the outcome of the proceedings: None.

3.      The name of every other entity which is likely to be an active participant in the proceedings, including the debtor and members of the creditors' committee (or twenty largest unsecured creditors) in bankruptcy cases: None.

4.      The name of each victim (individual or corporate) of civil and criminal conduct alleged to be wrongful, including every person who may be entitled to restitution:

The Plaintiff/Appellant, Nam Dang, by and through his Power of Attorney, Vina Dang.

The undersigned hereby certifies that, except as disclosed above, I am unaware of any actual or potential conflict of interest involving the district judge and magistrate judge assigned to this case, and will immediately notify the Court in writing on learning of any such conflict.

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is requested, as the issues in this case have not been recently decided authoritatively and oral argument may assist the decisional process.

# <u>STATEMENT OF JURISDICTION</u>

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

### I.

WHETHER THE TRIAL COURT ERRED IN GRANTING THE INDIVIDUAL DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT ON THEIR AFFIRMATIVE DEFENSES OF QUALIFIED IMMUNITY.

### II.

WHETHER THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT TO DONALD F. ESLINGER, in his official capacity as the SHERIFF OF SEMINOLE COUNTY ON THE 42 U.S.C. § 1983 MUNICIPAL LIABILITY CLAIM.

**STATEMENT OF THE CASE**

**I.** *Course of the Proceedings and Disposition in the Court Below*

On January 9, 2014, appellant Nam Dang, filed his complaint relating to his detainment at John E. Polk Correctional Facility located in Sanford, Seminole County, Florida. (Doc. 47) (amended complaint).[1] Counts II - VII of his amended complaint alleged liability under 42 U.S.C. § 1983 for the denial of medical care against several of the health care providers charged with caring for Nam Dang during his detainment. Count I alleged a municipal liability theory against DONALD F. ESLINGER, in his official capacity as the SHERIFF OF SEMINOLE COUNTY under 42 U.S.C. § 1983. Each Defendant filed a respective Answer and Affirmative Defenses. (Docs. 55, 69, 70, and 71).

Defendants moved for summary judgment. (Docs. 127, 128, 129, 137, 138, 140 and 152). Plaintiff filed responses thereto. (Docs. 176 and 177), and Defendants filed their respective replies. (Docs. 175-180). The court held oral argument on July 29, 2015. Thereafter, by Order issued on August 25, 2015, this Court granted summary judgment as to all Defendants (Doc. 184) and Judgment was entered on August 26, 2015 (Doc. 185). Plaintiff invoked the remedy provided by Rule 59(e) to alter or amend the Judgment to reflect that these

---

[1] The amended complaint was filed on March 24, 2014.

material facts are indeed in dispute, and further that, under the law of the Eleventh Circuit, there are genuine issues of material fact that preclude the Court from granting summary judgment. (Doc. 194). Defendants filed their respective responses and the Court subsequently denied Plaintiff's Motion to Alter and Amend Judgment on October 15, 2015. (Doc. 201). A notice of appeal was timely filed on October 28, 2015. (Doc. 205).

Granting summary judgment to all defendants, the district court, addressing the initial prong of the qualified immunity defense, concluded that each defendant acted within his or her discretionary authority. (Doc. 184 at 10). In so doing, the court rejected plaintiff's argument that the defendant LPNs Wilt, Scott, and Roberts acted outside their discretionary authority because the Florida Nurse Practice Act prohibits LPNs from performing assessments or preparing care plans. *Id.* at 10.

The district court then turned to the next prong of the qualified immunity defense, namely the argument that defendant did not violate a constitutional right, here the Fourteenth Amendment right to be free from deliberate indifference to a pretrial detainee's serious medical needs. *Id.* at 11. The court rejected plaintiff's contention that the Supreme Court's recent decision in *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), which held that the standard

governing pretrial detainees' claims of excessive force was purely objective, namely reasonableness, and therefore the subjective component of the deliberate indifference standard was no longer applicable. *Id.* at 11, n. 14. (Plaintiff proposed a standard of "objective indifference" to serious medical needs. *Id.*)

The district court assumed that Nam Dang had an objectively serious medical need, but determined that, evaluating the facts in the light most favorable to him, there was insufficient evidence that the defendants were deliberately indifferent to his medical needs. *Id.* at 11-18. The court concluded that, "In hindsight and with collective wisdom, it appears that the Jail's medical staff failed to properly diagnose and treat Dang's meningitis. This failure may have been negligent, and its consequence was tragic, but it was not the result of deliberate indifference to Dang's serious medical need." *Id.* at 19. Likewise, the district court granted Sheriff Eslinger's motion for summary judgment, reasoning that, given the court's conclusion that Dang suffered no constitutional deprivation, he cannot demonstrate that municipal policy or custom violated Dang's Fourteenth Amendment right. *Id.* at 18-19. The court subsequently denied plaintiff's motion to alter or amend the judgment, rejecting his argument that 1) it ignored disputes of material facts and 2) previous Eleventh Circuit precedent clearly established in materially indistinguishable factual

circumstances that jail medical staff were deliberately indifferent to serious medical needs.

## II. *Statement of the Facts*

### A. <u>Introduction</u>

Nam Dang was a pretrial detainee in the John E. Polk Correctional Facility (also referred to below as "the jail") in Seminole County, Florida from January 26, 2012 through February 23, 2012. The jail was administered by Seminole County Sheriff Donald Eslinger. At the time that Dang was arrested and taken into custody, his mother informed the arresting officers that her son was sick; in response, Mrs. Dang was assured that he would be well cared for at the jail. Over the course of Dang's 28 day detention, his complaints of worsening head and neck pain, neck stiffness, and fever went ignored, or insufficiently responded to, by the jail medical staff. Rather than benefiting from any meaningful investigation of the source of his pain and related symptoms, Dang was instead sent to the jail's mental health isolation unit, where he was left to suffer without care. Medical personnel at the jail claimed Dang was faking his symptoms, and falsely asserted that he had "fluttering eye syndrome," which is a term commonly used when medical professionals believe a patient is faking unconsciousness. It was not until after Dang suffered multiple severe brain infarcts that his serious condition was finally

addressed. Yet, even after sending him to the hospital, jail medical personnel conveyed inaccurate information and failed to convey critical information regarding Dang's condition to the hospital staff. (Doc. 164, Exhibit 1) Shortly after presentation to the hospital, Nam Dang was diagnosed with meningitis. (Doc. 164, Exhibit 2) As a result of the Defendants' deliberate indifference to Nam's serious health needs and the violation of Nam's constitutional rights under the Fourteenth Amendment, he suffered catastrophic damages and is permanently disabled.

The record evidence in this action, which will be discussed in detail below, shows that at a minimum, there is a question of fact as to whether each individual defendant's disregard and indifference caused Nam Dang to suffer for weeks as his serious medical condition was ignored and he was allowed to languish in pain to the point of becoming unresponsive. To be clear, the claims in this action are not about the Defendants' failure to specifically diagnose cryptococcal meningitis. Rather, this case is about a 31 year old man who was arrested at home without incident on January 26, 2012. The arresting officers were told that Nam Dang was sick, and his mother was given permission to put a Salonpas pain relief patch on her son's neck before he was put into the patrol car. From the moment he was detained, Nam Dang tried to get help. He tried telling the staff, including the individual Defendants, that something was wrong with him and that he needed

their medical intervention, but his requests were unavailing until it was too late to avoid catastrophic injury.

## B. Record Evidence

### Sandra Wilt, L.P.N.

Sandra Wilt was a licensed practical nurse (LPN) who was employed by the Seminole County Sherriff's Office in January, 2012. Wilt worked at the John E. Polk Correctional Facility in her capacity as a licensed practical nurse. On January 29, 2012 Wilt handled a sick call request form completed by Nam Dang. (Doc. 164, Exhibit 4). Dang filled out the section titled "problem" and wrote "moderate to severe head and neck pains. Strain neck muscle. Possible pinched nerve stiff neck." (Doc.164, Exhibit 4)

Wilt saw Dang per his Nurse Sick Call request form at approximately 9:00 p.m. on January 29. At that time, Dang was being housed in general population, namely in the E-Pod. At the time of her encounter with Dang, Wilt was made aware that he had complaints of moderate to severe head and neck pain, and a stiff neck. (Doc. 164, Exhibit 4; Doc. 142 at 28:15-17). Based on his complaints, and acting outside the scope of nursing practice under Florida law, Wilt evaluated Nam Dang's condition and created a plan to treat him by ordering Motrin. (Doc. 142 at 28:18-30). Nurse Wilt stated that she never touched Nam during the examination,

and took no vital signs. (Doc. 142 at 29:13; at 39:23-24). Nurse Wilt further testified that, in general, if an inmate has complaints of moderate to severe head and neck pain and a stiff neck, she would take vital signs; however, she did not do that for Dang. *Id.* at 16-24.

**Olugbenga Ogunsanwo, M.D.**

Dr. Ogunsanwo had two direct encounters with Dang; however, there were numerous additional occasions in which he was provided with specific information regarding Dang. Dang first saw Dr. Ogunsanwo on February 1, 2012 for a doctor sick call (DSC) for the primary purpose of getting an order for Robaxin entered. (Doc. 130-1 at 26; see also Doc. 142 at 30: 9-18.) During this initial encounter, Dang's temperature was 98.9 (slightly elevated), despite the fact that he was receiving ibuprofen. (Doc. 147, at 61:19-63:15.) Dr. Ogunsanwo admitted that at the time he saw Dang on February 1, 2012, he knew that Dang had complaints of a headache or a history of headaches, had a history of complaining of neck pain and neck stiffness, and had a temperature of 98.9 after being provided iburprofen/Motrin. (Doc. 147 at 96:22 – 97:16; see also Doc. 147 at 107:8-15.) Dr. Ogunsanwo agreed that the combination of headache, neck stiffness, and increased temperature is consistent with a possible diagnosis of meningitis. Doc. 147 at 98:1-6.)

