IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

Case No.: 15-14842-D

NAM DANG, by and through his Power of Attorney, VINA DANG,

Plaintiff/Appellant,

v.

DONALD F. ESLINGER, in his official capacity as the Sheriff of Seminole County; OLUGBENGA OGUNSANWO, M.D.; SANDRA WILT, LPN; BRENDA PRESTON-MAYLE, RN; ALECIA SCOTT, LPN; SHARYLE ROBERTS, LPN; and MARTHA DENSMORE, RN,

Defendants/Appellees.

Appeal from the United States District Court
for the Middle District of Florida, Orlando Division
Case No.: 6:14-cv-Orl-31TBS

**BRIEF OF APPELLEES ESLINGER, WILT AND PRESTON-MAYLE**

D. ANDREW DeBEVOISE, ESQ.
Florida Bar No.: 0281972
THOMAS W. POULTON, ESQ.
Florida Bar No.: 0083798
JEFFREY K. GRANT, ESQ.
Florida Bar No.: 0091197
DeBEVOISE & POULTON, P.A.
1035 S. Semoran Boulevard, Suite 1010
Winter Park, Florida 32792
Telephone: 407-673-5000
Attorneys for Defendants/Appellees
Eslinger, Wilt and Preston-Mayle

# CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Bogan, Bruce R. – Counsel for Defendant/Appellee Ogunsanwo

Cole, Scott & Kissane, P.A. – Counsel for Defendant/Appellee Eslinger in pending state case

Cotter, Daniel W. – Counsel for Plaintiff/Appellant

Dang, Cuong – Co-Power of Attorney for Plaintiff/Appellant

Dang, Nam – Plaintiff/Appellant

Dang, Vina – Co-Power of Attorney for Plaintiff/Appellant

DeBevoise & Poulton, P.A. – Counsel for Defendants/Appellees Eslinger, Wilt and Preston-Mayle

DeBevoise, D. Andrew – Counsel for Defendants/Appellees Eslinger, Wilt and Preston-Mayle

Densmore, Martha – Defendant/Appellee

Eslinger, Donald F., in his official capacity as Sheriff of Seminole County – Defendant/Appellee

Farmer & Fitzgerald, P.A. – Counsel for Plaintiff/Appellant

Florida Sheriffs Risk Management Fund – Insurer of Defendants/Appellees

Grant, Jeffrey K. – Counsel for Defendants/Appellees Eslinger, Wilt and Preston-Mayle

Green, John M., Jr. – Counsel for Defendants/Appellees Scott, Roberts and Densmore

Hilyard, Bogan & Palmer, P.A. – Counsel for Defendant/Appellee Ogunsanwo

John M. Green, Jr., P.A. – Counsel for Defendants/Appellees Scott, Roberts and Densmore

Maher Law Firm, P.A. – Counsel for Plaintiff/Appellant

Maher, Steven R. – Counsel for Plaintiff/Appellant

Ogunsanwo, Olugbenga – Defendant/Appellant

Poulton, Thomas W. – Counsel for Defendants/Appellees Eslinger, Wilt and Preston-Mayle

Powers, Melissa H. – Counsel for Plaintiff/Appellant

Presnell, Gregory A. – United States District Judge in the case below

Preston-Mayle, Brenda – Defendant/Appellee

Roberts, Sharyle – Defendant/Appellee

Savona, Therese A. – Counsel for Defendant/Appellee Eslinger in pending state case

Scott, Alecia – Defendant/Appellee

Shelton, Scott – Counsel for Defendant/Appellee Eslinger in pending state case

Smith, Thomas B. – United States Magistrate Judge in the case below

Sydow, Melissa Jean – Counsel for Defendant/Appellee Dr. Ogunsanwo

Wilt, Sandra – Defendant/Appellee

Winchenbach, Linda L. – Counsel for Defendants/Appellees Scott, Roberts and Densmore

Zubkin, Joy – Counsel (former) for Defendant/Appellee Eslinger in pending state case

Pursuant to Fed. R. App. P. 26.1(a) and Eleventh Circuit Rule 28-1(b), Appellees Donald F. Eslinger, Sandra Wilt, LPN and Brenda Preston-Mayle, RN, have no corporations to disclose.

# STATEMENT REGARDING ORAL ARGUMENT

Defendants/Appellees Sheriff Donald F. Eslinger, Sandra Wilt, LPN, and Brenda Preston-Mayle, RN, request oral argument because the decisional process may be aided by oral argument.

i

# TABLE OF CONTENTS

Page(s)

Certificate of Interested Persons and Corporate Disclosure Statement.................C-1

Statement Regarding Oral Argument ...................................................................i

Table of Contents ...................................................................................... ii

Table of Citations.........................................................................................v

Statement of Subject–Matter and Appellate Jurisdiction ..........................................x

Statement of the Issues....................................................................................1

    I.       Whether the District Court erred in granting summary judgment and qualified immunity to Nurse Wilt and Nurse Preston-Mayle on Plaintiff Dang's 42 U.S.C. § 1983 deliberate indifference claims against them. ...............................................................................1

    II.      Whether the District Court erred in granting summary judgment to Sheriff Eslinger on Plaintiff Dang's 42 U.S.C. § 1983 municipal liability claim against him in his official capacity. ..............1

Statement of the Case....................................................................................2

    I.       Course of Proceedings and Dispositions in the Court Below ...............2

    II.      Statement of the Facts ...............................................................4

          A.    Background ..................................................................4

          B.    Dang's Prior Drug Use and Encounter with Law Enforcement One Month Before His Arrest..............................4

          C.    Dang's Headaches, Neck Pain and Emergency Room Visit Two Weeks Before His Arrest..........................................5

D. Dang's Arrest on January 26, 2012 and Intake Into the Jail.......7

E. Dang's Only Clinical Encounter With Nurse Wilt on January 29, 2012 and His Representations That His Pain Was a Result of a Physical Encounter With Law Enforcement During Arrest........................................9

F. Dang's Clinical Encounter With Dr. Ogunsanwo on February 1, 2012 and His Continued Representations That His Pain Was a Result of a Physical Encounter With Law Enforcement During Arrest ..............................12

G. Dang's Only Clinical Encounter With Nurse Preston-Mayle on February 7, 2012 and His Continued Representations That His Pain Was a Result of a Physical Encounter With Law Enforcement During Arrest ..............................12

H. Chronology of Dang's Treatment as Reflected in the Jail Medical Records .................................16

III. Statement of the Standard or Scope of Review.................................23

Summary of the Argument.................................................24

Argument and Citations of Authority .................................26

I. THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT AND QUALIFIED IMMUNITY TO NURSE WILT AND NURSE PRESTON-MAYLE ON THE 42 U.S.C. § 1983 DELIBERATE INDIFFERENCE CLAIMS AGAINST THEM.................................26

A. The District Court Properly Concluded There Was No Constitutional Violation Because Nurse Wilt Was Not Deliberately Indifferent to a Serious Medical Need of Dang on January 29, 2012 and Nurse Preston-Mayle Was Not Deliberately Indifferent to a Serious Medical Need of Dang on February 7, 2012............................26

1.    *Kingsley* Did Not Change the Deliberate
Indifference Standard in Medical Care Cases ................27

2.    Legal Standard for Deliberate Indifference....................30

     i.    Objectively Serious Medical Need.......................31

     ii.    Acted With Deliberate Indifference.....................31

     iii.    Causation............................................................34

3.    Application of Deliberate Indifference Standard
to Nurse Wilt's Conduct...................................................35

4.    Application of Deliberate Indifference Standard
to Nurse Preston-Mayle's Conduct .................................42

B.    Nurses Wilt and Preston-Mayle Were Properly
Entitled to Qualified Immunity Because They Did Not
Violate Clearly Established Law .............................................47

II.    THE DISTRICT COURT PROPERLY GRANTED
SUMMARY JUDGMENT TO SHERIFF ESLINGER ON
THE 42 U.S.C. § 1983 MUNICIPAL LIABILITY CLAIM
AGAINST HIM IN HIS OFFICIAL CAPACITY............................50

A.    Dang's Waiver or Abandonment of the Municipal
Liability Claim Against Sheriff Eslinger on Appeal ................50

B.    Summary Judgment to Sheriff Eslinger Should
Nonetheless Be Affirmed Because Dang Has Failed to
Present Any Evidence of a Pattern or Practice of
Widespread Abuse ..................................................................53

Conclusion ..................................................................................................56

Certificate of Compliance ...........................................................................57

Certificate of Service ..................................................................................58

# TABLE OF CITATIONS

Page(s)

CASES:

*Access Now, Inc. v. Southwest Airlines Co.,* 385 F.3d 1324 (11th Cir. 2004) ........51

*Alderman v. McDermott,* No.: 6:03-CV-41-Orl-22-KRS, 2004 WL 1109541
    (M.D. Fla. April 27, 2004)...................................................................................55

*Anderson v. Creighton*, 483 U.S. 635 (1987) .........................................................48

*Austin v. County of Alameda,* No. 15-cv-00763-HSG, 2015 WL 4051997
    (N.D. Ca. July 2, 2015)......................................................................................30

*Beshers v. Harrison,* 495 F.3d 1260 (11th Cir. 2007)..............................................50

*Bilal v. Geo Care, LLC,* No. 2:14-cv-422-FTM-38MRM, 2016 WL 345514
    (M.D. Fla. Jan. 28, 2016)..................................................................................29

*Bozeman v. Orum,* 422 F.3d 1265 (11th Cir. 2005) ....................................30, 47, 48

*Burnette v. Taylor*, 533 F.3d 1325 (11th Cir. 2008)............................................32, 33

*Castro v. County of Los Angeles*, 797 F.3d 654 (9th Cir. 2015) .............................28

*Collins v. Al Shami*, No. 1:13-cv-01838-TWP-DML, 2015 WL 5098533
    (S.D. Ind. Aug. 31, 2015) .................................................................................28

*Cottone v. Jenne*, 326 F.3d 1352 (11th Cir. 2003)...................................................34

*Cottrell v. Caldwell*, 85 F.3d 1480 (11th Cir. 1996)................................................32

*Craig v. Floyd County, Georgia*, 643 F.3d 1306 (11th Cir. 2011)..........................54

*Davis v. Wessel*, 792 F.3d 793 (7th Cir. 2015) .......................................................29

*Detris v. Coates*, 523 Fed. Appx. 612 (11th Cir. 2013)...........................................52

*Doe v. Moore*, 410 F.3d 1337 (11th Cir. 2005) ........................................................51

*Engel Industries, Inc. v. Lockformer Co.*, 166 F.3d 1379 (Fed. Cir. 1999).............53

*Estelle v. Gamble*, 429 U.S. 97 (1976) ...................................................................33

*Farmer v. Brennan*, 511 U.S. 825 (1994)..............................................32, 33, 39, 44

*Freeman v. Lebedovych*, 186 Fed. Appx. 943 (11th Cir. 2006.) .............................34

*Garczynski v. Bradshaw*, 573 F.3d 1158 (11th Cir. 2009) ......................................23

*Gilbert v. Rohana*, No. 1:14-cv-00630-RLY-DKL, 2015 WL 6442289
    (S.D. Ind. Oct. 23, 2015) .................................................................................29

*Goebert v. Lee County*, 510 F.3d 1312
    (11th Cir. 2007) ............................................ 27, 30-34, 38, 39, 43, 44, 48, 49

*Granda v. Schulman*, 372 Fed.Appx. 79 (11th Cir. 2010)........................................31

*Hale v. Tallapoosa County*, 50 F.3d 1579 (11th Cir. 1995))...................................30

*Hall v. Holder*, 117 F.3d 1222 (11th Cir. 1997) .................................................23, 54

*Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316 (11th Cir. 2012).......51

*Harris v. Coweta County*, 21 F.3d 388 (11th Cir. 1994)....................................48, 49

*Harris v. Thigpen*, 941 F.2d 1495 (11th Cir. 1991)....................................34, 39, 45

*Harvey v. Daniels*, 625 Fed.Appx. 499 (11th Cir. 2015)..................................23, 53

*Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176 (11th Cir. 1994) ...............31, 34

*Holloman ex. rel. Holloman v. Harland*, 370 F.3d 1252 (11th Cir. 2004).............37

*Hope v. Pelzer*, 536 U.S. 730 (2002) ......................................................................31

*Howell v. Evans*, 922 F. 2d 712 (11th Cir. 1991) ...................................................33

*Jackson v. Jackson*, 456 Fed. Appx. 813 (11th Cir. 2012)...........................34, 39, 45

*Johnson v. Clafton*, No. 13-14922, 2015 WL 5729080
(E.D. Michigan, Sept. 30, 2015).................................................................28

*Keele v. Glynn County, Georgia*, 938 F. Supp. 2d 1270 (S.D. Ga. 2013).........31, 32

*Kennedy v. Bd. of County Comm. for Okla. County*, No. CIV-15-398-D,
2015 WL 4078177 (W.D. Okla. July 6, 2015) .............................................29