Shortly after his February 1, 2012 encounter, Ogunsanwo was sent the History and Physical form completed by Brenda Preston-Mayle, R.N. on February 7, 2012. (Doc. 143 at 26:22 – 28:8.) On the History and Physical form, Nurse Preston-Mayle documented that Dang's headaches were severe and frequent. (Doc. 143 at 38:15–40:13)  Ogunsanwo further agreed that, at the time of the history and physical on February 7, 2012, Dang was continuing to have neck pain and headaches despite taking the Robaxin, ibuprofen and Motrin, and said his "head was hurting so bad." (Doc. 147 at 67:3-6)  Preston-Mayle also documented a substantial worsening of Dang's condition; he was now reporting blurry vision and tinnitus associated with his severe headaches. (Doc. 143 at 40:25–41:8) Additionally, on February 13, 2012, after an emergency sick call visit with Alecia Scott, LPN on the evening of February 9, 2012, Ogunsanwo approved an order for blood pressure checks twice a day due to the fact that Dang was "running a fever." (Doc. 164, Exhibit 9); *see also* Doc. 147 at 68:10-24; see also Scott Depo. (Doc. 164 at 36:7 – 37: 3.).[2]

Ogunsanwo testified that: [1] meningitis is a medical condition that needs to be diagnosed by a physician; [2] meningitis requires medical treatment; and [3] if

---

[2] One has to physically hit a button to accept/approve an entry in the record and this action subsequently triggers a notation that the entry is "approved".  (Doc. #142, Wilt Depo., p. 27, l.14 – p.28, l.2.)

meningitis is not treated, it can create a substantial risk of serious harm to the patient. (Doc. 147 at 50:8-22.)   He further testified that somebody having a temperature over 100 degrees has a "significant fever," *id.* at 51:23-24, and that ibuprofen, in addition to being a pain reliever, also reduces fever. *Id.* at 52:4-6.

Despite the fact that Dang was in the infirmary after a "code orange" (medical emergency) during the night of February 20, 2012, Ogunsanwo did not see Dang again until February 23, 2012 at approximately 12:07 p.m., nearly an hour after he was found in his cell with his head in the toilet "trying to spit," unable to hold himself up, and incontinent. (Doc. 130-1:7-8; see also Doc. 164, Exhibit 10; *id.* at 66: 2-24).

During the deposition of Preston-Mayle, Plaintiff first learned that she was present for the February 23, 2012 encounter between Ogunsanwo and Dang (but she did not make any entry into the electronic medical record for that visit).  She recalled that encounter and described his condition in stark contrast to how Ogunsanwo described the same encounter.  According to Ogunsanwo, Dang was brought into the exam room in a wheelchair; told him that he was not steady on his feet when he attempted to walk; felt weak; thought it might be because of the muscle relaxer; and told him that he had a headache and neck pain for some time. (Doc. 147 at 77:16-78:6).   Ogunsanwo described that Dang's speech was "barely

audible and slurred but intelligible." *Id.* at 78:11-13.)  Finally, Ogunsanwo claimed that Dang denied any "bizarre behavior," and further stated that,

> Because when they brought the patient to me, they told me what he had been doing.  And I asked him whether he had been doing those things, and he said, "No, I wasn't bizarre.  I was not complaining of anything that would make them think I was bizarre."

*Id.* at 78:20 – 79:11.)

If one is to believe Ogunsanwo's testimony, when he saw Dang on February 23, 2012, Dang was able to communicate with him and Ogunsanwo was able to obtain intelligible, verbal responses to various questions.  Yet, according to Preston-Mayle's testimony, Dang was brought into the exam room slumped over in a wheelchair; had a glazed look in his eyes; and he "was speaking, but nobody understood him too well." (Doc. 143 at 49:15-20; p.53, l.22 – p.54, l.1.)  She further testified that she did not take Nam's vital signs and assumed they were taken by another nurse before bringing him into the exam room. *Id.* at 49:22-50:2, and that he stayed in the exam room "for quite a while."  *Id.* at  53:3-4.

During Ogunsanwo's examination on February 23, 2012, Dang had a temperature of 99[3], his blood pressure was 102/64, and he was lethargic. Ogunsanwo tried to do a fundoscopy to examine Dang's eyes, but it was a

---

[3] Dr. Ogunsanwo testified that a temperature of 99, 100, and above would be a concern. (Doc. #147, Ogunsanwo Depo., p. 91, ll.24-25.)

"difficult examination." (Doc. 147, at 79:13-23). He noted that Dang's speech was impaired and he had diminished power and tone in his extremities. *Id.* at 81: 13-19) Ogunsanwo administered a "neck stretch" which is often done if one suspects meningitis, and had a "equivocal result," which he defined as neither positive or negative, nor could he say it was normal. *Id.* at 81:20-24. Based on his assessment, he determined that "there was something really wrong that could be meningism or meningitis or an intracranial lesion." *Id.* at 82:4-9. Despite Dang's serious condition at this time, Ogunsanwo didn't believe his condition warranted calling 911. In fact, he testified that

> Well, I would call 911 if somebody is in a dire situation.
> I don't believe he was in a dire situation. I did believe he
> needed to be seen, but not as an emergent case that
> warranted an EMS 911 call.

*Id.* at 83: 9-20.

### Brenda Preston-Mayle, R.N.

Brenda Preston-Mayle, R.N. was a registered nurse employed by the Seminole County Sherriff's Office. (Doc. 143 at 8: 2-7). Preston-Mayle administered the history and physical of Dang on February 7, 2012. (Doc. 130-1 at 18-25) Preston-Mayle stated that the encounter with Dang began at approximately 9:58 a.m. (Doc. 143 at 37: 5-14.) According to her medical note, she completed and approved the history and physical at 10:11 a.m., 13 minutes later. (Doc. 130-1 at 18-25). On

February 7, 2012, Preston-Mayle was aware that he was having severe headaches and that they were occurring frequently (Doc. 143 at 39: 3-8); that he was having vision and hearing problems associated with the headaches, *id.* at 40:21 – 41:8; that he reported back and neck problems, *id.* at 41: 9-11); that she was aware that he was on Motrin since January 30, 2012, *id,* at 44: 8-17; and that although Dang weighed 140 pounds at the time of his initial intake screening, she recorded a weight of 132. *Id.* at 41:8 – 42: 8.) (This reflects that Dang lost almost 6% of his body weight in 11 days.) Once completed, the history and physical is sent to the physician for review. *Id.* at 26:22 – p. 28: 8.

Preston-Mayle's practice is to review the initial intake screening to see if detainees answered "yes" to any pertinent information, "because they don't always tell the truth when they come in to see you." *Id.* at 21: 21 – 22:3.[4] Moreover, a review of the history and physical form is notable in that it does not inquire about emergency room visits: rather, it only inquires whether the detainee has had any recent hospitalizations, to which Dang appropriately answered "no." (Doc. 130-1: 18-25.)

**Alecia Scott, L.P.N.**

---

[4] During the intake on January 26, 2012 L. Parker asked Nam if he had a emergency room (ER) or hospital visit **in the last 12 hours** to which Nam appropriately responded "no. (Doc. #130-1, p. 30)

Alecia Scott is employed by the Seminole County Sheriff's Office as a licensed practical nurse (LPN). (Doc. 164, Exhibit 11, Scott Depo., at 7:13 – 8:3.)  At times she has worked in the role as a "charge nurse" at the jail at the request of the Director of Nursing. *Id.*  at  8:4–9:5 & Ex. 11. She was working at the jail on the night of February 9, 2012 when she received a call from a correctional officer who reported  there was a detainee who was complaining of a headache;  Scott was also asked if officers could bring him up to medical.  She testified that she got Dang's name and reviewed his chart.  From her chart review, Scott learned Dang had previously seen the doctor. *Id.* at p. 20: 7-14 & Ex. 11.  She described  Dang's visit as an "emergency walk-in." *Id.*  at 17: 17., Ex.  11.

Scott stated that she spent about 15 minutes with Dang. *Id.*  at  25:7-10.   He told her he was upset because of his headache and that "nobody was helping him." *Id.* at  25:11-16, Ex. 11.  She noted that he had a fever of 101.5. (Doc. 130-1: 17-18; *see also* Doc. 164 at 26:14- 23.)  She administered the medication that was already prescribed for Dang, told him that was all they could do for him, and sent him back to his Pod.  (Doc. 164 at 55:2-4, Ex. 11).   Shortly after Dang left the medical unit, she heard something out in the hallway.  She went out to the hallway and saw Dang on the floor against the wall.  She testified that the correctional officer told her that he "snatched away and just slid down the wall and sat on the

floor." *Id.* at 31:10-14, Ex. 11. Dang did not respond verbally. *Id.* at 31:22-24. She describes his behavior in the hallway as "bizarre." (Doc. 130-1: 17-18; *see also* Doc. 164 at 32:1, Ex. 11).

Scott threatened Dang by telling him he would be put on suicide watch if he "didn't get up" or "if that was how he was going to behave." (Doc. 164 at 32:3-4, Ex. 11; *see also* 57: 11-20.) She then decided on her own to send Dang to mental health segregation. Scott's directive to house Dang in segregation for mental health observation was based on her own decision making and without doing any segregation assessment, as required. *Id. at* Exhibit 12, Sheriff's Policy and Procedure §10.01(VII)(B); *see also id.,* Exhibit 11, Scott Depo. at 32: 10-23.)[5] Scott made this decision despite the fact that she had reviewed Dang's medical chart and saw that he was already seen by the doctor for headaches, and knowing from her own encounter with him that he was running a high fever, had neck pain and a headache, and complained that "nobody was helping him." *Id.* at 20: 9-12: 35:14-20, Ex. 11) In addition to conceding her knowledge of Dang's serious medical condition, including the combination of headache, neck pain and fever,

---

[5]Mental health observation, house alone (MHO) is considered segregation and would trigger a required segregation assessment which was to be done before sending an inmate/detainee to segregation. The segregation assessment was to be completed by the medical personnel and could be a nurse. (Doc. #164, Exhibit 10, Densmore Depo., p. 31, l. 14 – p. 32, l. 9.)