*\*Kingsley v. Hendrickson*, 135 S.Ct. 2466 (2015) .................................27, 28, 29, 30

*\*Kruse v. Byrne*, No. 11-00513-KD-C, 2013 WL 6237694
(S.D. Ala., Dec. 3, 2013) ............................................................................37

*\*Kruse v. Williams*, 592 Fed. Appx. 848 (11th Cir. 2014) ..............37, 41, 42, 46, 47

*\*Lyles v. Osceola County*, No.:  6:11-cv-1585-Orl-36DAB,
2012 WL 4052258 (M.D. Fla. Sept. 13, 2012)......................................54, 55

*Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249 (11th Cir. 2001) .........................23, 53

*\*MacMillan v. Rodenberry*, 432 Fed.Appx. 890 (11th Cir. 2011) ...........................51

*McDowell v. Brown*, 392 F.3d 1283 (11th Cir. 2004) ...............................................54

*McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999) .........................................32, 34

*McIlwain v. Marengo County*, No. 13-168-CG-M, 2013 WL 5434145
(S.D. Ala. Sept 26, 2013)............................................................................33

*Mercado v. City of Orlando*, 407 F.3d 1152 (11th Cir. 2005)..................................48

*Nicholson v. Georgia Dep't of Human Res.*, 918 F.2d 145 (11th Cir. 1990)..........48

*Nimmons v. Aviles*, 409 Fed.Appx. 295 (11th Cir. 2011)...........................34, 40, 45

*Pace v. Capobianco*, 283 F.3d 1275 (11th Cir. 2002).............................................48

*Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808 (2009)..........................47, 48, 49

*Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313 (11th Cir. 2010) ...........................33

*Presley v. City of Blackshear*, 650 F.Supp.2d 1307 (S.D.Ga. 2008).....32, 33, 39, 44

*Presley v. City of Blackshear*, 340 Fed. Appx. 567 (11th Cir. 2009).......................32

*Pruitt v. Gillespie*, 625 Fed.Appx. 374 (11th Cir. 2015) ........................................52

*Roberts v. C-73 Med. Dir.*, No. 1:14-cv-5198-GHW, 2015 WL 4253796
    (S.D.N.Y. July 13, 2015) .................................................................................29

*Saetrum v. Raney*, No. 1:13-425WBS, 2015 WL 4730293
    (D. Idaho, Aug. 7, 2015).................................................................................28

*Skinner v. Sproul*, No. 1:14-cv-174-WLS-MSH, 2015 WL 3970693
    (M.D. Ga. June 30, 2015) ...............................................................................30

*Skop v. City of Atlanta*, 485 F.3d 1130 (11th Cir. 2007) ........................................54

*Taylor v. Adams*, 221 F.3d 1254 (11th Cir. 2000)..................................................34

*Thomley v. Bennett*, No.:  5:14-cv-73, 2016 WL 498436
    (S.D. Ga. Feb. 8, 2016).............................................................................29, 30

*Townsend v. Jefferson County*, 601 F.3d 1152 (11th Cir. 2010)............................31

*Ward v. Gates*, 52 Fed.Appx. 341 (9th Cir. 2002)..................................................52

*Watkins v. Bowden*, 105 F.3d 1344 (11th Cir. 1997).........................................23, 54

*Wooden v. Bd. of Regents of Univ. Sys. of Georgia*,
    247 F.3d 1262 (11th Cir. 2001) ......................................................................23

*Youmans v. Gagnon*, 626 F.3d 557 (11th Cir. 2010)..................................47, 48, 49

*Zatler v. Wainwright*, 802 F.2d 397 (11th Cir. 1986).........................................34, 35

STATUTES:

28 U.S.C. § 1291 .......................................................................................x

42 U.S.C. § 1983 .......................................... 1, 2, 26, 27, 30, 50, 54, 56

Fla. Stat. § 464.001-464.027 ...............................................................35

Fla. Stat. § 464.003(19).................................................................35, 36

Fla. Stat. § 464.003(20).................................................................35, 36


OTHER AUTHORITIES:

Fed. R. App. P. 26.1(a) ...............................................................C3 of 3

11th Cir. R. 28-1(b).....................................................................C3 of 3

Fed. R. App. P. 32(a)(7)(B) ..................................................................57

11th Cir. R. 32-4 ..................................................................................57

# <u>STATEMENT OF SUBJECT–MATTER<br>AND APPELLATE JURISDICTION</u>

Defendants/Appellees Eslinger, Wilt and Preston-Mayle agree that this Court has jurisdiction over an appeal from a final decision of the United States Middle District of Florida, Orlando Division, pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

I.      Whether the District Court erred in granting summary judgment and qualified immunity to Nurse Wilt and Nurse Preston-Mayle on Plaintiff Dang's 42 U.S.C. § 1983 deliberate indifference claims against them.

II.     Whether the District Court erred in granting summary judgment to Sheriff Eslinger on Plaintiff Dang's 42 U.S.C. § 1983 municipal liability claim against him in his official capacity.

**STATEMENT OF THE CASE**

I.      Course of Proceedings and Dispositions in the Court Below.

On January 9, 2014, Plaintiff Nam Dang, by and through his Power of Attorney, Vina Dang, filed his Complaint against Defendants.  (Complaint, Doc. 1.)  On March 24, 2014, Plaintiff filed an Amended Complaint.  (Am. Complaint, Doc. 47.)   Plaintiff's Amended Complaint asserted 42 U.S.C. § 1983 liability against Defendants alleging that deliberate indifference to Plaintiff Nam Dang's serious medical needs while a pre-trial detainee at the John E. Polk Correctional Facility violated his Fourteenth Amendment rights and caused serious injury. (Am. Complaint, Doc. 47.)

On April 4, 2014, Defendant Ogunsanwo filed his Answer and Affirmative Defenses.  (Answer, Doc. 55.)  On August 18, 2014, Defendants Scott, Roberts and Densmore filed their Answer and Affirmative Defenses.  (Answer, Doc. 69.)  On August 20, 2014, Defendants Eslinger, Wilt and Preston-Mayle filed their Answers and Affirmative Defenses.  (Answers, Doc. 70 and 71.)

On May 29, 2015, Defendants Scott, Roberts and Densmore filed a Motion for Summary Judgment.  (Motion, Doc. 127.)  On June 1, 2015, Defendants Eslinger, Wilt and Preston-Mayle filed separate Motions for Summary Judgment. (Motions, Docs. 137, 138 and 140.)  On June 1, 2015, Defendant Ogunsanwo filed a Motion for Summary Judgment.  (Motion, Doc. 152.)

On July 6, 2015, Plaintiff filed Responses to the Summary Judgment Motions. (Responses, Docs. 166 and 167.) On July 20, 2015, Defendants filed Replies. (Replies, Docs. 175 – 180.)

On July 29, 2015, the District Court held oral argument on the Motions for Summary Judgment. (Hrg. Transcript, Doc. 214.)

On August 25, 2015, the District Court entered an Order granting Defendants' Motions for Summary Judgment and directing the Clerk to enter judgment in favor of all Defendants and close the case. (Order, Doc. 184.) Judgment was entered in favor of all Defendants on August 26, 2015. (Judgment, Doc. 185.)

On September 15, 2015, Plaintiff filed a Motion to Alter or Amend Judgment. (Motion, Doc. 194.) On September 29, 2015, Defendants filed Responses to the Motion to Alter or Amend Judgment. (Responses, Docs. 198, 199 and 200.) On October 15, 2015, the District Court entered an Order denying Plaintiff's Motion to Alter or Amend Judgment. (Order, Doc. 201.)

On October 28, 2015, Plaintiff filed a Notice of Appeal. (Notice, Doc. 205.)

On November 17, 2015, the District Court entered Cost Judgments for Defendants. (Cost Judgments, Docs. 210, 211 and 212.)

II.    Statement of the Facts.

    A.    Background.

According to the allegations of the First Amended Complaint, Dang was arrested on January 26, 2012, and booked into the John E. Polk Correctional Facility in Sanford.  The First Amended Complaint alleges that members of the jail medical staff were deliberately indifferent to his worsening signs and symptoms and medical complaints from then until February 23, 2012, when he was transferred to the hospital, and subsequently diagnosed with cryptococcal meningitis.[1]  The First Amended Complaint alleges that a delay in diagnosis and treatment resulted in a serious injury to Dang. (Am. Complaint, Doc. 47.)

    B.    Dang's Prior Drug Use and Encounter With Law Enforcement One Month Before His Arrest.

Dang admitted in deposition that in 2011 he had had a drug problem. Specifically, Dang would crush and snort blue colored pills called "roxies"

_____

[1] Dang has the diagnosis of cryptococcal meningoencephalitis, commonly referred to as "cryptococcal meningitis" and multiple complications thereof.  The disease is acquired from inhalation of the fungus *Cryptococcus neoformans* which then establishes a lung infection [pneumonia] which can disseminate through the blood stream to the brain causing a diffuse brain infection most properly described as cryptococcal meningoencephalitis.  This is an extremely rare disease afflicting about 150-300 individuals each year in the United States who do not have any known predisposing conditions that are associated with cryptococcal meningoencephalitis.  Dang does not have any of those known predisposing conditions. (Expert Report of Robert A. Larsen, MD, Doc. 150, Att. #2 at p. 3; See also, Expert Report of James T. Noble, MD, FACP, Doc. 150, Att. #4 at p. 3.)

(oxycodone) at times up to four pills per day, which pills he would illegally purchase without a prescription at a residence in Sanford.  (Dang dep., Doc. 141, p. 42 – 45.)

On December 22, 2011, Dang was a passenger in a vehicle that was pulled over by the City County Investigative Bureau (CCIB).  Dang testified that during the encounter with CCIB, he was pulled from the vehicle, slammed on the ground and had a knee put on his neck.  (Dang dep., Doc. 141, p. 69 – 70.)  Dang testified that the police found "weed and Xanax or something like that" in his friend's car and arrested the driver.  However, no money or drugs were found on Dang and he was not arrested.  (Dang dep., Doc. 141, p. 46 – 47.)

C.  <u>Dang's Headaches, Neck Pain and Emergency Room Visit Two Weeks Before His Arrest</u>.

Dang testified that it was around the time of this December 22, 2011, incident that he began experiencing headaches.  However, he testified that he could not say for sure that it was the incident with law enforcement on December 22 that triggered his headaches and neck pain.  (Dang dep., Doc. 141, p. 37 – 38 and p. 71 – 72.)  Dang's father bought him a large bottle of Aleve at Christmas 2011 and he began taking 4 Aleve, which was twice the recommended dosage.  Dang testified that he took at least 4 Aleve per day and then at some point 6 Aleve per day between December 25, 2011 and January 25, 2012, the day before his arrest.

(Dang dep., Doc. 141, p. 63 – 66.)

On January 12, 2012, Dang drove himself to the Central Florida Regional Medical Center (CFRMC) emergency room in Sanford complaining about his neck being hurt and having bad headaches. Dang described, "I thought my head was going to blow up, plain and simple." Dang recalled being at the hospital for about 2 hours and that he received "morphine" and felt better. (Dang dep., Doc. 141, p. 37 – 39.)

Medical records from CFRMC reflect Dang was admitted on January 12, 2012 at 8:21 p.m. and discharged at 11:25 p.m. Records reflect that Dang reported "suffering severe headache & neck pain – dizziness & fever x 2 ½ weeks" and that it "was gradual in onset and has been constant and waxing/waning." A physical exam, labs, X-ray and EKG were performed. Notes indicated specifically:

> PROGRESS AND PROCEDURES:
> Course of Care: Discussed at length during initial exam. Pt is hemodynamically stable. He has no meningeal signs on exam and he has no focal neuro deficits. We will obtain labs, ct scan
>
> 23:11. Reviewed test results with pt and family. He is asymptomatic and eating popcorn. Explained the risk of SAH[2] and meningitis. After describing risks and benefits of LP[3], pt declines the procedure. He will return if symptoms worsen.

(CFRMC Records, Doc. 138, Att. #1.)

---

[2] "SAH" means subarachnoid hemorrhage.

[3] "LP" means lumbar puncture.

Dang signed an "Informed Refusal For Partial Refusal of Care and AMA" form at the hospital, which states that a recommended lumbar puncture to test for possible subarachnoid bleeding and meningitis was refused by Dang. (CFRMC Records, Doc. 138, Att. #1.)

There is no evidence in the medical record that Dang told hospital staff on January 12, 2012, that he was allegedly slammed to the ground and had a knee put on his neck by police officers on December 22, 2011.

D.   Dang's Arrest on January 26, 2012 and Intake Into the Jail.

On January 26, 2012, at approximately 11:00 a.m., Dang was arrested at his home without incident based on outstanding warrants for (1) Conspiracy to Traffic in Illegal Drugs (over 14 Grams)/Oxycodone and (2) Failure to Appear – No Valid Driver's License. (SCSO Warrant Arrest Reports, Doc. 138, Att. #2); (Dang dep., Doc. 141, p. 60 – 63.)