Scott's indifferent attitude was evident when asked the following:

> Q: …in a patient who has a combination of fever, headache, and neck pain, that's not out of the ordinary?
>
> A: Basically, I mean, to me, that's semantic. I don't know if this patient is really experiencing these things. The only thing that I can go by is basically is appearance and his behavior.

*Id.* at 66:17-24, Ex. 11. Even taking into consideration Nam's "behavior" as described by Scott, it is important to remember that she personally described his behavior as "bizarre."

Pursuant to the Sheriff's own policies and procedures, "bizarre behavior" is considered an "emergency health situation." *Id.* at Exhibit 13, Jail Policy 13.04) Specifically, policy 13.04 defines Emergency Health Situation as "[a]ny life or health threatening event such as severe bleeding, unconsciousness, serious breathing difficulties, **severe pain**, head injuries, suicide attempts, severe burns, **sudden bizarre behavior**, diabetic complications, child birth or death." (Emphasis added). Moreover, the Sheriff's Protocol #18 regarding Sick Call Procedures states that an emergency sick call visit, whether it is inmate- or staff-initiated, is defined as "[a]ny presenting medical or mental health condition that will subject the inmate to substantial risk of personal injury or serious degradation of health status." *Id.* at Exhibit 14, Jail Protocol #18. The health care encounters

21

on both February 9, 2012 and the code orange on February 20, 2012 were considered "emergency" encounters, and by the Sheriff's own definition that means that Dang was at risk of personal injury or serious degradation of health. Furthermore, given the description that Dang sought medical care due to severe pain and exhibited "bizarre" behavior, under the Sherriff's own definition, these conditions were considered an "emergency health situation."

Pursuant to the Florida Nurse Practice Act, only a Registered Nurse (R.N.) has the ability to assess and develop a plan of treatment for a patient.[6] Scott not only was acting outside the scope of her clinical licensure as a LPN when she evaluated Dang on February 9, 2012 and unilaterally decided to send him to segregation without completing the required segregation assessment, she also described working as a charge nurse pursuant to the request of the Director of Nursing.

It was not until the deposition of Defendant Sharyle Roberts, LPN that Plaintiff learned that Nurse Scott was also present during the medical emergency/code orange event that occurred on February 20, 2012. (Doc. 165 at

---

[6] See discussion regarding LPN scope of practice, pp.38-42 *infra*.)

19:9–10, Ex. 1)[7] The nurse scheduling sheets further show that Scott was working on the medical unit during the night shift on February 20, 2012. (Doc. 164, Exhibit 15)

**<u>Sharyle Roberts, L.P.N.</u>**

Sharyle Roberts, LPN was employed by the Seminole County Sherriff's Office as a licensed practical nurse (LPN) in early 2012. (Doc.165 at 10: 2-19, Ex.1) At times she has worked in the role as a "charge nurse" at the jail. *Id.* at 32:11-14, Ex. 1. She was working at the jail on the night of February 20, 2012 when she received notification of a "code orange" regarding Nam Dang.[8] A "code orange" is when an inmate has a medical emergency. (Doc. 164, Exhibit 17, 22:3-18.) According to the electronic medical record entry, the code orange was made at approximately 11:15 p.m., and Nurse Roberts arrived at the scene (D-pod hallway) at 11:17 p.m. Roberts could not state how long she spent with Dang in the medical unit waiting room which she described as evaluating him in medical;

---

[7] The testimony of Nurse Roberts along with the fact that the nursing schedule shows that Nurse Scott was working that night is sufficient evidence to support a finding and/or inference that Nurse Scott was present and involved in the code orange event on the night of February 20, 2012.

[8] According to the nurse schedule for February, 2012 (night shift), there was no RN scheduled to work on the night shift of 2/20/12 and the notation of "CHG" was made for Nurse Roberts on that shift which is believed to represent and/or infers that she was acting as the charge nurse for that shift. In addition, the nurse schedule shows that Nurse Scott was working on that same 2/20/12 night shift.

however, according to the segregation watch sheets, he was already in cell number MC05A in the infirmary at 11:45 p.m. (Doc. 164, Exhibit 16)

Roberts described her observation of Nam Dang as follows: he was in a wheelchair; he was "attempting to appear passed out"; he was non-verbal and drooling; his temperature was 99; he had "fluttering eye syndrome"[9]; and he "kept attempting to slide to the floor." (Doc. 165 at 44:19 – p. 45: 2, Ex. 1; *see also* 22:8-11.) She also claimed that Dang "did the same thing two weeks ago." *Id.* at 45:1-2, Ex. 1. Roberts testified that it was Nurse Scott who advised her that Dang "did the same thing two weeks prior." *Id.* at 25:19–26:3.) Roberts explained that Dang appeared to be passed out. *Id.* at 45:7-10. Despite the serious and grave condition that Dang was in at the time of the code orange alert, Roberts evaluated him (which was outside the scope of her practice as a LPN pursuant to the Florida Nurse Practice Act and the Sheriff's own policies and procedures), deliberately decided he was faking his symptoms, and referred Dang to the mental health unit. While Roberts had Dang placed in an infirmary cell, she neither called the

---

[9] Fluttering Eye Syndrome is a slang medical term describing a patient who is attempting to fake unconsciousness. See http://acronymsandslang.com/definition/4699951/FES-meaning.html. Nurse Roberts confirms the use of this term by agreeing that it meant that she believed Nam Dang was looking around to see if anybody was looking at him or if they had stopped talking he would open his eyes and look around. (Doc. #165, Exhibit 1, Roberts Depo., p. 46, ll.9-13.)

physician nor instituted a doctor sick call. *Id.* at 26: 4-6) Subsequently, according to the nurse schedule, Roberts also worked the following night (February 21, 2012) as the charge nurse (Doc. 164, Exhibit 15). Despite the facts that: 1) Nam was cleared of any psychiatric issues by Dr. Westhead earlier that day (Doc. 130-1, at 9-10), and 2) Roberts was required to do nurse rounds and check on the infirmary patients during her shift (Doc. 164 at 18:4-7, Ex. 10), there is no documentation that Roberts checked on Dang that shift. Instead, she ignored him and left him to languish in his cell for yet another day. [10]

**Martha Densmore, R.N**.

Martha Densmore is employed by Seminole County Sherriff's Office as a registered nurse. (Doc. 164 at 5:16-25, Ex. 10) She was the charge nurse in the jail infirmary during the day shift on February 22, 2012 and February 23, 2012. *Id.* at 15:14-17, Ex. 10. Densmore's first encounter with Dang was in the morning of February 22, 2012. *Id.* at 17:1-4, Ex. 10. Densmore saw Dang at approximately 8:40 a.m., and spent about 5-10 minutes with him. *Id.* at 52: 5-7). By this time, Nam was already cleared by psychiatry. [11] She recalls that Dang was in a "boat" (a

---

[10] There are no call lights in the infirmary cells which allow inmates/detainees to seek help. (Doc. #164, Exhibit 10, Densmore Depo., p. 24, ll. 18-21.); see also discussion, pp. 49-50, *infra.* ).

[11] In finding that Defendants are entitled to summary judgment, the trial Court emphasized key facts material to the issue of deliberate indifference in this case,

hard plastic item used as an extra sleeping surface in the event of insufficient beds) on the floor of his cell. *Id.* at 51: 13-15, Ex. 10. Densmore recalls that Dang tried, but was unable, to sit up, and instead would only rock back and forth. *Id.* at p. 52:5-20, Ex. 10.  At one point, she recalls, he just rocked and fell backwards.[12] *Id.*

---

erroneously describing each as undisputed.  Throughout the trial court's Order, the assessment of Nam Dang documented by Dr. Westhead in the John E. Polk Correctional Facility and her corresponding deposition testimony are referred to and treated as undisputed fact. (Doc. 184 at 7, 15) To the contrary, the record evidence puts her assessment in dispute and was wholly ignored by the trial court in its Order.  The affidavit of Anthony Laird (who was Nam Dang's cell-mate in the infirmary), the protective watch sheets, the testimony of Sarah Agurkis, and the opinion of the **defendants' expert**, Dr. Larsen, all contradict Dr. Westhead's assessment and conclusions based thereon.  First, a defense expert, Dr. Larsen, opined that Nam Dang was beginning to suffer from encephalitis as early as February 9, 2012 and that Nam Dang suffered a stroke on or about February 21, 2012. (Doc. 150) Certainly, a reasonable jury could conclude that Nam's ability to get up and communicate were not as Dr. Westhead describes.  This inference is further supported by the affidavit of Anthony Laird who stated Nam was never able to communicate. (Doc. 164-18)  Sarah Agurkis testified that, when she saw Nam Dang on February 19, 2012, he was delusional and in severe pain. (Doc. 164-19, p.35, l.8 – p.37, l.6).  Moreover, the protective watch sheets clearly contradict Dr. Westhead's testimony.  Specifically, Dr. Westhead adamantly testified that there was no correctional officer in the area while she attempted to talk to Nam Dang **through the cell door** from 11:40 a.m. – 11:50 a.m., yet the protective watch sheets show that a correctional officer was present at Nam's cell at 11:45 a.m. (Doc. 164-16) A determination of the weight and credibility of the witnesses is for the jury to assess.  As such, Nam Dang is entitled to the presumption of fact and reasonable inference that his condition was far worse on February 21, 2012 than that described by the Defendants' employees and Dr. Westhead, and despite his serious condition, they ignored him.