Dang's mother testified that during the arrest she told an unidentified officer that Dang was having pain in his neck and she asked if she could give him some medication before he left. The officer denied her request. She did state, however, that the officer permitted her to put a medicated patch on Dang's neck before he was transported to jail.[4] (Nguyen dep., Doc. 149, p. 19 – 20.)  Dang testified that

---

[4]  There is no indication in the jail records that Dang arrived at the jail wearing a medicated patch.

no force was used on him by any officer during his arrest on January 26, 2012, that he was not injured by any officer during arrest, and the officers were very civil. (Dang dep., Doc. 141, p. 68 – 69.)

Dang had previously been arrested and incarcerated at the John E. Polk Correctional Facility on several occasions, one of which included a detention period of 39 days, so he was familiar with the jail. (Dang dep., Doc. 141, p. 73 – 74.) The electronic medical record reflects that an Intake Screening was performed on January 26, 2012, at 2:41 p.m., and that Dang's vitals were normal, he had no complaints of illness or injury, and he was recommended for general population. (Wilt dep., Doc. 142, Ex. 3, p. 29 – 30.)

Upon arrival at the jail, Dang purposely did not disclose to anyone at the jail the issues that he had been having with headaches and neck pain. (Dang dep., Doc. 141, p. 75 – 78.) On January 27, 2012, Dang had his first appearance at the jail via video. Dang did not complain to any officers or anyone else regarding headaches or neck pain at the time of his first appearance. (Dang dep., Doc. 141, p. 76 – 79.) The First Amended Complaint alleges that Dang was "alert, oriented and coherent" at the first appearance. (Am. Complaint, Doc. 47, par. 15.) There is a video recording of Dang's first appearance and he does appear alert, oriented and coherent. (DVD, Doc. 159.)

E.  Dang's Only Clinical Encounter With Nurse Wilt on January 29, 2012 and His Representations That His Pain Was a Result of a Physical Encounter With Law Enforcement During Arrest.

On January 29, 2012, Dang completed a Nurse Sick Call form wherein he hand-wrote the following: "MODERATE TO SEVERE HEAD AND NECK PAINS. STRAIN NECK MUSCLE. POSSIBLE PINCHED NERVE. STIFF NECK." (Wilt dep., Doc. 142, Ex. 2.); (Dang dep., Doc. 141, p. 80 – 81.)  The Nurse Sick Call reflects that Dang was seen by Nurse Wilt at approximately 9:00 p.m. and that she wrote on the form the following: "Joustled by police and slammed. Neck pain. Motrin[5] and muscle rub. DSC. Apply BID PRN x 30 days to affected area." (Wilt dep., Doc. 142, Ex. 2.)  Nurse Wilt explained her notations as follows:

> I wrote his explanation was he was jostled by police and slammed. Neck pain.  So I ordered muscle rub - - Motrin and muscle rub and doctor sick call.  And the muscle rub was applied b.i.d. p.r.n. times 30 days to affected areas.  I didn't write out the protocol for the Motrin.

(Wilt dep., Doc. 142, p. 35.)

With regard to this encounter with Dang at approximately 9:00 p.m. on January 29, 2012, Nurse Wilt described her assessment as follows:

> A.  I check his - - I checked his eyes.  I checked his rotation of his neck and let him tell me his - - what his problem - - what his symptoms were.

---

[5]  Motrin is one of several trade names for Ibuprofen, a nonsteroidal anti-inflammatory drug (NSAID).

Q. When you were checking his eyes, what did you do?

A. I used - - we use a flashlight to check his eyes, pupils and all.

Q. And what are you looking for when you do that?

A. Well, to see if they were any severity with pinpoint; see if there were - - the shape was round; see if they were equal; if they reacted to the light when you put the flashlight there, to see if he was bothered by the light when you - - if he had any photophobia when you put the light to his eyes.

\* \* \*

Q. You checked the range of motion or rotation of his neck?

A. Yeah. I didn't touch him. I made him rotate his neck.

Q. What was your observation in doing that?

A. Well, he rotated his neck, he said it was - - I have to apologize. The way I wrote this, I read now what it said here. It should have been he had minimal pain. He didn't - - because if it was - - you know what did I put here? "Moderate to severe head and neck pains. Possible pinched nerve." Yeah, "minimal rotation." Yeah, "minimal rotation." It should have been "minimal pain with rotation." I didn't put the "pain" in there.

\* \* \*

Q. So you were trying to note that he had minimal pain with rotation?

A. Yes.

Q. And what was your plan to address his condition?

A. I just thought it was - - being what he said to me, I just ordered him our routine that we have for neck and muscle pain of Motrin, muscle rub. And I put him in to be seen by the doctor because they also give him Robaxin[6], and I can't give him Robaxin without the doctor order.

(Wilt dep., Doc. 142, p. 28 – 30.)

---

[6] Robaxin is a trade name for Methocarbamol, a central muscle relaxant.

10

Subsequently, following her duties of passing out medications to the inmates of the pod, Nurse Wilt returned to medical and entered into the computer shortly after midnight on January 30, 2012 the details of her encounter with Dang approximately three and a half hours earlier. (Wilt dep., Doc. 142, p. 36, and Ex. 3, p. 28.)

During this encounter with Nurse Wilt, Dang purposely did not disclose his prior history of headaches, his Aleve usage or the fact of his emergency room visit just a few weeks prior:

> Q.  And when you met with the nurse after you filled out the sick call request for the first time, did you tell her about you going to the ER - -
> A.  No.
> Q.  - - a couple of weeks prior on January 12th?
> A.  (Moves head side to side.)
> Q.  Why did you not tell her that?
> A.  I didn't feel like it was important.
> Q.  Why was that?  You were experiencing the same problems, correct?
> A.  Yeah.
> Q.  Did you tell the nurse about the amount of Aleve that you had been taking during that month time period leading up to your arrest?
> A.  No.
> Q.  Why not?
> A.  It was none of their business.

(Dang dep., Doc. 141, p. 82 – 83.)

F.      Dang's Clinical Encounter With Dr. Ogunsanwo on February 1, 2012 and His Continued Representations That His Pain Was a Result of a Physical Encounter With Law Enforcement During Arrest.

Following Nurse Wilt's encounter with Dang on January 29, Dang was then seen by Dr. Ogunsanwo at 12:37 p.m. on February 1, 2012 pursuant to the "doctor sick call" that Nurse Wilt initiated.  During this encounter, Dang's vitals were normal and his temperature was 98.9, which is within a normal range between 98 and 99.  (Ogunsanwo dep., Doc. 147, p. 51 – 52.)  Dang also told Dr. Ogunsanwo that he was slammed on the ground by officers during his arrest before he came into the jail on January 26, 2012.  Dr. Ogunsanwo continued Dang on the Motrin and muscle rub ordered by Nurse Wilt, and he prescribed Robaxin, a muscle relaxant.  (Ogunsanwo dep., Doc. 147, Ex. 1.)

G.      Dang's Only Clinical Encounter With Nurse Preston-Mayle on February 7, 2012 and His Continued Representations That His Pain Was a Result of a Physical Encounter With Law Enforcement During Arrest.

Nurse Preston-Mayle completed the required 14-day History and Physical Health Evaluation of Dang on February 7, 2012 at approximately 9:58 a.m. (Preston-Mayle dep., Doc. 143, p. 36 – 37.)  Nurse Preston-Mayle described the evaluation process as follows:

A.  Typically, we bring the inmate in.  We usually do a review of their history on the electronic medical record first.  I usually review the intake screening to see if they answered yes or not to any pertinent

12

information there, because sometimes they don't always tell the truth when they come in to see you.

Then we'd call the patient into the room, take their weight, take their vital signs. We would ask them about their dental history. Do you have any missing teeth? Any pain? Any loose teeth going on with your mouth? They answer yes or no. We quickly look over their mouth see if there is anything major going on.

Then we would go into the history part. We'd ask them about their - - you know, where they live, their address. Then we get into have they been in the hospital before, and we go over like a whole body system of different ailments that they've had in the past.

Q. Is that considered the review of systems?

A. Yes.

Q. What else?

A. I was also trained to ask them about their tattoos and get a description where they're located. We would write that down in there. Anything abnormal, we were to send it over to the doctor or call the doctor, let him know.

\* \* \*

A. Like if they're - - they have a cold or something or if they're throwing up, nausea, vomiting, or anything that's just out of the ordinary.

\* \* \*

A. We would offer them sick call, dental, mental health, and doctor. We offer that every single time we do the history and physical, because if they have any complaints they want to address, they sometimes say, "oh, I haven't seen mental health yet and I take all these psychotropics and I would like to be seen," we can refer them at that time to see mental health.

Q. Okay. What else?

A. Same thing with dental. If they're complaining about a toothache, we would do that there too. And that's basically the gist of the H&P, and then we'd send them on their way.

(Preston-Mayle dep., Doc. 143, p. 21 – 23.)

Nurse Preston-Mayle vaguely recalled the evaluation of Dang, but remembered that during his 15-20 minute evaluation he "was coherent; he was alert and oriented; he was talking to me; he was joking even." (Preston-Mayle dep., Doc. 143, p. 34.) Dang did complain that his back and neck were hurting in relation to an incident with CCIB wherein officers allegedly hyperextended his neck, and that he was having frequent headaches. (Preston-Mayle dep., Doc. 143, p. 34 – 35.)

Nurse Preston-Mayle noted the following in the electronic medical record:

> A. I put on here that "headaches occurs frequently, per inmate. Inmate reports that he gets" - - that is kind of difficult to read. It's like both sides of the paper.
> "That he gets vision and hearing problems with his headaches, blurry vision, and tinnitus. He also stated that he had back and neck problems, and his allegations were that the CCIB brushed the car and yanked him out" - - "him and a friend out of the car and pushed their heads into the ground, hyperextending their necks. Has been having neck, back pains, along with headaches."

(Preston-Mayle dep., Doc. 143, p. 39.) Nurse Preston-Mayle clarified in deposition Dang's characterization of his headaches: "I didn't note them to be severe. As he was telling me it was in relation to the people hyperextending his neck, he was complaining about the muscle pain and stuff." (Preston-Mayle dep., Doc. 143, p. 40.)

Nurse Preston-Mayle documented that she reviewed the medical administration record (MAR) and noted that Dang was taking medication for his

14

complaints.  (See Ogunsanwo dep., Doc. 147, Ex. 1, p. 19 and 22.)  Nurse Preston-Mayle also documented Dang's vitals were normal, including a temperature of 98.9 which is "in normal limits."  (Preston-Mayle dep., Doc. 143, p. 43 – 44.)  Dang's weight on February 7 was documented as 132 pounds.  Nurse Preston-Mayle acknowledged in deposition that Dang's recorded weight on the intake screening of January 26 was 140 pounds; however, she noted that there were different scales in the intake area and the medical unit.[7]  (Preston-Mayle dep., Doc. 143, p. 42.)

Nurse Preston-Mayle concluded that there were no abnormalities during the evaluation that would have caused her to refer Dang to mental health or the doctor.  (Preston-Mayle dep., Doc. 143, p. 45.)  Although every inmate, including Dang, is offered "sick call, dental, mental health and doctor" during the History and Physical evaluation, Dang did not request any form of sick call or doctor call on February 7, 2012.  (Preston-Mayle dep., Doc. 143, p. 23.)  The electronic medical record reflects that "INMATE DENIES ANY NEED FOR REFERRALS AT THIS TIME."  (Wilt dep., Doc. 142, Ex. 3, p. 25.)  Following the History and Physical evaluation, Dang returned to general population as reflected in the electronic

---

[7]  Dang's weight was also recorded to be 132 in the medical unit six days earlier on February 1, 2012, when he saw Dr. Ogunsanwo.  (Ogunsanwo dep., Doc. 147, Ex. 1, p. 26.)

medical record.[8]  (See Ogunsanwo dep., Doc. 147, Ex. 1, p. 21.)

H.  Chronology of Dang's Treatment as Reflected in the Jail Medical Records.[9]

The main evidence of the medical treatment that Dang received during his time at the jail, and his various encounters with healthcare personnel, can be found in the electronic medical record consisting of 31 pages, the medical administration record (MAR) consisting of 12 pages, and the printouts of Dang's prescriptions and dates and times of administration thereof, consisting of 32 pages.  (Jail Medical Records, Doc. 140, Att. #1.)  Those medical records reflect the following as a general chronology Dang's medical treatment:

*Dang in E Pod (General Population) – January 26 to February 9*

- 1/26/12, 2:41 p.m.:  New Intake Screening by L. Parker CNA technician; no complaints of illness or injury; vitals (BP: 97/63, Temp

---

[8]  Subsequently, two weeks later on February 23, 2012, the day that Dr. Ogunsanwo sent Dang to the hospital, Nurse Preston-Mayle was merely present in the medical office, but did not have any nursing role with respect to Dang. (Preston-Mayle dep., Doc. 143, p. 51.)  Dang makes no claims of deliberate indifference on the part of Nurse Preston-Mayle apart from her single clinical encounter with Dang on February 7, 2012.  (Am. Complaint, Doc. 47, par. 23.)