[12] Nurse Densmore later testified that she thought Nam may have been going through withdrawals from something because of his rocking.  (Doc. #164, Exhibit 10, Densmore Depo., p. 81, ll.16-18.)  This is consistent with the observations of

at 51:18-20, Ex. 10. Because of Dang's inability to sit up, Densmore had to take his vital signs while he was lying down. *Id.* at 51:10-12, Ex. 10. Despite the fact that Dang could not sit up for vitals, Densmore claimed that this did not concern her. *Id.* at 51: 21-24, Ex. 10. Moreover, she stated that she observed Dang getting up, but noted he was unsteady. *Id.* at 56:19-20, Ex. 10. She did not observe Dang doing his activities of daily living, and assumed he did them on his own. *Id.* at 83:10-18, Ex. 10. However, the nurse's note at 7:53 a.m. on February 21, 2012 stated that a nurse had to provide assistance to Dang with his "activities of daily living" (ADLs), and further stated that the nurse provided total care for his ADLs. (Doc. 130-1 at 10).

The following day, February 23, 2012, Densmore saw Dang again during her morning rounds at around 8:30 a.m. *Id.* at 54:17-21, Ex. 10. She took his vital signs and he had temperature of 99. *Id.* at 55:2-6, Ex. 10. She noted that Dang had a headache for about two weeks and that his neck hurt. *Id.* at 55:10-12, Ex. 10. She did not observe Dang getting up in his cell on February 23rd. *Id.* at 56: 23-25, Ex. 10. She described Dang as pale, noted white patches on his tongue, and further agreed that it could be an indication of a thrush infection. *Id.* at 57:25-58:15).

---

Nam's cellmate, Anthony Laird. (Doc. #164, Exhibit 18, Affidavit of Anthony Laird)

At lunchtime on February 23, 2012, a correctional officer informed Densmore that Dang was in his cell trying to sit up at the toilet. Densmore observed Dang with his head lying on the toilet while he was trying to spit. He was incontinent of urine and was "very, very weak." *Id.* at 61:15-21, Ex. 10. She did not take vital signs at this time. *Id.* at p. 89:3-6, Ex. 10. Dang's cellmate, Anthony Laird,[13] told Densmore that Dang was putting his face directly into his tray when he tried to eat. *Id.* at 51:6-9, Ex. 10. Rather than calling 911, Nurse Densmore went to Dr. Ogunsanwo, since Nam had still not been seen by him. *Id.* at 63:11-15; *see also* p. 66: 2-24, Ex. 10) Densmore confirmed that 911 was not called, and Dang was transported in a patrol car to the hospital. *Id.* at 67: 3-21, Ex. 10.

Densmore described the role of nursing when a detainee was placed in segregation. She stated that nursing is expected to do a daily check on those who are segregation in addition to the routine medication pass. That check is supposed to be documented in the security watch sheets. *Id.* at 75:25–77:l-13, Ex. 10.

**Muthien Nguyen**.

Mythien Nguyen is the mother of Nam Dang. (Doc 149, Deposition of Ms. Nguyen) She was present at their home on the morning her son was arrested and

---

[13] See also, Doc. #164, Exhibit 18, Affidavit of Anthony Laird.

taken into custody by the Seminole County Sheriff's office on January 26, 2012. At the time he was taken into custody, Ms. Nguyen told the arresting officers that her son was having pain in his neck. She asked them for permission to give him some medication before they left, but the officers refused. The officers told her that they can take of that later for him. She then asked if she could put a Salonpas pain relief patch on Nam before they left. She was allowed to put a patch on her son, and she placed it on his neck before the officers took him away. She also testified that he didn't look good. (Doc. 149 at 19:16 – 21: 3.)

**Sarah T. Agurkis.**

Sarah Agurkis was Nam Dang's girlfriend. She visited him at the jail on several occasions. (Doc. 164, Exhibit 19, Agurkis Depo., 2-11) In particular, she visited with him on February 19, 2012, and was very concerned about his condition. After seeing Dang that day she asked staff at the jail to get him medical attention. She described him that day as being delusional (which she described as "seeing things"), in severe pain, and starting getting "black things" all over his face and hands. She testified, "You could tell he needed help." *Id.* at 35:8 – 37:6, Ex. 19. In response to her request to get Dang medical attention, Agurkis was told that he can wait until medical and to just go back to her visitation. She did not stay long due to Dang's condition. *Id.* at 37:7–23, Ex. 19. After leaving, Agurkis

continued to try and get him help by making several phone calls to the jail. *Id.* at 37:24 –38:11, Ex. 19. She also had her parents try to call the jail regarding Dang as well. *Id.* at 50:17-51:8, Ex. 19.

**Anthony Laird**.

Anthony Laird was Nam Dang's cell mate in the infirmary in February, 2012. Mr. Laird provided critical testimony through his affidavit as to Dang's condition during this critical time as well as the inaction of the medical staff to Dang. In his affidavit, Laird stated that, Dang was "unresponsive to any conversation; "appeared to mumble unintelligibly and drooled on himself"; "did not appear to be able to hold his head steady or in an upright manner; and "appeared to be in an extreme amount of physical discomfort." In addition, Laird was "never able to have any substantial conversation with Mr. Dang" and he "was very concerned with his health and well-being". His concern caused him to inform the medical staff several times, "but they never did anything to help him." It was his impression that the nursing staff "didn't care about Mr. Dang, didn't take his condition seriously, or that he was faking being sick." (Doc. 164-18).

C.  *Summary: Time Line*

[1]  On January 26, 2012 Nam Dang was arrested at home without incident. At this time he was being taken into custody, his mother told the arresting officers that he was sick. (Doc. #149, Nguyen Depo., p. 19, l. 16 – p. 21, l. 3)

[2]    On January 29, 2012, Nam Dang requested a Nurse Sick Call for complaints of moderate to severe head and neck pain and neck stiffness. (Doc. #164, Exhibit 4)

[3]    On February 1, 2012, Nam Dang was seen by OLUGBENGA OGUNSANWO, M.D. for continued complaints of neck stiffness and pain and headaches.  (Doc. #130-1)

[4]    On February 7, 2012 Nam Dang continued to complain of frequent severe headaches and neck pain and further identified that he was now having vision and hearing symptoms associated with his severe headaches.  (Doc. #143, Preston-Mayle Depo. at. p. 39, ll. 3-8;  40, l. 21 – 41 l. 8)

[5]    On February 9, 2012, Nam Dang had an emergency sick call visit in the jail infirmary.  At that time he told the nurse nobody is helping him.  ALICIA SCOTT, LPN unilaterally decided to send Dang to mental health segregation.  (Doc. #164, Exhibit 11, Scott Depo. at 32, ll. 10-23)

[6]    Nam Dang remained in segregation for approximately eleven days (February 9 – 20, 2012). (Doc. #130-1)

[7]    A "code orange" (medical emergency) was called regarding Nam Dang on February 20, 2012.  (Doc. #164, Exhibit 17, Sweet Depo., p. 22, ll. 3-18.)

[8]    Nam Dang was moved to the infirmary after the code orange on February 20, 2012. (Doc. #165, Exhibit 1, Roberts' Depo., p. 26, ll. 4-6)

[9]    At approximately 7:53 a.m. on February 21, 2012 an infirmary nurse noted that Nam Dang needed assistance with his activities of daily living (ADLs). (Doc. #130-1, p. 10).

[10]    Nam Dang was cleared by psychiatry on February 21, 2012. (Doc. #130-1, pp. 9-10)

[11] At approximately 11:15 a.m. on February 23, 2012 MARTHA DENSMORE, R.N. observed Nam Dang leaning his head into the cell toilet spitting into it and unable to hold himself up. She also noted he was incontinent of urine. (Doc. #164, Exhibit 10, Densmore Depo. at p. 61, ll.15-21).

[12] At approximately 12:07 p.m. Nam Dang saw OLUGBENGA OGUNSANWO, M.D. and was noted to have positive neurological deficits. (Doc. #130-1, pp. 7-8; see also Doc. #164, Exhibit 10, Densmore Depo., p.66, ll. 2-24.)

[13] Nam Dang was still in the infirmary at 12:47 p.m. 9-1-1 was not called to transport Nam Dang to the emergency room. Instead, he was taken to the emergency room in a regular patrol car. (Doc. #164 Exhibit 16; Doc. #164, Exhibit 10, Densmore Depo. at p. 67, 3-21.)

[14] A MRI scan of Nam Dang's head was taken while he was in the emergency room at Central Florida Regional Hospital and it showed that he had "extensive multiple acute and subacute infarcts". (Doc. #164, Exhibit 20)

[15] Nam Dang was diagnosed with cryptococcal meningitis during his February 23, 2012 admission to Central Florida Regional Medical Center. (Doc. #164, Exhibit 2)

[16] Nam Dang was released from custody of the Seminole County Sherriff's office on March 8, 2012. (Doc. #130-1, p. 1)

Ultimately, this case is not about determining the specific medical **cause** of Nam Dang's pain and complaints; but rather it is about how the Defendants ignored and disregarded the fact that Nam Dang was getting worse and deteriorating to the point of suffering day after day over his 28 day incarceration, and ultimately becoming unresponsive.

### III.   *Standard of Review*

A review of a district court's summary judgment ruling must be performed *de novo,* applying the same legal standards that governed the district court.

According to *Skop v. City of Atlanta*, 485 F.3d 1130 (11th Cir. 2007),

> We review a district court's grant of summary judgment *de novo*. *Kingsland v. City of Miami*, 382 F.3d 1220, 1225 (11th Cir. 2004). Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In making this determination, we "view the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-movant." *Kingsland*, 382 F.3d at 1226; *see also Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999). In making a qualified immunity determination, we are similarly obliged to review the facts in the light most favorable to the plaintiff. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *McClish v. Nugent*, 483 F.3d 1231 (11th Cir. 2007).