[9]  This general chronology of Dang's medical treatment at the jail, compiled from the jail medical records, was provided by Sheriff Eslinger to the District Court in his Motion for Summary Judgment (Motion, Doc. 140), and is reproduced here for this Court's ease of reference.  This chronology is provided to the Court in response to Dang's underlying theme in his Brief that he was basically "ignored and disregarded" and "left to suffer without care" by medical staff at the jail (Appellant's Brief, p. 10, 32, 50 and 62), which assertions are not supported by the record evidence.

98.6, R: 18, P: 81, W: 140).

- 1/29/12, 7:38 a.m.: Trusty Work Release Clearance by T. Million; nurse findings – no restrictions.
- 1/29/12, 9:00 p.m.: Nurse Sick Call form provided to Nurse Wilt; Complaint of moderate to severe head and neck pains, strain neck muscle, possible pinched nerve, stiff neck; inmate states jostled and slammed by police and held in neck lock hold.
- 1/30/12, 12:37 a.m.: Nurse Sick Call electronically documented by Nurse Wilt; Assessment – PERRLA. Observed with minimal [pain with][10] rotations left and right due to pain per inmate; Plan: Motrin and muscle rub and doctor sick call for Robaxin order.
- 1/30/12, 11:49 a.m.: Ibuprofen dose given by Nurse McCray.
- 1/30/12, 6:45 p.m.: Ibuprofen dose given by Nurse Cymerman.
- 1/31/12, 12:36 p.m.: Ibuprofen dose given by Nurse McCray.
- 1/31/12, 7:59 p.m.: Ibuprofen dose given by Nurse Herrera.
- 2/1/12, 8:40 a.m.: Ibuprofen dose given by Nurse Butler.
- 2/1/12, 12:37 p.m.: Doctor Sick Call with Dr. Ogunsanwo: inmate alleged that SWAT officers dragged him out of car and slammed on ground on arrest, been having neck stiffness and pain and headaches; full range of motion in cervical spine with mild pain, no evidence of swelling or deformity, normal gait, no neurological deficit elicited; Assessment – pain and stiffness in the neck and headache post-arrest; continue Ibuprofen and muscle rub, extend Ibuprofen 400 mg twice a day, Robaxin 750 mg twice a day and muscle rub as needed; Vitals (W: 132, BP: 98/66, Temp: 98.9, P: 96, R: 18).
- 2/2/12, 8:34 a.m.: Robaxin and Ibuprofen doses given by Nurse Butler.
- 2/2/12, 8:10 p.m.: Robaxin and Ibuprofen doses given by Nurse Roberts.
- 2/3/12, 7:22 p.m.: Robaxin and Ibuprofen doses given by Nurse Herrera.
- 2/4/12, 6:14 a.m.: Robaxin dose given by Nurse McCray.
- 2/4/12, 7:54 p.m.: Ibuprofen dose given by Nurse Ablucas.
- 2/5/12, 5:22 p.m.: Robaxin and Ibuprofen doses given by Nurse McCray.
- 2/5/12, 8:30 p.m.: Ibuprofen dose given by Nurse Roberts.

---

[10] See Wilt dep., Doc. 142, p. 28 – 30.

- 2/6/12, 8:51 a.m.: Robaxin and Ibuprofen doses given by Nurse Desjardin.
- 2/6/12, 9:14 a.m.: PPD Test given, results negative.[11]
- 2/6/12, 7:36 p.m.: Robaxin and Ibuprofen doses given by Nurse Cymerman.
- 2/7/12, 8:26 a.m.: Robaxin and Ibuprofen doses given by Nurse Desjardin.
- 2/7/12, 9:58 a.m.: History and Physical with Nurse Preston-Mayle: Vitals (H: 6'0", W: 132, Temp: 98.9, BP: 104/72, P: 18); inmate reports frequent headaches and blurry vision and tinitis; inmate reports he was yanked out of car by CCIB and pushed head into the ground hyperextending neck and has had neck and back pain with headaches; inmate denies any need for referral at this time; inmate returned to general population.
- 2/7/12, 7:23 p.m.: Robaxin and Ibuprofen doses given by Nurse Cymerman.
- 2/8/12, 8:21 a.m.: Robaxin and Ibuprofen doses given by Nurse Carlin.
- 2/9/12, 9:00 p.m.: Emergency Care Encounter with Nurse Scott: vitals (BP: 107/22, P: 84, Temp: 101.5)[12]; Robaxin and Motrin doses given; inmate reports "I have this pain in the back of my neck and it's having my head hurting so bad. They drop me and stomp on my head and stuff when I was arrested."; "Inmate was observed clinching his fist and squinting his eyes. Appeared to have full ROM of motion to neck. No swelling, no redness noted to neck. Inmate is ambulatory at this time."; "Inmate was being sent back to pod and behavior became bizarre and inmate slid down on the wall. Inmate was informed to get up and he got up and waled (sic) [walked]."; Assessment: alteration in comfort, neck pain and temperature, moved to Dpod

---

[11] "PPD Test" means a tuberculosis screening.

[12] Dang's temperature of 101.5 on February 9, 2012, is the only time he was recorded to have a fever during the 29-day period he was at the jail. A temperature of 98.9 or 99 is not a fever. The medical definition of a fever is above 100.4 when measured orally. (See, e.g., Expert Report of Robert A. Larsen, MD, Doc. 150, Att. #2, p. 3.) Appellant's contentions that Dang had been running an "ongoing, increased temperature/fever" (Appellant's Brief p. 49) for extended periods of time are simply not supported by any record evidence.

for mental health evaluation; Plan: monitor temperature, force fluids, blood pressure checks for 5 days.

*Dang in D Pod (Mental Health) – February 9 to February 21*

- 2/9/12, 11:45 p.m.:      Temperature check by Nurse Scott – 97.9.
- 2/10/12, 7:35 a.m.:      Robaxin and Ibuprofen doses given by Nurse Desjardin.
- 2/10/12, 12:00 p.m.:   Initial Mental Health Evaluation with Kyle Pritchard, mental health specialist.  Inmate presented with appropriate affect, mood and good eye contact; denied any past mental health or substance abuse history; Inmate states he was feeling "odd" yesterday due to a combination of head and neck pain as reacting poorly to medication and "feeling really strange.  It was like I was real light headed and my head really hurts."; "He attributes this pain to events surrounding his arrest."; Inmate does not appear to be a danger to self or others and will be monitored for a few days to be sure behavior is stable and complaints are entirely medical.
- 2/10/12, 6:09 p.m.:      Robaxin and Ibuprofen doses given by Nurse Wilt.
- 2/11/12, 7:14 a.m.:      Robaxin and Ibuprofen doses given by Nurse Rados.
- 2/11/12, 6:18 p.m.:      Robaxin and Ibuprofen doses given by Nurse Wilt.
- 2/11/12, 9:34 p.m.:      Vitals check (BP:  108/67, P: 84, R:  16, Temp. 98.2).
- 2/12/12, 7:04 a.m.:      Robaxin and Ibuprofen doses given by Nurse Rados.
- 2/12/12, 6:24 p.m.:      Robaxin and Ibuprofen doses given by Nurse Wilt.
- 2/13/12, 2:03 p.m.:      Robaxin and Ibuprofen doses given by Nurse McCray.
- 2/13/12, 11:07 p.m.:    Vitals check (BP:  110/63, P:  80, R:  18, Temp:  98.9).
- 2/13/12, 11:44 p.m.:    Vitals check (BP:  114/78, P:  105, R:  18, Temp:  98.9).
- 2/14/12, 1:57 a.m.:      Robaxin and Ibuprofen doses given by Nurse Idehen.
- 2/14/12, 7:41 a.m.:      Robaxin and Ibuprofen doses given by Nurse Scott.
- 2/14/12, 7:40 p.m.:      General Encounter chart review by Nurse Scott.
- 2/14/12, 11:43 p.m.:    Vitals check (BP:  116/70, P:  80, R:  18,  Temp: 98.4).
- 2/15/12, 1:25 a.m.:      Robaxin and Ibuprofen doses given by Nurse Idehen.
- 2/15/12, 5:56 a.m.:      Robaxin and Ibuprofen doses given by Nurse Butler.
- 2/15/12, 5:25 p.m.:      Robaxin dose given by Nurse Butler.
- 2/15/12, 6:35 p.m.:      Ibuprofen dose given by Nurse Williams.
- 2/16/12, 6:25 a.m.:      Robaxin and Ibuprofen doses given by Nurse Butler.

- 2/16/12, 6:19 p.m.: Robaxin and Ibuprofen doses given by Nurse Cymerman.
- 2/17/12, 6:37 a.m.: Robaxin and Ibuprofen doses given by Nurse Beller.
- 2/17/12, 6:22 p.m.: Robaxin and Ibuprofen doses given by Nurse Herrera.
- 2/18/12, 6:58 a.m.: Robaxin and Ibuprofen doses given by Nurse Beller.
- 2/18/12, 6:12 p.m.: Robaxin and Ibuprofen doses given by Nurse Herrera.
- 2/19/12, 8:03 a.m.: Robaxin and Ibuprofen doses given by Nurse Beller.
- 2/19/12, 7:35 p.m.: Robaxin and Ibuprofen doses given by Nurse Herrera.
- 2/20/12, 7:50 a.m.: Robaxin and Ibuprofen doses given by Nurse Desjardin.
- 2/20/12, 6:22 p.m.: Robaxin and Ibuprofen doses given by Nurse Cymerman.
- 2/20/12, 11:15 p.m.: Medical Notified of Code Orange/Emergency Care. Nurse Roberts documents inmate arrived in medical at 11:18 p.m.: "Inmate in wheelchair attempting to appear passed out. Inmate drooling but would wipe the drool from face. PERRLA. VS 136/85 pulse 84 resp 20. Temp 99.0 BS 132. Inmate had fluttering eye syndrome. Inmate kept attempting to slide to the floor. Inmate informed to sit up. Inmate placed in medical for observation. Per EMR Inmate did this same thing two weeks. Refer to mental health."

*Dang in Medical – February 21 to February 23*

- 2/21/12, 5:00 a.m.: Infirmary Observation Order – Medical, ordered by Nurse Roberts for 24 hours due to inmate bizarre behavior.
- 2/21/12, 7:53 a.m.: Nursing Assessment by Nurse Bledsoe: Vitals (BP: 116/74, R: 16, Temp 97.1); Inmate alert and oriented x3; no complaints voiced.
- 2/21/12, 8:09 a.m.: Ibuprofen dose given by Nurse Bledsoe.
- 2/21/12, 10:40 a.m.: Mental Health Follow Up: "MH will staff case with Dr. Westhead to address this issue on 2/21/12."
- 2/21/12, 11:50 a.m.: Encounter with Dr. Valerie Westhead: "Im seen in medical because having what appears to have been an idiosyncratic reaction to muscle relaxants. He reports a drop in blood pressure and 'feeling odd.' He denies hallucinations or delusional thoughts. He reports that he feels calm with no mood complaints."; Dr. Westhead concluded Dang had suffered an "acute drug reaction,"

20

- 2/22/12, 8:40 a.m.:     stated no psychotropic medication and inmate is "cleared psychiatrically at this time."

- 2/22/12, 8:40 a.m.: Nursing Assessment by Nurse Densmore: Vitals (BP: 118/76, P: 76, R: 14, Temp 98.9); noted to be alert and oriented x3; notation that inmate attempted to sit up but kept rocking backwards onto the mattress and vitals were checked bedside.

- 2/22/12, 10:45 p.m.: Nursing Assessment by Nurse Thercier: Vitals (BP: 114/83, P: 88, R: 16, Temp: 97.8); Inmate alert and oriented x3 with no complaints voiced.

- 2/23/12, 8:30 a.m.: Nursing Assessment by Nurse Densmore: Vitals (BP: 102/64, P: 60, R: 14, Temp 99); alert and oriented x3; Inmate stated has a headache and has had it for 2 weeks; Roommate stated he is only eating a few bites of food at meals; White patches noted on tongue; Inmate is to be seen by doctor today.

- 2/23/12, 11:15 a.m.: Encounter with Nurse Densmore: Inmate trying to sit up at toilet and leaving head on toilet spitting into it unable to hold himself up and roommate stated that is how he had been eating he lays his face in his tray and eats then, he was incontinent of urine, he is less mobile than yesterday, he could sit up yesterday by himself, just unsteady when trying to get up, he is going to be seeing the doctor.