*Id*. at 1136. Reversing a judgment granting qualified immunity, the *Skop* court found that the district court "misapplied the clear dictates of our summary judgment law by assuming hotly contested facts against the non-moving party" and failed to draw inferences in the light most favorable to the plaintiff. *Id*. at 1140. Moreover,

> In conducting our review, we construe the evidence in favor of the plaintiff and decide whether the defendant is entitled to qualified immunity under the plaintiff's version of the facts. We acknowledge that the 'facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." Nevertheless, we view the facts from the plaintiff's perspective because the determinative issue on appeal is "not which facts the parties might be able to prove," but rather, whether 'certain given facts" demonstrate a violation of clearly established law.

*Claridy v. Golub*, __ F.3d ___, 2015 WL 7720312 (11th Cir. 2015) (Citations omitted.)

In *Tolan v. Cotton,* 572 U.S.__, 134 S. Ct. 1861 (2014), the Supreme Court addressed the legal standards applicable to the qualified immunity defense when raised on motions for summary judgment. The *Tolan* Court cautioned that, "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Id.* According to the *Tolan* Court,

> This is not a rule specific to qualified immunity; it is simply an application of the more general rule that a "judge's function" at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby,* 477 U.S. [242, 249 (1986).] Summary judgment is appropriate only if "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to a judgment of law. " Fed. Rule Civ. Proc. 56(a). In making that determination,

a court must view the evidence "in the light most favorable to the opposing party." *Adickes v. S.H. Kress & Co.,* 398 U.S.144 (1970); *Anderson, supra,* at 255.

*Id.*

The *Tolan* Court observed that, "Our qualified immunity cases illustrate the importance of drawing inferences in favor of the nonmovant, even when… a court decides only the clearly-established prong of the standard." *Id.* Also, "Courts must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions." *Id.*

The *Tolan* Court found that the appeals court failed to view the evidence in the light most favorable to the nonmovant at the summary judgment stage on the central facts of the case. *Id.* The court "fail[ed] to credit evidence that contradicted some of [the court's] key factual conclusions," and in so doing improperly weighed the evidence and "resolved disputed issues in favor of the moving party." *Id.* The *Tolan* Court concluded by observing that, because witnesses on both sides of a dispute often have their own perceptions, recollections, and biases, "genuine disputes are generally resolved by juries in our adversarial system. By weighing the evidence and reaching factual inferences contrary to [the plaintiff's] competent evidence, the court below neglected to adhere to the fundamental principle that at the summary judgment stage. *Id.* at 1868.

<u>**SUMMARY OF THE ARGUMENT**</u>

In its Order granting summary judgment, this Court treated as undisputed several material facts even though Plaintiff established a legitimate dispute thereof by identifying record facts that controverted the Defendants' version of those facts. In addition, this Court failed to consider the law of the Eleventh Circuit as established in the cases of *McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999), *Carswell v. Bay County*, 854 F.2d 454 (11th Cir. 1988), *Mandel v. Doe*, 888 F.2d 783 (11th Cir. 1989), and *Ancata v. Prison Health Services*, 769 F.2d 700 (11th Cir. 1985). The trial court accepted the Defendants' version of the facts which go the heart of the issue of deliberate indifference, ignored facts and reasonable inferences in favor of the non-moving party, unjustly took the factual disputes away from a jury, and erroneously entered summary judgment.

# ARGUMENT

## I.

### THE TRIAL COURT ERRED IN GRANTING THE INDIVIDUAL DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT ON THEIR AFFIRMATIVE DEFENSES OF QUALIFIED IMMUNITY

*A. The Fourteenth Amendment Standard for Pretrial Detainees is No Longer Deliberate Indifference.*

As an initial matter, the district court erred by rejecting Dang's argument that, in the context of Fourteenth Amendment claims by pretrial detainees, who of course are assumed not guilty and therefore, unlike prisoners, may not be punished, the deliberate indifference standard no longer applies. This is so because the deliberate indifference standard contains a subjective component, which the United States Supreme Court now rejects. The Court recently addressed the elements of a Fourteenth Amendment substantive Due Process claim by a pretrial detainee, as distinguished from an Eighth Amendment claim by a convicted prisoner. *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015).

The *Kingsley* Court determined that "[t]he language of the two Clauses [the Fourteenth and Eighth Amendment] differs, and the nature of the claims often differs," the Court reasoned, "[a]nd, most importantly, **pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less "'maliciously and sadistically.'"** *Id.* at 10-11. (Emphasis added.)

Although *Kingsley* obviously does not involve claims of constitutionally deficient medical care for pretrial detainees, the opinion has equally obvious application for all Fourteenth Amendment claims on behalf of pretrial detainees. The deliberate indifference standard contains both objective and subjective components. *Farrow v. West*, 320 F. 3d 1235, 1243 (11th Cir. 2003). The *Farrow* court observed that a plaintiff must first show evidence of an objectively serious medical need, and, referring to the subjective component, the plaintiff must prove that the official acted "with an attitude of deliberate indifference" to that serious medical need. *Id.* (quotations omitted). Thus, following *Kingsley,* a pretrial detainee alleging constitutionally deficient medical care at a jail, in contrast to a convicted prisoner alleging such care at a prison, must prove that he suffered an objectively serious medical need to which jail officials acted with attitudes of objective unreasonableness.

In *Castro v. County of Los Angeles,* 797 F.3d. 654 (9th Cir. 2015), the Ninth Circuit recently addressed the question whether the objective *Kingsley* standard applies to pretrial detainees' Fourteenth Amendment claims outside the excessive force standard. (In *Castro,* the detainee's claim was that jail officials failed to protect him from harm from other detainees.) The panel's majority decision applied the traditional deliberate indifference standard. In a concurring opinion, Judge Graber concluded that *Kingsley*'s ruling rejects the deliberate indifference

standard altogether for pretrial detainees alleging violations of the Fourteenth Amendment. On December 28, 2015, the Ninth Circuit granted the detainee's petition for rehearing en banc on this issue.

In *Johnson v. Clafton,* 2015 WL 5729080 (E.D. Michigan, Sept. 30, 2015), similarly, the district court observed that, in a jail inadequate medical care case, *Kingsley* may well have jettisoned the deliberate indifference standard, but concluded that the issue need not be resolved in the case, holding that the pretrial detainee satisfied the deliberate indifference standard as well. In *Saetrum v. Raney,* 2015 WL 4730293 (D. Idaho, Aug. 7, 2015), the district court similarly in *Collins v. Al-Shami,* 2015 WL 5098533 (S.D. Ind., Aug. 31, 2015), the court reasoned that a pretrial detainee's argument that *Kingsley* means that Fourteenth Amendment claims of inadequate medical care must be evaluated using an objectively unreasonable standard, not deliberate indifference, was well-taken. (However, the court determined that the plaintiff would fail under the new standard, anyway.)

 B. *Violation of the Fourteenth Amendment Under the Deliberate Indifference Standard*

Under the clearly established law that existed at the time of Nam Dang's detention, a reasonable nurse and physician working at the John E. Polk Correctional Facility would have known that failing to adequately investigate and treat a serious medical need violates a detainee's constitutional rights.

Generally, "[w]hether a particular defendant has subjective knowledge of the risk of serious harm is a question of fact 'subject to demonstration in the usual ways, including inference from circumstantial evidence, and a fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Goebert v. Lee County*, 510 F.3d 1312, 1327 (11th Cir. 2007)(quotation omitted). The issue is not whether the Defendant nurses had subjective knowledge of Nam Dang's meningitis; rather, it is whether they had subjective knowledge of his need for medical care. *Carswell v. Bay County*, 854 F.2d 454 (11th Cir. 1988).

Eleventh Circuit precedent clearly supports a conclusion that, **under the Plantiff's version of the facts**, Nam Dang's Fourteenth Amendment rights were violated. In *Ancata v. Prison Health Services,* 769 F.2d 700 (11th Cir. 1985), the Eleventh Circuit reversed a district court's order denying a pretrial detainee's deliberate indifference claim. *Id.* at 706. The detainee's estate alleged that, nine days into his pretrial detention, he began to suffer from swollen ankles, an inability to sleep, chills, tingling and numbness in his hands, hyperventilation, severe back and leg pain, and double vision. *Id.* at 702. He alleged that a doctor and three nurses at the jail did little or nothing to evaluate his medical need, other than administering Ben Gay and Tylenol, and suggesting an orthopedic or psychiatric evaluation. *Id.* Court-ordered orthopedic and neurological examinations finally

occurred due to the detainee's continued medical deterioration after which the detainee was hospitalized. *Id.* Finally diagnosed with leukemia, he died in the hospital. *Id.*

The *Ancata* court observed that, "'Deliberate indifference to serious medical needs is shown when prison officials have prevented an inmate from receiving recommended treatment or when an inmate is denied access to medical personnel capable of evaluating the need for treatment. "" *Id.* at 704 (quotation omitted). Also, in the event of serious medical problems, cursory care, like prescribing only aspirin, may effectively amount to no care at all, and thus violates the Fourteenth Amendment. *Id.* The detainee's experience in *Ancata* is materially identical to Nam Dang's experience here.

Similarly, in *Carswell v. Bay County*, 854 F. 2d 454 (11th Cir. 1988), the Eleventh Circuit found that the facts supported a finding of a Fourteenth Amendment violation. In *Carswell,* a pretrial detainee indicated during the jail's medical screening procedure that he was not suffering from any illness, or taking any medication, and he was not administered a physical examination. *Id.* at 455. Over the next three months, however, the detainee repeatedly requested medical attention and medication for skin rashes, constipation, and significant weight loss. *Id.* Although he was given occasional doses of milk of magnesia, jail medical personnel labeled him a "complainer," and usually ignored his medical complaints.