- 2/23/12, 12:07 p.m.: Infirmary Review with Dr. Ogunsanwo:S: Inmate was brought in a wheelchair. Has not been steady on his legs on attempt to walk. Says that he feels weak and wonders if it was the muscle relaxer – has not taken it for three days now, however. Has headache and neck pain, though he had the latter for sometime now. Speech barely audible and slurred but intelligible. Denies any bizarre behavior. Deinies any illicit drug use. O: T99 P60 BP102/64. Looks lethargic. PERRLA. Difficult fundoscopy but I could not see any papilledema. Two or three small lumps R side of the tongue, otherwise NAD. No pallor or Jaundice Lungs: Clear Heart: Normal HS, no murmurs/arrhythmias ABD: NAD Neuro: In a wheelchair (gait had been noted unsteady earlier),

Inaudible but intelligible speech. Diminished power and tone in RUE and LLE. Neck stretch was equivocal in pain response. A: Positive neurological deficits, noted gait unsteadiness, Slurred speech, Headache and equivocally positive neck stretch sign are suggestive of either meningism/meningitis or intracranial lesion. P/E: Refer ER ASAP.

- 2/23/12, 12:20 p.m.: Nurse Densmore documents that inmate seen by doctor and called her in to let her know to send inmate to ER via security ASAP; Nurse Densmore called Sgt. Lawshe at 12:08 p.m. to let her know inmate needs to go to ER ASAP; 12:15 p.m. called CFRH ER and gave report to Allison; 12:18 p.m. called Dr. Desai at CFRH and left message.

(Jail Medical Records, Doc. 140, Att. #1.)

There is no evidence in the record that Dang ever informed medical staff, or anyone else at the jail, of pertinent information regarding the fact that he had been experiencing headaches and neck pain since around late December 2011, that he had been taking considerable amounts of Aleve for his headaches, that he went to the emergency room on January 12, 2012, and that he refused at that time a lumbar puncture to test for possible subarachnoid bleeding and meningitis. (See Dang dep., Doc. 141, p. 37 – 39, p. 40 – 41, p. 63 – 66, p. 71 and p. 75 – 78.) These facts cannot be overstated: Dang failed to provide an accurate history to medical staff at the jail and consistently told medical staff an untrue, or at best misleading, story about being injured by police when he was arrested on January 26, 2012 as the cause of his complaints.

III.     <u>Statement of the Standard or Scope of Review</u>.

The standard of review of the District Court's Order granting summary judgment in favor of Defendants Eslinger, Wilt and Preston-Mayle is *de novo*, applying the same legal standard as the District Court.  *Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (11th Cir. 2009); W*ooden v. Bd. of Regents of Univ. Sys. of Georgia*, 247 F.3d 1262, 1271 (11th Cir. 2001).  Further, as to the scope of review, this Court may affirm the District Court's judgment "on any basis supported by the record, regardless of whether the district court decided the case on that basis." *Harvey v. Daniels*, 625 Fed.Appx. 499 (11th Cir. 2015)(citing *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1256 (11th Cir. 2001)); *Hall v. Holder*, 117 F.3d 1222, 1226 (11th Cir. 1997)(citing *Watkins v. Bowden*, 105 F.3d 1344, 1353 n. 17 (11th Cir. 1997)(appellate court may affirm district court on any ground, even one not considered)).

## SUMMARY OF THE ARGUMENT

The District Court did not err in granting summary judgment and qualified immunity to Nurse Wilt and Nurse Preston-Mayle because neither of them were deliberately indifferent to a serious medical need of Dang when they had brief clinical encounters with him on January 29, 2012 and February 7, 2012, respectively.

Regarding Nurse Wilt, she saw Dang on January 29, 2012 pursuant to a nurse sick call in which Dang complained of headaches and neck pain as a result of a physical encounter with law enforcement during arrest. Nurse Wilt professionally and appropriately examined Dang and prescribed him Motrin and a muscle rub and placed an order for Dang to see the jail doctor, which occurred shortly thereafter. Dang has not presented evidence that Nurse Wilt was deliberately indifferent to a known serious medical need on January 29, 2012.

Regarding Nurse Preston-Mayle, she conducted a required 14-day History and Physical of Dang on February 7, 2012 in a professional and appropriate manner. Dang also complained to Nurse Preston-Mayle that his headaches and pain were a result of a physical encounter with law enforcement during arrest. Nurse Preston-Mayle noted that Dang was already on a course of treatment by the jail doctor for his complaints, and she concluded that there were no abnormalities during the evaluation that would have caused her to refer Dang to mental health or

24

the doctor.  Nonetheless, Nurse Preston-Mayle offered a doctor, dental and mental health sick call at the time to Dang, which he declined.  Dang has not presented evidence that Nurse Preston-Mayle was deliberately indifferent to a known serious medical need on February 7, 2012.

Because there was no underlying constitutional violation by any individual Defendant/Appellee at the jail, the District Court did not err in granting summary judgment to Sheriff Eslinger on the municipal liability claim against him.

Additionally, Sheriff Eslinger is entitled to have summary judgment affirmed as to the municipal liability claim because Dang has waived or abandoned that claim on appeal by failing to present any argument or authority for reversal in his Initial Brief.

Nonetheless, summary judgment to Sheriff Eslinger was appropriate because, even if there was an underlying constitutional violation by any individual Defendant/Appellee, Dang has failed to present any evidence of a pattern or practice of widespread abuse by the Sheriff that caused Dang's injury.

## ARGUMENT AND CITATIONS OF AUTHORITY

I.    THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT AND QUALIFIED IMMUNITY TO NURSE WILT AND NURSE PRESTON-MAYLE ON THE 42 U.S.C. § 1983 DELIBERATE INDIFFERENCE CLAIMS AGAINST THEM.

In Count III, Dang brought a claim against Nurse Wilt pursuant to 42 U.S.C. § 1983, asserting that Nurse Wilt was deliberately indifferent to Dang's serious medical needs in violation of the Fourteenth Amendment when she saw him on January 29, 2012.  In Count IV, Dang brought a claim against Nurse Preston-Mayle pursuant to 42 U.S.C. § 1983, asserting that Nurse Preston-Mayle was deliberately indifferent to Dang's serious medical needs in violation of the Fourteenth Amendment when she saw him on February 7, 2012.  However, even when viewed in a light most favorable to Dang, the evidence does not establish that Nurse Wilt or Preston-Mayle were deliberately indifferent to a serious medical need of Dang during the course of their limited interaction with Dang, and they were properly granted summary judgment and qualified immunity because their conduct did not violate clearly established law.

A.    The District Court Properly Concluded There Was No Constitutional Violation Because Nurse Wilt Was Not Deliberately Indifferent to a Serious Medical Need of Dang on January 29, 2012 and Nurse Preston-Mayle Was Not Deliberately Indifferent to a Serious Medical Need of Dang on February 7, 2012.

Deliberate indifference to a pretrial detainee's serious medical needs is a

26

violation of the detainee's Fourteenth Amendment rights. See *Goebert v. Lee County*, 510 F.3d 1312, 1326 (11th Cir. 2007) (referring to prisoner and Eighth Amendment).

### 1. *Kingsley* Did Not Change the Deliberate Indifference Standard in Medical Care Cases.

Appellant Dang argues that the *Kingsley v. Hendrickson*, 135 S.Ct. 2466 (2015), changed the appropriate deliberate indifference standard in medical care cases to a new, objective standard with no subjective component. (Appellant's Brief, p. 37 – 39.) However, the District Court correctly determined that "*Kingsley* did not alter the standard applicable to medical care claims." (Order, Doc. 184, p. 11.) *Kingsley* is limited to excessive force cases.

In *Kingsley*, the Supreme Court ruled that in order to prove a 42 U.S.C. § 1983 excessive force claim, a pretrial detainee must show only that the defendant officer's use of force was objectively unreasonable, not that the defendant officer was subjectively aware that the use of force was unreasonable. *Id*. at 2472-73. Thus, while *Kingsley* may have a significant effect on cases involving excessive force applied to pretrial detainees, it does not impact the standard applied to the case at bar, as this case does not involve allegations of excessive force.

Appellant Dang's Brief concedes that *Kingsley* did not involve claims of deficient medical care to pretrial detainees, but argues that the opinion should be

broadly applied to all claims of pretrial detainees involving alleged violations of the Fourteenth Amendment. The *Kingsley* opinion does not provide authority for Dang's position. The Supreme Court's intent to limit the *Kingsley* opinion is evident because the opinion explicitly acknowledges that "the objective standard is appropriate in the context of *excessive force claims* brought by pretrial detainees pursuant to the Fourteenth Amendment." *Id.* at 2476 (emphasis added.)

Dang's reliance upon *Castro v. County of Los Angeles*, 797 F.3d 654 (9th Cir. 2015), *Johnson v. Clafton*, No. 13-14922, 2015 WL 5729080 (E.D. Michigan, Sept. 30, 2015), *Saetrum v. Raney*, No. 1:13-425WBS, 2015 WL 4730293 (D. Idaho, Aug. 7, 2015) and *Collins v. Al Shami*, No. 1:13-cv-01838-TWP-DML, 2015 WL 5098533 (S.D. Ind. Aug. 31, 2015) is misplaced. In *Castro*, as Dang concedes, the Ninth Circuit applied the traditional deliberate indifference standard, while a dissenting judge opined that *Kingsley* called into question the standard. *Castro*, 797 F.3d at 665. In *Johnson*, the court did not resolve the issue of whether *Kingsley* altered the deliberate indifference standard in medical care cases. *Johnson*, 2015 WL 5729080 at *4. Likewise, the courts in *Saetrum* and *Collins* did not resolve the issue either. *Saetrum*, 2015 WL 4730293 at *11, n. 5; *Collins*, 2015 WL 5098533 at *8.

Although the Eleventh Circuit has yet to rule on the proper standard to employ in analyzing a pretrial detainee's deliberate indifference claim in light of

the *Kingsley* decision, there is ample case law that supports Appellees' argument that *Kingsley* does not extend to all Fourteenth Amendment due process claims, including a due process claim regarding jail medical care. See *Davis v. Wessel*, 792 F.3d 793, 801 (7th Cir. 2015)(finding the *Kingsley* case was "instructive" to the due process analysis, but not directly applicable and ultimately requiring the plaintiff to prove subjective intent); *Thomley v. Bennett*, No.: 5:14-cv-73, 2016 WL 498436, *6-7 and n.7 (S.D. Ga. Feb. 8, 2016)("However, it does not appear that *Kingsley* provides the standard which is to be applied in this [conditions of confinement] case."); *Bilal v. Geo Care, LLC*, No. 2:14-cv-422-FTM-38MRM, 2016 WL 345514 at *6 (M.D. Fla. Jan. 28, 2016)(recognizing the *Kingsley* decision and stating that in the context of conditions of confinement cases, "the relevant state of mind for a condition claim is deliberate indifference."); *Kennedy v. Bd. of County Comm. for Okla. County*, No. CIV-15-398-D, 2015 WL 4078177 at *1, n. 6 (W.D. Okla. July 6, 2015)(applying the deliberate indifference standard and finding that *Kingsley* does not alter the standard applicable to medical care claims); *Roberts v. C-73 Med. Dir.*, No. 1:14-cv-5198-GHW, 2015 WL 4253796 at *3, n. 3 (S.D.N.Y. July 13, 2015)(applying the deliberate indifference standard and finding that *Kingsley* was limited to excessive force claims); *Gilbert v. Rohana*, No. 1:14-cv-00630-RLY-DKL, 2015 WL 6442289, *4 (S.D. Ind. Oct. 23, 2015)(finding *Kingsley* did not alter the legal standard for denial of medical

29

treatment claims brought by pretrial detainees because *Kingsley* was limited to excessive force claims); *Austin v. County of Alameda*, No. 15-cv-00763-HSG, 2015 WL 4051997 (N.D. Ca. July 2, 2015)(case involving claims of excessive force and deliberate indifference to serious medical needs of pretrial detainee; court noted that *Kingsley* recently clarified the standard for excessive force claims under § 1983 for a pretrial detainee); *Skinner v. Sproul*, No. 1:14-cv-174-WLS-MSH, 2015 WL 3970693 (M.D. Ga. June 30, 2015)(same).  Therefore, Dang's argument that *Kingsley* changed the applicable standard in the present case must fail.[13]

> 2. Legal Standard for Deliberate Indifference.

To prove deliberate indifference, a plaintiff must show three things. First, he must show that the detainee had a serious medical need.  *Goebert*, 510 F.3d at 1326. (citing *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005)). This is an objective inquiry. *Id*. Second, he must show that the defendant acted with deliberate indifference to the detainee's serious medical need. *Id*. (citing *Bozeman*, 422 F.3d at 1272). This is a subjective inquiry. *Id.* Third, the plaintiff must show that the defendant's wrongful conduct caused the detainee's injury. *Id*. (citing *Hale*

---

[13]  In any event, because the standard applicable at the time giving rise to this lawsuit in 2012 was unquestionably the deliberate indifference standard, the individual Appellees should nonetheless be entitled to qualified immunity as *Kingsley* was not clearly established law at that time.  See *Thomley*, 2016 WL 498436 at n.7.