*Id.* On two occasions, a physician's assistant provided medication for a rash and for tonsillitis and constipation, but the detainee continued to complain about health problems *Id.*at 455. The detainee was finally admitted to the hospital, where he was diagnosed with diabetes. *Id.* He was then treated at the hospital for two months before recovering. *Id.*

The jury in *Carswell* found that the administrator, the physician's assistant, and the private doctor under contract with the jail were all deliberately indifferent to the detainee's serious health needs. *Id.* at 456. The *Carswell* court affirmed the jury's findings that the administrator and the physician's assistant were deliberately indifferent. *Id.* Relying on *Ancata*'s holding that knowledge of the need for medical care and intentional refusal to provide that care constitutes deliberate indifference, the *Carswell* court affirmed the verdict. *Id.* Again, Dang's experience at the jail is materially indistinguishable from the detainee's experience in *Carswell.*

In *Mandel v. Doe*, 888 F. 2d 783 (11th Cir. 1989), the Eleventh Circuit affirmed a finding of deliberate indifference against a Florida county responsible for providing medical care to an inmate at its road prison. *Id.* at 784. In *Mandel,* a physician's assistant was assigned to provide medical care at the facility; although supervision by a physician was contemplated, a custom and practice developed so that the assistant was not supervised or his actions reviewed by a doctor. *Id.* at 785.

Considering only the County's liability at trial, the jury found in the inmate's favor on his deliberate indifference claim. *Id.* The *Mandel* court found significant evidence of a serious medical need and grossly deficient treatment. *Id.* The *Mandel* court found ample evidence of a serious medical need in which the inmate complained of an inability to bear weight on his leg and observations by the corrections officer and the assistant consistent with those complaints. *Id.*

Relying on *Ancata* and *Carswell*, the Eleventh Circuit noted that knowledge of a need for care and the intentional refusal to provide that care amounts to deliberate indifference. *Id.* In *Mandel,* the court found sufficient evidence that the assistant was well aware of the inmate's medical problem, yet "never took the appropriate measures to ensure that [the inmate] received adequate medical treatment." *Id.* at 789.

The Eleventh Circuit found that the evidence was even more illustrative of deliberate indifference than the facts in *Carswell. Id.* The assistant in *Mandel* was completely indifferent to the inmate's worsening condition. *Id.* He ignored repeated indications that the inmate's condition was far more serious than the assistant's diagnoses- bone and muscle inflammation – suggested. *Id.*

The *Mandel* court concluded that a physician's assistant could not be expected to correctly diagnose every problem brought to his attention. *Id.* "However," the court summarized, "his persistent refusal to order an x-ray, or to

refer Mandel to a doctor or a hospital for more experienced and knowledgeable treatment, coupled with his utter lack of concern for the well-being of an inmate with whose care he had been entrusted, constitutes precisely the deliberate indifference not tolerated by the Constitution." *Id.* Again, the facts in *Mandel* are materially similar to the facts of this case, under the Supreme Court's standard of *Hope v. Pelzer.*

In the *Carswell* case, the subjective knowledge element was satisfied even though the jail medical staff did not diagnose nor were they aware that the detainee had diabetes. *Carswell*, 854 F.2d at 457. Similarly, in the case of *McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999), the Eleventh Circuit concluded that a jail physician and nurse had subjective knowledge of a detainee's serious medical needs when he made complaints of severe pain that were not resolved through the minimal treatment, and continued to worsen. Similar to the instant case, this finding was made despite the fact that the defendants did not diagnose, nor did they know, that the detainee had cancer. Specifically, the court stated:

> Although Dr. Foley did not diagnose Elmore's condition as cancer and did not know that he had cancer, a jury could find that Dr. Foley and Wagner were aware of the tremendous pain and illness that Elmore was suffering from at the very outset of his incarceration. Dr. Foley's examinations, infrequent as they were, as well as Elmore's nearly constant complaints about the pain he was having, addressed to both Dr. Foley and nurse Wagner, were sufficient to create a question for the jury whether Foley and nurse Wagner were aware of a substantial risk of harm to Elmore.

*Id.* at 1256. The *McElligott* court found that the both the jail physician and nurse were aware that the detainee was "vitally in need of medical treatment to address his pain" and that a reasonable jury could conclude that they acted with deliberate indifference as to his "need for further diagnosis of and treatment for the severe pain he was experiencing". *Id*. at 1256-57.

Based on the facts it found in the record at the summary judgment stage, the district court concluded that each individual defendant did not act with deliberate indifference as to the serious medical need of Nam Dang. The district court's conclusions were erroneous as they accepted the defendants' version of numerous material facts, ignored facts raised by Plaintiff, made assumptions not in favor of the non-moving party and ignored the law of this Circuit.

> *A. The issue of whether the LPN defendants (Wilt, Scott and Roberts) were acting within their discretionary authority was in dispute and therefore summary judgment was inappropriate.*

The trial court made a factual determination that the licensed practical nurses (Wilt, Scott and Roberts) acted within their discretionary authority in their treatment of Dang. Dang raised facts that call this material issue into question.

The Eleventh Circuit had defined "discretionary authority" to include all actions of a governmental official that (1) were undertaken "pursuant to the performance of his duties", and (2) were "within the scope of his authority". *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988). Before a defendant can reach a substantive

evaluation of the qualified immunity defense, one must first prove that "'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. "" *Id*. at 1563, citing *Zeigler v. Jackson*, 716 F.2d 847 (11th Cir. 1983).

Pursuant to the Florida Nurse Practice Act,[14] only a Registered Nurse (R.N.) has the ability to assess and develop a plan of treatment for a patient. *See* §464.003(20), *Fla. Stat*. (Doc. 164, Exhibit 5). To the contrary, the scope of practice described under the Florida Nurse Practice Act does not provide such authority for a Licensed Practical Nurse (LPN) such as Wilt, Scott and Roberts. *Id.* at §464.003(19), *Fla. Stat.* Importantly, §13.05(D) of the Jail's Policies and Procedures states as follows (Doc. 165, Exhibit 2):

> The Health Care Administrator will ensure that state licensure or certification requirements and restrictions shall apply to health care personnel working in the Facility the same as those working in the community. Health care personnel will not perform any tasks beyond those permitted by their credentials.

The Florida Nurse Practice Act sets forth the specific parameters and scope of practice for both LPNs and RNs. See generally §§464.003(16) – (20), *Fla. Stat.* (Doc. 164, Exhibit 5). The scope of a LPN is set forth in sub-section (19), and the scope of a RN is set forth in sub-section (20). Critically, while a LPN has the authority to administer medication and treatments, only a RN had the authority to

---

[14] The Florida Nurse Practice Act is found at §§464.001-464.027, *Fla. Stat*.

observe, assess, make nursing diagnoses, plan, and evaluate care. The Sheriff's job descriptions for both LPNs and RNs clearly state that each respective position must be construed in accordance with the "scope of practice and licensure." (Doc. 164, Exhibit 7 & 8)The Court stated in its Order that the language contained within the Florida Nurse Practice Act does not prohibit LPNs from performing assessments or preparing care plans. (Doc. 184, Order, p.10, FN 12) However, the record evidence establishes a question of fact as to the scope of practice for a LPN and, further, that Defendants WILT, SCOTT and ROBERTS acted well outside of the scope of practice allowed under Florida law.

Nowhere in the definition of the scope of practice for a practical nurse (LPN) does it permit independent assessment of patients or development of a plan of care. The statute provides for two separate items that are stated in the disjunctive. First a LPN may administer treatment and medication in the care of the ill, injured or infirm and second, they can promote wellness, maintenance of health and prevention of illness of others **under the direction of a registered nurse or physician**.

The scope of practice describes **what is permitted** and the fact that independent assessment and development of a plan of care is not included in the description of a LPN practice (but is included in the scope of a professional nurse (RN)) clearly establishes evidence that an LPN is not permitted to perform

independent assessment of a patient or develop a plan of care. To the extent that the provision that a LPN can promote "wellness, maintenance of health, and prevention of illness" she is not permitted to do that independently, rather, as the statute clearly states, **she can only do so** "under the direction of a registered nurse, a licensed physician, a licensed osteopathic physician, a licensed podiatric physician, or a licensed dentist". (*See* §464.003(19), Fla. Stat., Doc. 164-5). The record evidence is clear that Defendants Roberts and Scott were acting in a charge nurse role during the night shifts and further that there was no registered nurse or licensed physician whom directed, reviewed or oversaw the assessments and critical medical decision making they made regarding Nam Dang. (Doc. 164-11, p.8, l. 4 – p. 9, l. 5; Doc. 165-1 p.32, ll. 11-14; Doc. 164-15)  Finally, Plaintiff offered expert opinion testimony regarding the scope of an LPN practice. (Doc. 164-23, p. 3)

A reasonable jury could conclude that the assessment and plan of care Wilt, Scott and Roberts put in place independently and without the necessary oversight of a registered nurse or physician were beyond the scope of their respective LPN license. It is further reasonable to conclude that by acting outside the scope of their practice, Nam Dang was prevented from seeing health care providers that were better trained to recognize that Nam Dang's condition was not only serious but that he urgently needed treatment. The trial court, however, erroneously

weighed the evidence and made a factual determination as to these issues that was contrary to the facts as seen in the light most favorable to the plaintiff.

   *B. The trial court erroneously concluded that each individual defendant did not act with deliberate indifference as to the serious medical needs to Dang.*

In *McElligott,* the Eleventh Circuit discusses the underlying principle of a prison medical care claim as follows:

> A core principle of Eighth Amendment jurisprudence in the area of medical care is that prison officials with knowledge of the need for care may not, by failing to provide care, delaying care, or providing grossly inadequate care, cause a prisoner to needlessly suffer the pain resulting from his or her illness.  In *Estelle,* the Supreme Court recognized that the Eighth Amendment requires the government "to provide medical care for those whom it is punishing by incarceration" precisely because the failure to do so "may actually produce physical 'torture or a lingering death'" or, "[i]n less serious cases, …may result in pain and suffering which no one suggests would serve any penological purpose.

*Id*. at 1257 (Citations omitted.)