*v. Tallapoosa County*, 50 F.3d 1579, 1582 (11th Cir. 1995)); See also, *Keele v. Glynn County, Georgia*, 938 F. Supp. 2d 1270, 1291 (S.D. Ga. 2013).

i. Objectively Serious Medical Need.

First, a plaintiff must show that the detainee had an objectively serious medical need. "A medical need that is serious enough to satisfy the objective component 'is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Goebert*, 510 F.3d at 1326. (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994), *overruled in part on other grounds by Hope v. Pelzer*, 536 U.S. 730, 739 n. 9 (2002)).

ii. Acted With Deliberate Indifference.

Second, a plaintiff must show that each defendant acted with deliberate indifference to the detainee's medical need. This requires proof of three things: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence."[14] *Goebert*, 510 F.3d at 1327 (citation omitted) (alteration in original).

---

[14] There was previously an intra-circuit split regarding the third prong of this test. Some courts required "more than mere negligence;" others required "more than gross negligence." See *Granda v. Schulman*, 372 Fed.Appx. 79, 83 n. 1 (11th Cir. 2010). However, the Eleventh Circuit clarified that its "mere negligence" statements were utilized in dicta and upheld the "gross negligence standard." *Townsend v. Jefferson County*, 601 F.3d 1152, 1158 (11th Cir. 2010) ("Although

Subjective knowledge of the risk requires that the defendant be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). It also requires the defendant to "draw the inference." *Id*. "Whether a particular defendant has subjective knowledge of the risk of serious harm is a question of fact 'subject to demonstration in the usual ways, including inference from circumstantial evidence.'" *Goebert*, 510 F.3d at 1327 (quoting *Farmer*, 511 U.S. at 842). Moreover, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id*. (quoting *Farmer*, 511 U.S. at 842). Crucially, the inquiry does not focus on serious medical needs "that [a defendant] *should* have perceived but did not." *Presley v. City of Blackshear*, 650 F.Supp.2d 1307, 1315 (S.D.Ga. 2008), *aff'd*, *Presley v. City of Blackshear*, 340 Fed.Appx. 567 (11th Cir. 2009) (citing *Burnette v. Taylor*, 533 F.3d 1325 (11th Cir. 2008)) (emphasis added). Rather, the official must have actually perceived the medical need. *See id*. Also, "imputed or collective knowledge cannot serve as the

---

we have occasionally stated, in dicta, that a claim of deliberate indifference requires proof of "more than mere negligence," *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999), our earlier holding in *Cottrell* [*v. Caldwell* ], 85 F.3d [1480] at 1490 [ (11th Cir. 1996) ], made clear that, after *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), a claim of deliberate indifference requires proof of more than gross negligence."). *Keele*, 938 F.Supp. 2d at 1291.

basis for a claim of deliberate indifference. Each individual Defendant must be judged separately and on the basis of what that person kn[ew]." *Id*. (quoting *Burnette*, 533 F.3d at 1331).

After showing the defendant's subjective awareness of the substantial risk of harm, the plaintiff must show that the defendant "disregard[ed] that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. Thus, even if a defendant "actually knew of a substantial risk to [detainee] health or safety[, she] may be found free from liability if [she] responded reasonably to the risk, even if the harm ultimately was not averted." *Id*. at 844. Deliberate indifference requires "'not merely the knowledge of a condition, but the knowledge of necessary treatment coupled with a refusal to treat properly or a delay in such treatment.'" *McIlwain v. Marengo County*, No. 13-168-CG-M, 2013 WL 5434145 at *10 (S.D. Ala. Sept 26, 2013)(quoting *Howell v. Evans*, 922 F. 2d 712, 721 (11th Cir. 1991)(citing *Estelle v. Gamble*, 429 U.S. 97 (1976)).

Last, the plaintiff must show that the defendant's conduct constituted more than gross negligence. "The meaning of 'more than gross negligence' is not self-evident." *Goebert*, 510 F.3d at 1327. However, case law provides some guidance. *Id*. Notably, "[e]ven where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs." *Pourmoghani–Esfahani v. Gee*, 625 F.3d 1313, 1317 (11th

Cir. 2010) (citing *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999)). Where a plaintiff is harmed by a delay in the provision of medical care, courts consider: "(1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay." *Goebert*, 510 F.3d at 1327 (citing *Hill*, 40 F.3d at 1189). However, "accidental inadequacy, negligence in diagnosis or treatment, [and] medical malpractice" are insufficient to sustain a claim of deliberate indifference. *Nimmons v. Aviles*, 409 Fed.Appx. 295, 297 (11th Cir. 2011) (per curiam) (quoting *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000)).

The Eleventh Circuit has stated that for medical treatment to rise to the level of a constitutional violation, the care must be "'so grossly incompetent, inadequate, or excessive as to shock the conscience or be intolerable to fundamental fairness.'" *Jackson v. Jackson*, 456 Fed. Appx. 813, 814 (11th Cir. 2012)(quoting *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991)); See also, *Freeman v. Lebedovych*, 186 Fed. Appx. 943, 944 (11th Cir. 2006.).

### iii. Causation.

Last, a plaintiff must show that "the constitutional violation caused the injury." *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003); *Goebert*, 510 F.3d at 1327. Causation "can be shown by personal participation in the constitutional violation." *Goebert*, 510 F.3d at 1327 (citing *Zatler v. Wainwright*,

802 F.2d 397, 401 (11th Cir. 1986) (per curiam)).

      3.      Application of Deliberate Indifference Standard to Nurse Wilt's Conduct.

Initially, Dang's characterization as to the scope of authority of LPNs, including Nurse Wilt, is not accurate. First, the Florida Nurse Practice Act (Fla. Stat. §§ 464.001-464.027), does not state that "only a Registered Nurse (R.N.) has the ability to assess and develop a plan of treatment for a patient" as Dang argues. (See Appellant's Brief, p. 46)(citing Fla. Stat. § 464.003(20)). Rather, the statutory language relating to LPNs and RNs specifically states:

> (19) "Practice of practical nursing" means the performance of selected acts, including the administration of treatments and medications, in the care of the ill, injured, or infirm and the promotion of wellness, maintenance of health, and prevention of illness of others under the direction of a registered nurse, a licensed physician, a licensed osteopathic physician, a licensed podiatric physician, or a licensed dentist. *A practical nurse is responsible and accountable for making decisions that are based upon the individual's educational preparation and experience in nursing.*
> (20) "Practice of professional nursing" means the performance of those acts requiring substantial specialized knowledge, judgment, and nursing skill based upon applied principles of psychological, biological, physical, and social sciences which shall include, but not be limited to:
> (a) The observation, assessment, nursing diagnosis, planning, intervention, and evaluation of care; health teaching and counseling of the ill, injured, or infirm; and the promotion of wellness, maintenance of health, and prevention of illness of others.
> (b) The administration of medications and treatments as prescribed or authorized by a duly licensed practitioner authorized by the laws of this state to prescribe such medications and treatments.
> (c) The supervision and teaching of other personnel in the theory

and performance of any of the acts described in this subsection.

> A professional nurse is responsible and accountable for making decisions that are based upon the individual's educational preparation and experience in nursing.

Fla. Stat. §§ 464.003(19) and (20)(emphasis added).

Importantly, an LPN "is responsible and accountable for making decisions that are based upon the individual's educational preparation and experience in nursing." Fla. Stat. § 464.003(19). The statute does not state, as Dang suggests, that an LPN cannot "observe," "assess" or "develop a plan for treatment."

Further, the Seminole County Sheriff's Office job description for LPNs (Job Description, Doc. 164-7) states that part of LPNs duties are to complete "physical assessments on inmates in accordance with medical protocol" and conduct "daily nurse's sick call."[15] (Doc. 164-7.) Accordingly, Plaintiff's argument that LPNs, including Nurse Wilt, were not permitted by statute or policy to "assess" and "develop a plan of treatment" is simply not true.

Plaintiff's argument that Nurse Wilt as an LPN was acting outside the scope of her discretionary authority is without merit. As set forth above, Nurse Wilt was not acting outside the professional parameters of the Florida Nurse Practice Act,

---

[15] This is precisely what Nurse Wilt, an LPN with over 45 years of experience, did when she conducted a nurse sick call of Dang on the evening of January 29, 2012, and ordered Motrin, a muscle rub and placed a doctor sick call for a Robaxin order pursuant to the jail's pain management protocol. (See Wilt dep., Doc. 142, p. 9 and p. 28 – 30); (Del Castillo dep., Doc. 144, Ex. 5.)

36

and was not acting contrary to the policies and procedures and job description of the Sheriff's Office.

In determining whether an official was "acting within the scope of [her] discretionary authority," the Court assesses whether the official's actions are "of a type that fell within the employee's job responsibilities. [The Court's] inquiry is two-fold. We ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within [her] power to utilize." *Kruse v. Byrne*, No. 11-00513-KD-C, 2013 WL 6237694, *8 (S.D. Ala., Dec. 3, 2013), *aff'd Kruse v. Williams*, 592 Fed. Appx. 848 (11th Cir. 2014) (quoting *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1256 (11th Cir. 2004)). The record here reveals that the nurse sick call encounter that Nurse Wilt had with Dang on January 29 was well within the scope of her job duties and responsibilities as an LPN at the jail. See *Kruse*, 2013 WL 6237694 at *8 (finding that an LPN employed by a county correctional facility was acting within her discretionary authority when she performed assessments and treated inmates).

The only encounter in which Plaintiff alleges that Nurse Wilt acted with deliberate indifference was during the nurse sick call encounter on the evening of January 29, which was then electronically documented on January 30. The record evidence, however, reflects that Nurse Wilt professionally and appropriately

examined Dang during this encounter and there is no evidence that Nurse Wilt was deliberately indifferent to a known serious medical need at that time.

First, Dang's complaints of essentially neck strain and headaches from a police encounter which Dang represented took place on arrest, meaning only three days prior, did not at the time amount to an objectively serious medical need for purposes of the federal deliberate indifference standard.[16]  This is because (1) Dang had not been diagnosed by a physician as having a serious medical need (for example, cryptococcal meningitis) which needed treatment, and (2) Dang did not exhibit such signs that were "so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Goebert*, 510 F.3d at 1326. Dang's complaints and presentation to Nurse Wilt on January 29 were consistent with the neck/muscle strain that Dang attributed to a physical encounter with police, which would not amount to an objectively serious medical need at that point in time.  Accordingly, Dang's claim against Nurse Wilt should fail at this first step of the analysis.

Second, there is no evidence in the record that Nurse Wilt was subjectively aware of a serious medical need such as cryptococcal meningitis.  Rather, the evidence is that on January 29 and 30 Nurse Wilt was not "aware of facts from

---

[16]  The District Court assumed an objectively serious medical need for purposes of its analysis.  (Order, Doc. 184, p. 11.)  Nurse Wilt disagrees that an objectively serious medical need was apparent when she saw Dang on January 29, 2012.

which the inference could be drawn that a substantial risk of serious harm exist[ed]," *Farmer*, 511 U.S. at 837, and that in fact Nurse Wilt drew the inference. *Id*. Essentially, Dang argues that Nurse Wilt *should* have done a more thorough evaluation and *should* have been aware that Dang's symptoms then could be signs of meningitis. Crucially, however, the inquiry does not focus on serious medical needs "that [a defendant] *should* have perceived but did not." *Presley*, 650 F.Supp.2d at 1315. Rather, for Dang to establish a claim of deliberate indifference against Nurse Wilt, Plaintiff must set forth evidence that Nurse Wilt actually perceived the medical need. *See id.* Dang has failed to meet the burden of showing a subjective knowledge of a risk of serious harm.

Third, Dang has failed to set forth evidence that, assuming *arguendo* a subjective awareness of a substantial risk of harm, that Nurse Wilt disregarded that risk by failing to take reasonable measures to abate it by conduct that constituted "more than gross negligence." *Goebert*, 510 F.3d at 1327. There is no evidence in the record that would establish that Nurse Wilt's conduct on January 29 and 30 was "'so grossly incompetent, inadequate, or excessive as to shock the conscience or be intolerable to fundamental fairness.'" *Jackson*, 456 Fed.Appx. at 814 (quoting *Harris*, 941 F.2d at 1505.)

The only conduct alleged is that Nurse Wilt "ignored" signs and symptoms of "possible" meningitis, that she ordered Motrin and a muscle rub, and that she

made a request for a doctor sick call to get an order for a muscle relaxant. Dang does not allege what other actions Nurse Wilt should have taken on January 29 given that she clearly placed an order for Dang to be seen by the physician, which did in fact occur shortly thereafter on February 1, 2012.