The Eleventh Circuit has repeatedly recognized that failing to treat an inmate's pain is a "constitutionally cognizable injury".  *Id*. at 1257.  Plaintiff has identified sufficient record evidence to support a finding or inference that Defendants did nothing to address the continuing complaints of pain and other symptoms, including ongoing, increased temperature/fever and bizarre behavior associated with meningitis and chose not to further assess or investigate the cause of Nam Dang's worsening complaints until the damage was catastrophic.

When a §1983 claim involves an injury due to delay in medical treatment, the Eleventh Circuit generally considers (1) the seriousness of the medical need; (2) whether the delay worsening the medical condition; and (3) the reason for the delay. *Goebert, supra,* 510 F.3d at 1327. Appellant has sufficiently identified facts to support each of these considerations. Appellant has further shown that Nam Dang's worsening condition went ignored because unqualified staff determined that he was faking his symptoms rather than addressing his clear medical needs.

As described more fully below, Appellant's facts sufficiently support a reasonable basis for deliberate indifference and that the defendants' actions were the cause or moving force behind the events leading up to the devastating effects of the significant delay in diagnosing and treating his meningitis.

### 1. *Deliberate Indifference of Nurse Wilt.*

Because there is a material issue of disputed fact as to whether Nurse Wilt was acting within her discretionary authority, she was not entitled to summary judgment based on her qualified immunity defense. However, even assuming *arguendo* that she was acting within her discretionary authority, the Court further erroneously concluded there was no dispute as to whether she acted with deliberate indifference as to the serious medical needs to Dang[15].

---

[15] The issue of whether Dang had a serious medical need was not contested and the trial court assumed that Dang demonstrated an objectively serious medical need. (Doc. 184, p. 11.)

The trial court concluded that Nurse Wilt did not "ignore his complaints" or "refuse to treat him" and further concluded that she "took appropriate steps to address Dang's complaints." (Doc. #184, p. 12). However, the trial court ignores critical facts that raise a question of fact as to whether she acted with deliberate indifference. At the time of her encounter with Nam Dang, Nurse Wilt was made aware that he had complaints of moderate to severe head and neck pain and a stiff neck. (Doc. #164, Exhibit 4; see also Doc. #142, Wilt Depo. at 28, ll.15-17). Based on his complaints, and acting outside the scope of nursing practice under Florida law, Nurse Wilt did an assessment, evaluated Nam Dang's condition and created a plan to treat him by ordering Motrin. (Doc. #142 at p. 28, l.18 – p. p.30, l. 9). Nurse Wilt stated that she never touched Nam during the examination, nor did she take any vital signs. (Doc. #142 at p. 29, l. 13, p. 39, l. 23-24). Nurse Wilt further testified that, in general, if an inmate has complaints of moderate to severe head and neck pain and a stiff neck, she would take vital signs; however, inexplicitly she did not do that for Dang. (Doc. #142 at p. 16-24).

A jury could reasonably conclude from this evidence that Nurse Wilt knew she needed to do more than just cursory care based on Dang's complaints yet she failed to do so. This establishes a question of fact as to whether she acted with deliberate indifference to Nam's serious medical need. Her cursory treatment contrary to what she knew should have been done and based on an improper

assessment is for the jury to consider.

### 2. *Deliberate Indifference of Nurse Preston-Mayle.*

The trial court concluded that Nurse Preston-Mayle did not act with deliberate indifference to Dang's medical needs. However, this determination was based upon those facts favorable to Nurse Preston-Mayle and importantly ignored facts and reasonable inferences therefrom that raise a question of fact as to her treatment of Dang.[16]

Specifically, Nurse Preston-Mayle performed a history and physical on Nam Dang on February 7, 2012. (Doc. #130-1, pp. 18-25) The record evidence presented shows that Nurse Preston-Mayle not only knew of Dang's complaints she also was aware that he had new, worsening symptoms (vision and hearing problems) associated with the headaches and significant weight loss. Despite her knowledge that Dang's condition was worsening and he continued to have significant pain, she merely allowed Dang to return to general population with no attempt to further evaluate his deteriorating condition. The record evidence clearly establishes a genuine issue of material fact as to whether Nurse Preston Mayle acted with deliberate indifference to Dang's serious medical need.

### 3. *Deliberate Indifference of Nurse Scott.*

---

[16] Nurse Preston-Mayle was not entitled to a failure to mitigate damages affirmative defense. To the extent that the trial court relied upon record evidence that it believed showed that Dang declined a sick call this was inappropriate given the lack of an appropriate affirmative defense.

Not only did the trial court base its determination as to whether there was sufficient evidence to support a claim of deliberate indifference against Nurse Scott on incorrect assumptions, it also wholly ignored Dang's version of the facts as it relates to her encounters with Dang.

First, in its order, the trial court heavily relied upon the defendant's version of the facts, in particular the testimony that Nurse Scott was "concerned" Dang may have mental health issues and referring him to DPod for mental health observation. The court failed to consider the evidence that Nurse Scott not only threatened Dang to put him on suicide watch if he didn't "get up" and she didn't believe that Dang actually had the symptoms he complained of. Taking plaintiff's version of the facts as true and giving him the benefit of all reasonable inferences thereon, it is without question that there is, at a minimum, a question of fact as to the conduct of Nurse Scott and whether she acted with deliberate indifference to Dang's serious medical needs. Rather than taking Dang's deteriorating condition seriously and giving Dang access to health care providers that had the ability and knowledge to evaluate his serious medical need, she made a unilateral decision that Dang was not really sick and was acting out to which she responded with threats to put him on suicide watch as punishment for not cooperating with her demands and actually moving him to segregation without instituting the segregation assessment protocol.

The Court's Order stated that Scott's "only interaction with Dang occurred on February 9, 2012 when he came to Medical and advised that he was experiencing headaches and neck pain." (Doc. 184 at 14). This conclusion is not only inconsistent within the Order itself (Doc. 184 at FN 7), but, more importantly, the record evidence places this fact in dispute. Nurse Roberts testified that Nurse Scott was present and involved in the Code Orange encounter on February 20, 2012 and the nurses' schedules show that she was working during that night shift. (Doc. 165-1, p.19, ll. 9-10; Doc. 164-15) Nam Dang is entitled to an inference that Nurse Scott knew his condition had further deteriorated from the emergency walk-in encounter on February 9, 2012 by virtue of the fact that, when she saw him on February 20, 2012 during the Code Orange, he was now non-verbal, unconscious, and drooling. However, rather than providing the medical attention he obviously required, she, along with Nurse Roberts, chose to merely implement cursory care and further believed that he was faking his symptoms. Even assuming that they believed Nam Dang would be seen by a physician the following morning after being placed in the infirmary cell, the record evidence establishes that a physician would not be present in the infirmary until hours later.[17]

---

[17] According to the electronic medical record entry, the code orange was made at approximately 23:15 (11:15 p.m.), and Nurse Roberts arrived at the scene (D-pod hallway) at 23:17 (11:17 p.m.). Nurse Roberts could not state how long she spent with Dang in the medical unit waiting room (where she described evaluating him in medical); however, according to the segregation watch sheets, he was already in

### 4. *Deliberate Indifference of Nurse Roberts.*

The trial court again failed to accept Plaintiff's version of the facts as it relates to Nurse Roberts and disregarded evidence that created a question of fact as to whether Nurse Roberts acted with deliberate indifference regarding Dang. Specifically, the trial court heavily relied upon assumptions that Nurse Roberts conduct was appropriate in that by placing Dang in the infirmary he would be assessed by a physician. While Nurse Roberts had Dang placed in an infirmary cell, she neither called the physician nor instituted a doctor sick call. (Doc. #165, Exhibit 1, Roberts' Depo., p. 26, ll. 4-6)

Given Nurse Roberts' improper assessment that Dang's condition was "voluntary" and that he was faking unconsciousness for some unknown reason, Dang was referred to mental health which resulted in him not seeing the general medical doctor, but the psychiatrist instead. Moreover, Dang presented evidence that calls into question Dr. Westhead's evaluation and testimony regarding Dang's condition at the time.[18]

Even assuming that Nurse Roberts relied upon the findings of Dr. Westhead, once it was determined that Dang was not suffering from any mental health

---

cell number MC05A in the infirmary at 23:45 (11:45 p.m.). (Doc. 164, Exhibit 16). Dr. Ogunsanwo testified that he typically arrived at the jail between 7 -8 a.m. (Doc. 147, p.21, ll. 2-25). Therefore, there was no expectation for a physician to be present at the infirmary for at least 7 hours from the time Nam Dang arrived.

[18] See FN *11, *supra*.)

condition and his problems were likely medical in nature, Nurse Roberts ignored Dang during the following night shift. According to the nurse schedule, Nurse Roberts also worked the following night (February 21, 2012) as the charge nurse (Doc. #164, Exhibit 15). Despite the fact that 1) Nam was cleared of any psychiatric issues by Dr. Westhead earlier that day (Exhibit Doc. #130-1, pp. 9-10), and 2) she was required to do nurse rounds and check on the infirmary patients during her shift (Doc. #164, Exhibit 10, Densmore Depo., p. 18, ll.4-7), there is no documentation that she checked on Dang that shift.