Dang also points out that Nurse Wilt did not take vitals of Dang on January 29, and that she should have. Nurse Wilt disagrees. Given that Dang presented with muscle pain and headache due to an alleged physical altercation and that he did not complain of being sick, and kept important information from Nurse Wilt regarding his prior complaints of headaches, dizziness, fever and emergency room visit, it was entirely reasonable to treat Dang as Nurse Wilt did without taking vitals. (See Expert Report of Robert A. Larsen, MD, Doc. 150, Att. #2 at p. 4 and Expert Report of Renee Dahring, MSN, RN, CNP, CCHP, Doc. 150, Att. #5 at p. 3.) In any event, the failure to take vitals under these circumstances cannot be said as a matter of law to be so grossly incompetent or inadequate so as to "shock the conscience." As previously noted, "accidental inadequacy, negligence in diagnosis or treatment, [and] medical malpractice" are insufficient to state a claim for "deliberate indifference." *Nimmons*, 409 Fed.Appx. at 297.

Last, Dang failed to set forth evidence that Nurse Wilt's conduct was deliberately indifferent to a serious medical need, *and* that such conduct actually caused Dang's injury. Although Dang is critical of Nurse Wilt for not taking

40

Dang's vitals and critical of Nurse Wilt for failing to suspect the possibility of an extremely rare condition such as cryptococcal meningitis on January 29 or 30, Dang was seen by a physician approximately 36 hours later and was found with normal vitals. And, Dr. Ogunsanwo, a physician, did not suspect Dang had a serious and rare condition at that time based on Dang's complaints, stated history and presentation. Further, it was well over 3 weeks after Nurse Wilt saw Dang that he was taken to the hospital and eventually diagnosed with cryptococcal meningitis. Dang cannot set forth evidence that Nurse Wilt's conduct caused Dang's injuries, and therefore summary judgment to her should be affirmed.

The Eleventh Circuit recently addressed a similar deliberate indifference claim against a jail nurse, and affirmed the district court's granting of summary judgment in favor of the nurse. *Kruse v. Williams*, 592 Fed.Appx. 848 (11th Cir. 2014). In *Kruse*, the Eleventh Circuit found that a jail nurse did not act with deliberate indifference to the medical needs of a pretrial detainee with Addison's disease by failing to send the detainee to the hospital in response to his complaints, and thus did not violate the Fourteenth Amendment; the jail nurse promptly treated all of the detainee's symptoms of which she was made aware, consulted with a doctor and implemented the course of treatment she recommended, and continued to check on detainee's condition after administering the treatment recommended by the doctor. *Id*. at 856-859. In particular, the Court determined that plaintiff

41

failed to demonstrate a genuine issue of material fact as to the subjective component of the deliberate indifference test. The Court importantly concluded its opinion as follows:

> Even if grossly negligent, [Nurse] William's failure to detect that [detainee] Jordan's condition necessitated an emergency trip to the hospital is not sufficient to establish a claim of deliberate indifference in violation of the Fourteenth Amendment.

*Id.* at 859.

Similarly Nurse Wilt's reaction to and treatment of Dang's complaints on January 29, including her failure to detect a rare case of potential cryptococcal meningitis and send him immediately to the hospital, even if considered to be negligent or grossly negligent, which Nurse Wilt denies, is not sufficient to establish a claim of deliberate indifference and Nurse Wilt was properly entitled to summary judgment. See *Kruse*, 592 Fed. Appx. at 859.

4. Application of Deliberate Indifference Standard to Nurse Preston-Mayle's Conduct.

The only encounter in which Dang alleges that Nurse Preston-Mayle acted with deliberate indifference was during the History and Physical evaluation on the morning of February 7, 2012. The record evidence, however, reflects that Nurse Preston-Mayle professionally and appropriately examined Dang during this encounter and there is no evidence that Nurse Preston-Mayle was deliberately

indifferent to a known serious medical need at that time.[17]

First, Dang's complaints of essentially neck strain and headaches from a police encounter which Dang represented took place on arrest, did not at the time amount to an objectively serious medical need for purposes of the federal deliberate indifference standard.[18] This is because (1) Dang was seen by Dr. Ogunsanwo six days earlier on February 1, 2012, and he was prescribed Motrin, a muscle rub and Robaxin (a muscle relaxant) relating to his complaints; therefore, he had not previously been diagnosed by a physician as having a serious medical need (for example, cryptococcal meningitis) which needed treatment; and (2) Dang did not exhibit such signs that were "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Goebert*, 510 F.3d at 1326. Dang's complaints and presentation to Nurse Preston-Mayle on February 7 were consistent with the neck/muscle strain that Dang attributed to a physical encounter with police, which would not amount to an objectively serious medical need at that point in time. Accordingly, Dang's claim against Nurse Preston-Mayle should fail

---

[17] Dang does not argue that Nurse Preston-Mayle, an RN, at any point acted outside the scope of her discretionary authority. Nonetheless, for the same reasons previously set forth above regarding Nurse Wilt, Nurse Preston-Mayle was clearly acting within the scope of her discretionary authority at all times material hereto.

[18] The District Court assumed an objectively serious medical need for purposes of its analysis, (Order, Doc. 184, p. 11.) Nurse Preston-Mayle disagrees that an objectively serious medical need was apparent when she saw Dang on February 7, 2012.

at this first step of the analysis.

Second, there is no evidence in the record that Nurse Preston-Mayle was subjectively aware of a serious medical need such as cryptococcal meningitis. Rather, the evidence is that on February 7, 2012, Nurse Preston-Mayle was not "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]," *Farmer*, 511 U.S. at 837, and that in fact Nurse Preston-Mayle drew the difference. *Id*. Essentially, Dang argues that Nurse Preston-Mayle *should* have been aware that Dang's symptoms then could be signs of meningitis. Crucially, however, the inquiry does not focus on serious medical needs "that [a defendant] *should* have perceived but did not." *Presley*, 650 F.Supp.2d at 1315. Rather, for Plaintiff to establish a claim of deliberate indifference against Nurse Preston-Mayle, Plaintiff must set forth evidence that Nurse Preston-Mayle actually perceived the medical need. *See id*. Plaintiff has failed to meet the burden of showing a subjective knowledge of a risk of serious harm.

Third, Dang has failed to set forth evidence that, assuming *arguendo* a subjective awareness of a substantial risk of harm, that Nurse Preston-Mayle disregarded that risk by failing to take reasonable measures to abate it by conduct that constituted "more than gross negligence." *Goebert*, 510 F.3d at 1327. There is no evidence in the record that would establish that Nurse Preston-Mayle's conduct on February 7 was "so grossly incompetent, inadequate, or excessive as to shock

44

the conscience or be intolerable to fundamental fairness." *Jackson*, 456 Fed.Appx. at 814 (quoting *Harris*, 941 F.2d at 1505.)

The only conduct alleged is that Nurse Preston-Mayle did not recognize Dang's signs and symptoms were that of meningitis and that he was "allowed to return to general population with no attempt to further evaluate his deteriorating condition." (Appellant's Brief, p. 52.)  Thus, Dang seems to claim Nurse Preston-Mayle should have made the call to immediately transfer Dang to the medical unit on February 7 due to his complaints and presentation.  But, Nurse Preston-Mayle offered Dang the opportunity to make a doctor sick call if needed, which Dang refused.  And, Nurse Preston-Mayle described that Dang appeared "coherent," "alert," "oriented" and even "joking" at times.  Nurse Preston-Mayle's conduct with regard to Dang on February 7 was appropriate and reasonable.  (See Expert Report of Robert A. Larsen, MD, Doc. 150, Att. #2 at p. 5, and Expert Report of Renee Dahring, MSN, RN, CNP, CCHP, Doc. 150, Att. #5 at p. 3.)  The fact that Nurse Preston-Mayle did not cause Dang to be transferred to the medical unit on February 7 is not deliberate indifference.  As previously noted, "accidental inadequacy, negligence in diagnosis or treatment, [and] medical malpractice" are insufficient to state a claim for "deliberate indifference." *Nimmons*, 409 Fed.Appx. at 297.

Last, Dang failed to set forth evidence that Nurse Preston-Mayle's conduct

was deliberately indifferent to a serious medical need, *and* that such conduct

actually caused Dang's injury. It was over 2 weeks after Nurse Preston-Mayle saw

Dang that he was taken to the hospital and eventually diagnosed with cryptococcal

meningitis. Dang cannot set forth evidence that Nurse Preston-Mayle's conduct

caused Dang's injuries, and therefore summary judgment to her should be

affirmed.

As previously noted in section I.A.3. above, the Eleventh Circuit recently

addressed a similar deliberate indifference claim against a jail nurse, and affirmed

the district court's granting of summary judgment in favor of the nurse. *Kruse v.*

*Williams*, 592 Fed.Appx. 848 (11th Cir. 2014). [19]

---

[19] In *Kruse*, the Eleventh Circuit found that a jail nurse did not act with deliberate indifference to the medical needs of a pretrial detainee with Addison's disease by failing to send the detainee to the hospital in response to his complaints, and thus did not violate the Fourteenth Amendment; the jail nurse promptly treated all of the detainee's symptoms of which she was made aware, consulted with a doctor and implemented the course of treatment she recommended, and continued to check on detainee's condition after administering the treatment recommended by the doctor. *Id.* at 856-859. In particular, the Court determined that plaintiff failed to demonstrate a genuine issue of material fact as to the subjective component of the deliberate indifference test. The Court importantly concluded its opinion as follows:

> Even if grossly negligent, [Nurse] William's failure to detect that [detainee] Jordan's condition necessitated an emergency trip to the hospital is not sufficient to establish a claim of deliberate indifference in violation of the Fourteenth Amendment.

*Id.* at 859.

Similarly Nurse Preston-Mayle's standard History and Physical evaluation of February 7, 2012, including her failure to detect a rare case of potential cryptococcal meningitis and send him immediately to medical or to the hospital, even if considered to be negligent or grossly negligent, which Nurse Preston-Mayle denies, is not sufficient to establish a claim of deliberate indifference and Nurse Preston-Mayle was properly entitled to summary judgment. See *Kruse*, 592 Fed. Appx. at 859.

B.  Nurses Wilt and Preston- Mayle Were Properly Entitled to Qualified Immunity Because They Did Not Violate Clearly Established Law.

Additionally, Nurses Wilt and Preston-Mayle were properly granted qualified immunity because their actions were discretionary and did not violate clearly established law.

The qualified immunity defense "protect[s] government officials from liability for civil damages." *Youmans v. Gagnon*, 626 F.3d 557, 562 (11th Cir. 2010) (citing *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808 (2009) (internal punctuation omitted)). Finding that an official was deliberately indifferent to a detainee's serious medical needs does not necessarily preclude qualified immunity. *Bozeman v. Orum*, 422 F.3d 1265, 1273–74 (11th Cir. 2005). Therefore, Nurses Wilt and Preston-Mayle retain their entitlement to qualified immunity "unless the law preexisting [her] supposedly wrongful act was already established to such a

high degree that every objectively reasonable official standing in [her] place would be on notice that what [she] was doing would be clearly unlawful given the circumstances." *Id.* at 1273 (quoting *Pace v. Capobianco*, 283 F.3d 1275, 1282 (11th Cir. 2002)).

The Eleventh Circuit established a burden-shifting framework within which to analyze a defendant's qualified immunity defense. First, "a defendant official must ... show that his allegedly wrongful act or omission occurred while he was engaged in a discretionary duty." *Goebert*, 510 F.3d at 1329 (citing *Mercado v. City of Orlando*, 407 F.3d 1152, 1156 (11th Cir. 2005)). Assuming that the defendant was engaged in a discretionary duty, the plaintiff must establish "both that the defendant committed a constitutional violation and that the law governing the circumstances was already clearly established at the time of the violation." *Youmans*, 626 F.3d at 562 (citing *Pearson*, 555 U.S. 223, 129 S.Ct. at 815-16).

In assessing the merits of a qualified immunity defense in deliberate indifference cases, courts conduct an objective, albeit fact-specific, inquiry. *Harris v. Coweta County*, 21 F.3d 388, 390 (11th Cir. 1994) (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). The Court "review[s] the record through the eyes of an objective, reasonable government official." *Id.* (citing *Nicholson v. Georgia Dep't of Human Res.*, 918 F.2d 145, 147 (11th Cir. 1990)).

The District Court properly concluded that Nurse Wilt and Preston-Mayle

were acting within the scope of their authority and pursuant to their duties as nurses at the jail. (Order, Doc. 184, p. 10.) Furthermore, Nurse Wilt and Preston-Mayle's decisions regarding whether and how to provide Dang with medical care were arguably discretionary. See, e.g., *Goebert*, 510 F.3d at 1329–31 (applying qualified immunity analysis to detention facility commander's decision not to provide medical care to a detainee). Accordingly, Nurses Wilt Preston-Mayle have met their burden to "show that [their] allegedly wrongful act or omission occurred while [they were] engaged in a discretionary duty." *Id.* at 1329.