The Court mistakenly concluded that Plaintiff offered no evidence to support the argument that Nam Dang languished in his infirmary cell during the night shift on February 21, 2012. (Doc. 184 at 16, FN 18) To the contrary, Plaintiff offered both direct and circumstantial evidence to support a reasonable inference that Nam Dang was in fact suffering at or around the time he was in the infirmary. First, the affidavit of Nam Dang's cell-mate, Anthony Laird, clearly establishes direct evidence that Nam Dang was in "extreme physical discomfort" and further that he not only informed the nursing staff of his concern for Nam Dang, but that the nursing staff did nothing to help Nam Dang, didn't care about Dang, didn't take Dang's condition seriously and believed Dang was faking sickness. (Doc. 164-18) Second, Nam Dang is further entitled to the reasonable inference that he has suffered a stroke and as a result thereof was suffering and languishing in his cell

without treatment that night and was physically unable to speak and ask for help, as his brain was being damaged further as time went on. (Doc. 150; Doc. 164-20) Finally, the testimony of Sarah Agurkis also establishes that Nam Dang was delusional and in extreme pain at this critical time period. (Doc. 164-19, p.35, l.8 – p.37, l.6)

Once again, rather than accepting Plaintiff's version of the facts, the court chose to accept facts that benefited the defendant and ignored other facts that clearly contradict and raise a question of material fact as to the deliberate indifference of Nurse Roberts.

### 5. *Deliberate Indifference of Nurse Densmore.*

With regard to the inaction of Nurse Densmore, the trial court relied upon assumptions that on February 22, 2012 Dang had vital signs that were in a normal range and that he was "alert and oriented". Dang is entitled to the reasonable inference that, even based on her testimony alone, Dang's condition was far worse than assumed by the trial court, yet Densmore did nothing to follow up.

The court failed to consider facts presented by Dang that contradict the assumptions upon which it relied to determine that Defendant Densmore did not act with deliberate indifference to Dang's serious medical needs. Second, the trial Court also specifically asserts that it is undisputed that Nam Dang was alert, oriented and voiced no complaints while in the medical unit after the Code Orange

emergency encounter. (Doc. 184 at 16, 17) Again, the Court ignored the record evidence that clearly places that fact in dispute.

First, the affidavit of Anthony Laird, who was Nam Dang's cellmate in the medical unit, describes a very different picture.[19] Dang also submitted evidence of Sarah Agurkis who visited Nam Dang shortly before the code orange incident and described him as being delusional and in severe pain. (Doc. 164-19, p.35, l.8 – p.37, l.6) This evidence alone place in dispute the material fact of Nam Dang's condition during this critical time period.

The fact that Nam Dang reportedly did not "voice any complaints" very likely was due to the fact that he had suffered a stroke, (as opined by defense expert Dr. Larsen and confirmed by the MRI taken at Central Florida Regional Medical Center on February 23, 2012, which showed both acute and **subacute** infarcts), and was unable to speak. Nam Dang is entitled to a reasonable inference that based on his version of the facts, he required more than cursory care of checking vital signs and was denied the emergent medical care he desperately needed. Moreover, according to Nam Dang's version of the facts, he was in "extreme physical discomfort" and "severe pain" yet nothing was done by the medical staff.

The trial court accepts the self-serving testimony of Defendant Densmore

---

[19] See record evidence section regarding Mr. Laird on pp. 22-23, *supra* above; see also Doc. #164-18.)

and ignores that of other witnesses. In doing so, the trial court improperly weighed the credibility of the witnesses and accepted the moving party's version rather than giving Dang the benefit of accepting his version as true as required under the well established law pertaining to summary judgment.

### 6. *Deliberate Indifference of Dr. Ogunsanwo.*

The trial court improperly made factual determinations on material issues regarding the inaction of Dr. Ogunsanwo that were in dispute. First, the trial court stated that Dang only offered evidence of what Dr. Ogunsanwo should have known rather than what he actually knew regarding Dang's condition. The trial court's interpretation in this regard is misplaced. Dang offered evidence that on February 13, 2012 Dr. Ogunsanwo knew (not should have known) that Dang's condition had deteriorated. In addition, while the Court acknowledges that Plaintiff raised circumstantial evidence of Dr. Ogunsanwo's knowledge of Nam Dang's serious medical need (Doc. 184 at 18, FN 20), it completely disregards any reasonable inferences that can be drawn therefrom.

Plaintiff established that Dr. Ogunsanwo electronically signed and approved an order on February 13, 2012 that specifically directed blood pressure checks for Nam Dang because he was "**running a fever.**" (Doc. 164-9; Doc. 147, p.68, ll. 10-24; Doc. 164-11, p. 36, l. 7 – p. 37, l. 3.) Nam Dang is entitled to a reasonable inference that by signing this order, Dr. Ogunsanwo had specific knowledge that

Nam was now running a fever, which is not only inconsistent with muscular skeletal pain that Dr. Ogunsanwo initially diagnosed, but also establishes, based on Dr. Ogunsanwo's own testimony, that a more serious condition existed that required further assessment and treatment. (Doc. 147, p. 98, ll. 1-6; *see also* Doc. #147, p.50, ll. 8-22) Instead of viewing this as direct evidence that creates (at a minimum) a question of fact as to whether Dr. Ogunsanwo knew Nam was running a fever, or even affording Nam Dang a reasonable inference in his favor in this regard, the Court wrongfully determined that the evidence merely showed that Dr. Ogunsanwo **should** have known Nam was running a fever. Assuming Plaintiff's version of the facts the court was required to accept the evidence, or infer therefrom, that as of February 13, 2012, Dr. Ogunsanwo knew Dang's condition had worsened.

Secondly, the Court erroneously concluded that it is undisputed that Nam Dang was transported to the hospital emergency room approximately 15 minutes after Dr. Ogunsanwo's directive, and as result of that factual determination stated that a 15 minute delay is not enough to support deliberate indifference without any authority. First, whether a 15 minute delay is enough to establish deliberate indifference is a question of fact which should have been left for the jury. Second, the factual determination that there was no more than a 15 minute delay based on the testimony of Nurse Densmore was incorrect. The protective watch

sheets show that Nam Dang was in the infirmary at 12:47 p.m., which is **40** minutes after he was seen by Dr. Ogunsanwo. (Doc. 164-16) Not only did the Court invade the province of the jury to determining that a 15 minute delay does not support deliberate indifference, it did so based on an incorrect assumption of undisputed fact. At a minimum, there is a question of fact as to the length of the delay in getting Nam Dang to the hospital and whether the medical staff at John E. Polk Correctional Facility acted with deliberate indifference to Nam Dang's serious medical need.

## II

THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT TO SEMINOLE COUNTY SHERIFF ON THE 42 U.S.C. § 1983 MUNICIPAL LIABILITY CLAIM

In its order, the district court did not reach the issue of whether an official policy, custom, or usage of Sheriff Eslinger, in his official capacity, caused Nam Dang's constitutional deprivations. Instead, the court simply held that, because it concluded that none of the individual defendants violated the Fourteenth Amendment, it need not engage in the municipal policy analysis. Because the district court erred in its finding that no defendant violated the Constitution, therefore, Dang submits that this Court should reverse and remand with directions to the district court to assess whether Dang's constitutional deprivations were

caused by the policies, customs, or usages of Sheriff Eslinger, the final policymaker in the area of medical care at the Seminole County Jail.

<u>CONCLUSION</u>

Evidence that put critical facts at issue in this case in dispute was wholly ignored, and the moving parties' version of the facts was improperly accepted and relied upon to grant summary judgment. Moreover, the trial court failed to consider or apply the law of the Eleventh Circuit as established in *McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999), *Carswell v. Bay County*, 854 F.2d 454 (11th Cir. 1988), *Ancata v. Prison Health Services*, 769 F.2d 700 (11th Cir. 1985), and *Mandel v. Doe*, 888 F.2d 783 (11th Cir. 1989). As such, the trial court created manifest errors of fact and law upon which the judgment was based and resulted in manifest injustice to Nam Dang. Ultimately, this case is not about determining the specific medical **cause** of Nam Dang's pain and complaints; but rather it is about how the Defendants ignored and disregarded the fact that Nam Dang was getting worse and deteriorating to the point of suffering day after day over his 28 day incarceration, and ultimately becoming unresponsive. As a result thereof, Nam Dang has been given an unjust life sentence of a permanent debilitating injury that could have otherwise been avoided with prompt medical care.

The district court's order granting summary judgment on all counts should be vacated, and this case should be remanded for further proceedings in the

district court.

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed.R.App.P. 32(a)(7)(B) because this brief contains 13,782 words, excluding the pages of the brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Word in 14 point Times New Roman font.

*/s/ Melissa H. Powers*

_____

MELISSA H. POWERS

Respectfully submitted,


/s/ Matthew P. Farmer

_____

Matthew P. Farmer
FL Bar No. 0793469
708 E. Jackson Street
Tampa, FL  33602
(813) 228-0095
Fax (813) 224-0269
MattFarmer1@aol.com

and

Melissa H. Powers, Esq.
FL Bar No. 0132284
631 W. Morse
Blvd., Suite 200
Winter Park, FL 32789
(407) 839-0866
FAX (407) 425-7958
mhpowers@maherlawfirm.com

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that an original and six (6) copies of this brief was furnished by U.S. mail on the 13th day of January 2016 to U.S. Court of Appeals for the 11th Circuit, 56 Forsyth St., N.W., Atlanta, GA 30303 and a copy was provided to counsel via the ePortal electronic system to:

Matthew P. Farmer, Esq.
Farmer & Fitzgerald
102 W. Whiting St.
Tampa, FL   33602

D. Andrew DeBevoise, Esq.
Thomas W. Poulton, Esq.
Jeffrey K. Grant, Esq.
DeBevoise & Poulton, P.A.
1035 S. Semoran Blvd.
Suite 1010
Winter Park, FL   32792

John M. Green, Jr., Esq.
John M. Green, Jr., P.A.
125 N.E. 1st Avenue
Suite 2
Ocala, FL    34470

Bruce R. Bogan, Esq.
Hilyard, Bogan & Palmer, P.A.
105 E. Robinson St.
Suite 201
Orlando, FL   32801

*/s/ Melissa H. Powers*

_____
MELISSA H. POWERS, ESQ.
Florida Bar No.: 132284
The Maher Law Firm, P.A.
631 W. Morse Blvd., Suite 200
Winter Park, FL    32789
Phone: (407) 839-0866
Facsimile: (407) 425-7958