Therefore, the only remaining question for the Court is whether "the law governing the circumstances was already clearly established at the time of the violation." *Youmans*, 626 F.3d at 562 (citing *Pearson*, 555 U.S. 223, 129 S.Ct. at 815-16). Consequently, the Court should consider whether it would have been apparent to a reasonable jail nurse in Nurse Wilt's and Preston-Mayle's positions that their conduct constituted deliberate indifference to Dang's medical needs. Because the test is objective, the Court must not look to what Nurses Wilt and Preston-Mayle actually thought or intended. Instead, the Court must consider what a reasonable nurse would think given what she knew at the time and the relevant circumstances in which she found herself. See *Harris*, 21 F.3d at 390–91.

More specifically, the question before the Court is whether on January 29, 2012 and February 7, 2012, the law sufficiently established that Nurse Wilt's and

Preston-Mayle's brief interactions with Dang and the fact that they did not then recognize his symptoms as possible meningitis and cause him to immediately receive physician attention, was a constitutional violation. Nurses Wilt and Preston-Mayle submit that it was not clearly established at the time such limited contact with an inmate's complaints, and their respective responses to same, would amount to deliberate indifference to Dang's serious medical needs and therefore Nurses Wilt and Preston-Mayle were properly entitled to qualified immunity.

II. THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT TO SHERIFF ESLINGER ON THE 42 U.S.C § 1983 MUNICIPAL LIABILITY CLAIM AGAINST HIM IN HIS OFFICIAL CAPACITY.

The District Court properly granted summary judgment to Sheriff Eslinger on the § 1983 municipal liability claim against him in his official capacity because the Court concluded that none of the individual Defendants violated Dang's constitutional rights. (Order, Doc. 184, p. 18 – 19.)[20]

A. Dang's Waiver or Abandonment of the Municipal Liability Claim Against Sheriff Eslinger on Appeal.

Despite the specific arguments and proofs offered by Sheriff Eslinger in his summary judgment motion, on appeal Dang does not address the municipal

---

[20] Although the District Court references "supervisor liability" as opposed to "municipal liability" in its order, it is clear that neither can exist without an underlying constitutional violation. *Beshers v. Harrison*, 495 F.3d 1260, 1264 n.7 (11th Cir. 2007)("We need not address Appellant's claims of municipal or supervisory liability since we conclude no constitutional violation occurred.")

liability claim against Sheriff Eslinger apart from requesting that the municipal liability claim should be remanded for the District Court to address in the event this Court concludes one or more individual Defendants violated Dang's constitutional rights. (Appellant Brief, p. 61 – 62.) Dang does not make any argument and does not cite any authority in his Initial Brief that summary judgment to the Sheriff should be reversed, and cites no authority for his request that this Court direct the District Court to re-visit the issue should this Court find an underlying constitutional violation.

"'[T]he law is by now well settled in this Circuit that a legal claim or argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed.'" *MacMillan v. Rodenberry*, 432 Fed.Appx. 890, 896 (11th Cir. 2011)("Although MacMillan says in a wholly conclusory manner that the Sheriff was deliberately indifferent to his serious medical needs, he does not make any argument in support this claim. He has therefore abandoned the argument on appeal.")(quoting *Access Now, Inc. v. Southwest Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004)); See also, *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012)("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *Doe v. Moore*, 410 F.3d 1337, 1349 n.10 (11th Cir. 2005)("On appeal, we require appellants to not only state their contentions to us, but also give the reasons for them, with citations to the

authorities and parts of the record on which the appellant relies."); *Pruitt v. Gillespie*, 625 Fed.Appx. 374, 375 (11th Cir. 2015)("We note, too, a third claim brought by Pruitt in the district court, unlawful search of his business, has been abandoned on appeal because he did not argue in favor of it in his initial brief."); *Detris v. Coates*, 523 Fed. Appx. 612, 618 n. 5 (11th Cir. 2013)("Detris does not raise any argument in his initial brief regarding the district court's dismissal of Count V. Accordingly, the issue is abandoned."); *Ward v. Gates*, 52 Fed.Appx. 341, 346 (9th Cir. 2002)("We decline to preserve Ward's claim under *Monell*. Even assuming a valid argument could be made that a successful disposition on her underlying claims was not necessary to preserve her *Monell* claim, Ward waived the argument by not specifically raising it in her opening brief.")

This Court clearly has jurisdiction and authority on *de novo* review to evaluate the municipal liability issue raised by Sheriff Eslinger on summary judgment, despite the absence of commentary on said issue by the District Court or argument by Dang in his Initial Brief:

> The scope of the issues presented to this court on appeal must be measured by the scope of the judgment appealed from, not by the arguments advanced by the appellant. To hold otherwise would allow appellants to present appeals in a piecemeal and repeated fashion, and would lead to the untenable result that a party who has chosen not to argue a point on a first appeal should stand better as regards the law of the case than one who had argued and lost. As an appellate court, we have the responsibility to review the judgments appealed to us. . . . An issue that falls within the scope of the judgment appealed from but

is not raised by the appellant in its opening brief on appeal is necessarily waived.

*Engel Industries, Inc. v. Lockformer Co.*, 166 F.3d 1379, 1382-83 (Fed. Cir. 1999)(internal citations and quotations omitted).

Since Dang has failed to raise any argument in his Initial Brief for reversal of summary judgment to Sheriff Eslinger on the municipal liability claim, that claim has been abandoned on appeal and summary judgment to Sheriff Eslinger should be affirmed.

    B.    <u>Summary Judgment to Sheriff Eslinger Should Nonetheless Be Affirmed Because Dang Has Failed to Present Any Evidence of a Pattern or Practice of Widespread Abuse</u>.

But even if this Court were to conclude that Dang's Initial Brief managed to preserve the claim against Sheriff Eslinger, this Court should still conclude that summary judgment was properly granted to Sheriff Eslinger by the District Court. The District Court granted summary judgment to Sheriff Eslinger because it found no underlying constitutional violations. The District Court did not need to address the issue of whether Dang had set forth sufficient evidence to support a municipal liability claim against Sheriff Eslinger. (Order, Doc. 184, p. 18 – 19.) Notwithstanding, this Court "may affirm on any basis supported by the record, regardless of whether the district court decided the case on that basis." *Harvey v. Daniels*, 625 Fed.Appx. 499 (11th Cir. 2015)(citing *Lucas v. W.W. Grainger, Inc.*,

257 F.3d 1249, 1256 (11th Cir. 2001)); *Hall v. Holder*, 117 F.3d 1222, 1226 (11th Cir. 1997)(citing *Watkins v. Bowden*, 105 F.3d 1344, 1353, n. 17 (11th Cir. 1997)(appellate court may affirm district court on any ground, even one not considered)). Accordingly, and notwithstanding the issue of whether an underlying constitutional violation is found by this Court in any respect, summary judgment should be affirmed for Sheriff Eslinger because Dang has presented no evidence of a pattern or practice of widespread abuse by Sheriff Eslinger.

"[I]n order to be held liable for a § 1983 violation, a municipality must be found to have *itself* caused the constitutional violation at issue; it cannot be found liable on a vicarious liability theory." *Skop v. City of Atlanta,* 485 F.3d 1130, 1145 (11th Cir. 2007) (emphasis in original). That is why, "to impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown,* 392 F.3d 1283, 1289 (11th Cir. 2004).

In the Eleventh Circuit, with few exceptions, a "'single incident of a constitutional violation is insufficient to prove a policy or custom even when the incident involves several employees of the municipality' participating in the unconstitutional conduct." *Lyles v. Osceola County*, No.: 6:11-cv-1585-Orl-36DAB, 2012 WL 4052258, *9 (M.D. Fla. Sept. 13, 2012)(quoting *Craig v. Floyd*

54

*County, Georgia*, 643 F.3d 1306, 1311 (11th Cir. 2011)(plaintiff's claim that Floyd County had a practice of not referring detainees to physicians, supported only by evidence that during his own incarceration he was not referred to a physician, was insufficient to demonstrate a practice of deliberate indifference)).

Dang does not point to any other alleged similar abuse on the part of Sheriff Eslinger, in his official capacity, that his jail staff had been deliberately indifferent to a serious medical need of any other inmate at the John E. Polk Correctional Facility. Dang alleges no factual basis and provides no proof for the claim of a policy or custom of deliberate indifference to inmates' serious medical needs other than his own incarceration. As such, this single incident involving Dang's treatment at the jail is insufficient and summary judgment to Sheriff Eslinger should be affirmed. See *Lyles*, 2012 WL 4052258 at *9 ("Nevertheless, the Court agrees with Defendant Osceola County that Plaintiff's attempt to frame Saunder's death, a single occurrence, as evidence of an existing policy or custom, is unpersuasive . . . . [A]lthough Plaintiff has pled facts that, taken as true, allege a claim for deliberate indifference against the Individual Defendants, she has not alleged a pattern or custom of deliberate indifference to medical needs at the Jail.); See also, *Alderman v. McDermott*, No.: 6:03-CV-41-Orl-22-KRS, 2004 WL 1109541, *15 (M.D. Fla. April 27, 2004)("Indeed, the record is bereft of evidence of abuses similar to those alleged in the Amended Complaint sufficient to put the

City of Orlando on notice. Instead, it is apparent that the claim of governmental liability is predicated on unsupported and speculative allegations of custom and policy. That type of evidence is insufficient to establish municipal liability under § 1983.")

## <u>CONCLUSION</u>

For the foregoing reasons, the District Court's entry of judgment in favor of Sheriff Donald F. Eslinger, Sandra Wilt, LPN, and Brenda Preston-Mayle, RN, should be affirmed.

DATED this 4th day of March, 2016.

<div style="margin-left: 40%;">

*s/ D. Andrew DeBevoise*
D. ANDREW DeBEVOISE, ESQ.
Florida Bar No.:    0281972
*debevoise@debevoisepoulton.com*
THOMAS W. POULTON, ESQ.
Florida Bar No.:    0083798
*poulton@debevoisepoulton.com*
JEFFREY K. GRANT, ESQ.
Florida Bar No.:    0091197
*grant@debevoisepoulton.com*
DeBEVOISE & POULTON, P.A.
1035 S. Semoran Boulevard, Suite 1010
Winter Park, Florida  32792
Telephone:  407-673-5000
Attorneys for Defendants/Appellees
Eslinger, Wilt and Preston-Mayle

</div>

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 32(a)(7) of the Federal Rules of Appellate Procedure and 11th Cir. R. 32-4, I hereby certify the Brief of Appellees Eslinger, Wilt and Preston-Mayle complies with the type-volume limitation of Rule 32(a)(7)(B) in that this Brief contains 13,929 words, excluding the portions which do not count toward the type-volume limitations.

<div align="right">

*s/ D. Andrew DeBevoise*

D. ANDREW DeBEVOISE, ESQ.
Florida Bar No.:    0281972
*debevoise@debevoisepoulton.com*
THOMAS W. POULTON, ESQ.
Florida Bar No.:    0083798
*poulton@debevoisepoulton.com*
JEFFREY K. GRANT, ESQ.
Florida Bar No.:    0091197
*grant@debevoisepoulton.com*
DeBEVOISE & POULTON, P.A.
1035 S. Semoran Boulevard, Suite 1010
Winter Park, Florida  32792
Telephone:  407-673-5000
Facsimile:  407-673-5059
Attorneys for Defendants/Appellees
Eslinger, Wilt and Preston-Mayle

</div>

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 4th day of March, 2016, the foregoing was served via electronic and U.S. Mail to the following:

Melissa H. Powers, Esq.
The Maher Law Firm, P.A.
631 West Morse Blvd., Suite 200
Winter Park, Florida  32789
*mhpowers@maherlawfirm.com*

Matthew P. Farmer, Esq.
Farmer & Fitzgerald, P.A.
102 W. Whiting Street, Suite 501
Tampa, Florida  33602
*mattfarmer1@aol.com*

John M. Green, Jr., Esq.
Linda L. Winchenbach, Esq.
John M. Green, Jr., P.A.
125 N.E. 1st Avenue, Suite 2
Ocala, Florida  34770
*jmgjr@mac.com*
*lwinchenbach@me.com*

Bruce R. Bogan, Esq.
Melissa J. Sydow, Esq.
Hilyard, Bogan & Palmer, P.A.
105 E. Robinson St., Suite 201
Orlando, Florida  32801
*bbogan@hilyardlawfirm.com*
*msydow@hilyardlawfirm.com*

*s/ D. Andrew DeBevoise*
D. ANDREW DeBEVOISE, ESQ.
Florida Bar No.:    0281972
*debevoise@debevoisepoulton.com*
THOMAS W. POULTON, ESQ.
Florida Bar No.:    0083798
*poulton@debevoisepoulton.com*
JEFFREY K. GRANT, ESQ.
Florida Bar No.:    0091197
*grant@debevoisepoulton.com*
DeBEVOISE & POULTON, P.A.
1035 S. Semoran Boulevard, Suite 1010
Winter Park, Florida  32792
Telephone:  407-673-5000
Attorneys for Defendants/Appellees
Eslinger, Wilt and Preston-Mayle

58