CASE NO. 15-14842-D

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

NAM DANG, by and through his
Power of Attorney, VINA DANG,

Plaintiff-Appellant,

vs.

DONALD F. ESLINGER, in his official
capacity as the SHERIFF OF SEMINOLE
COUNTY; OLUGBENGA OGUNSANWO, M.D.;
SANDRA WILT, LPN; BRENDA PRESTON-MAYLE, RN;
ALECIA SCOTT, LPN; SHARYLE ROBERTS, LPN;
and MARTHA DENSMORE, RN,

Defendants-Appellees.

Appeal from the United States District Court,
Middle District of Florida

ANSWER BRIEF OF APPELLEES
SCOTT, ROBERTS AND DENSMORE

Linda L. Winchenbach
Fla. Bar No. 0749249
John M. Green, Jr., P.A.
125 NE 1st Avenue, Ste 2
Ocala, Florida 34470
T: 352-732-9252
F: 888-545-7282

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT OF APPELLEES SCOTT, ROBERTS, AND DENSMORE

The undersigned counsel for the Appellees, ALECIA SCOTT, LPN; SHARYLE ROBERTS, LPN; and MARTHA DENSMORE, RN, hereby certifies that the following is a complete list of persons and entities known to have an interest in the outcome of this case:

Bogan, Bruce R., Esq., Trial/Appellate Attorney for Defendant Dr. Ogunsanwo

Cole, Scott, & Kissane, P.A., Trial Attorneys for Sheriff in pending state law case (Doc. 110; Doc. 122.)

Cotter, Daniel W., Esq., Trial Attorney for Plaintiff

Dang, Nam, Plaintiff/Appellant

Dang, Vina, Plaintiff/Appellant

DeBevoise & Poulton, P.A., Trial/Appellate Attorneys for Defendants Sheriff, Wilt, and Preston-Mayle

DeBevoise, H. Andrew, Esq., Trial/Appellate Attorney for Defendants Sheriff, Wilt, and Preston-Mayle

Densmore, Martha, Defendant/Appellee

Eslinger, Donald F. (Sheriff of Seminole County, FL), Defendant/Appellee

Farmer & Fitzgerald, P.A., Trial/Appellate Attorneys for Plaintiff

Farmer, Matthew P., Esq., Trial/Appellate Attorney for Plaintiff

Florida Sheriffs' Risk Management Fund

Grant, Jeffrey K., Esq., Trial/Appellate Attorney for Defendants Sheriff, Wilt, and Preston-Mayle

Green, John M., Jr., Esq., Trial/Appellate Attorney for Defendants Scott, Roberts, and Densmore

Hilyard, Bogan & Palmer, P.A., Trial/Appellate Attorneys for Defendant Dr. Ogunsanwo

John M. Green, Jr., P.A., Trial/Appellate Attorneys for Defendants Scott, Roberts, and Densmore

Maher Law Firm, P.A., Trial/Appellate Attorneys for Plaintiff

Maher, Steven R., Esq., Trial Attorney for Plaintiff

Ogunsanwo, M.D., Olugbenga, Defendant/Appellee

Poulton, Thomas W., Esq., Trial/Appellate Attorney for Defendants Sheriff, Wilt, and Preston-Mayle

Powers, Melissa H., Esq., Trial/Appellate Attorney for Plaintiff

Presnell, Gregory A., District Court Judge

Preston-Mayle, Brenda, Defendant/Appellee

Roberts, Sharyle, Defendant/Appellee

Scott, Alecia, Defendant/Appellee

Shelton, Scott, Esq., Trial Attorney for Sheriff in pending state law case (Doc. 122)

Smith, Thomas B., Magistrate Judge

Sydow, Melissa Jean, Esq., Trial/Appellate Attorney for Defendant Dr. Ogunsanwo

Wilt, Sandra, Defendant/Appellee

Winchenbach, Linda L., Esq., Trial/Appellate Attorney for Defendants Scott, Roberts, and Densmore

Zubkin, Joy G., Esq., Trial Attorney for Sheriff in pending state law case (Doc. 110)

/s/ Linda L. Winchenbach
LINDA L. WINCHENBACH
Fla. Bar No. 0749249

# STATEMENT OF ORAL ARGUMENT

The Defendants-Appellees, Scott, Roberts, and Densmore do not request oral argument because the appellate briefs adequately address the issue and oral argument would not add anything to the Court's analysis.

# TABLE OF CONTENTS

Certificate of Interested Persons and Corporate Disclosure Statement ................ C-1

Statement of Oral Argument.................................................................................i

Table of Contents................................................................................................ii

Table of Citations.............................................................................................. iv

Statement of Jurisdiction.................................................................................... xi

Statement of the Issue ........................................................................................ 1

Preface................................................................................................................ 1

Statement of the Case:

    I.      Nature of the Case ................................................................. 2

    II.    Course of the Proceedings and Disposition Below ............................. 2

    III.   Statement of the Facts ........................................................... 3

          A.    Nam Dang ..................................................................... 4

          B.    Alecia Scott, LPN ........................................................ 6

          C.    Sharyle Roberts, LPN ................................................. 11

          D.    Nurse Bledsoe ........................................................ 13

          E.    Valerie Westhead, M.D........................................... 13

          F.    Martha Densmore, RN ............................................. 15

    IV.   Standard of Review ...................................................... 20

Summary of the Argument................................................................................. 21

Argument:

I. THE COURT DID NOT ERR IN GRANTING SUMMARY JUDGMENT TO SCOTT, ROBERTS, AND DENSMORE ................................................................22

A.    Summary Judgment Standard................................................................23

B.    Standard for an Inadequate Medical Care Claim ...............................24

C.    Florida Nurse Practice Act ..................................................................29

D.    No Knowledge of a Substantial Risk of Serious Harm To which the Nurses were Deliberately Indifferent ...........................35

    (1)    Alecia Scott, LPN ......................................................................36

    (2)    Sharyle Roberts, LPN ................................................................40

    (3)    Martha Densmore, RN ..............................................................43

E.    Nurses have Qualified Immunity ........................................................46

Conclusion .........................................................................................................54

Certificate of Compliance with Rule 32(a)........................................................55

Certificate of Service .........................................................................................55

# TABLE OF CITATIONS

## CASES

\*Adams v. Poag,

      61 F.3d 1537 (11th Cir. 1995) ........................................................ 26, 47, 48

Agostini v. Felton,

      521 U.S. 203, 117 S. Ct. 1997 (1997) ........................................................ 27

Am. Home Assur. Co. v. Glenn Estess & Assocs., Inc.,

      763 F.2d 1237 (11th Ct. 1985).......................................................... 20

Ancata v. Prison Health Services,

      769 F.2d 700 (11th Cir. 1985) ........................................................ 52

Beal v. Paramount Pictures, Corp.,

      20 F.3d 454 (11th Cir. 1994),

      cert. denied, 513 U.S. 1062, 115 S. Ct. 675 (1994).............................. 23, 24

Bilal v. Geo Care, LLC.,

      2016 U.S. Dist. LEXIS 10141 (M.D. Fla. Jan. 28, 2016)............................ 29

Bonner v. Chambers County

      2007 U.S. Dist. LEXIS 54550, (M.D. Ala. July 26, 2007)......................... 34

Brown v. City of Huntsville,

      608 F.3d 724 (11th Cir. 2010) ...................................................... 46

Brown v. Johnson,

    387 F.3d 1344 (11th Cir. 2004) ...................................................................... 24

*Burnette v. Taylor,

    533 F.3d 1325 (11th Cir. 2008) ...................................................................... 23

Buzzi v. Gomez,

    24 F. Supp. 2d 1352 (S.D. Fla. 1998) ............................................................ 39

Campbell v. Sikes,

    169 F.3d 1353 (11th Cir. 1999) ...................................................................... 26

Carswell v. Bay County,

    854 F.2d 454 (11th Cir. 1988) ........................................................................ 52

Castro v. County of Los Angeles,

    797 F.3d 654 (9th Cir. 2015),

    reh. en banc granted, 809 F.3d 536 ................................................................ 28

Celotex Corp. v. Catrett,

    477 U.S. 317, 106 S. Ct. 2548 (1986) ............................................................ 23

Cottrell v. Caldwell,

    85 F.3d 1480 (11th Cir. 1996) ........................................................................ 24

Daniels v. Williams,

    474 U.S. 327, 106 S. Ct. 662 (1986) .............................................................. 26

Davis v. Scherer,

468 U.S. 183, 104 S. Ct. 3012 (1984) ................................................... 33, 39

Edwards v. Gilbert,

867 F.2d 1271 (11th Cir. 1989) ................................................................. 39

Edwards v. Wallace Community College,

49 F.3d 1517 (11th Cir. 1995) .................................................................. 4

Estelle v. Gamble,

429 U.S. 97, 97 S. Ct. 285 (1976) ......................................................... 24, 40

Farmer v. Brennan,

511 U.S. 825, 114 S. Ct. 1970 (1994) ......................................................... 25

Fitzpatrick v. City of Atlanta

2 F.3d 1112 (11th Cir. 1993) ................................................................... 20

Goebert v. Lee County,

510 F.3d 1312 (11th Cir. 2007) ................................................................. 26

Halperin v. Regional Adjustment Bureau, Inc.,

206 F.3d 1063 (11th Cir. 2000) ................................................................. 34

Harris v. Thigpen,

941 F.2d 1495 (11th Cir. 1991) ............................................................ 25, 49

Harvey v. Harvey,

949 F.2d 1127 (11th Cir. 1992) ................................................................. 4

Hill v. Dekalb Reg'l Youth Det. Ctr.,

    40 F.3d 1176 (11th Cir. 1994) ................................................................. 25

Holloman v. Harland,

    370 F.3d 1252 (11th Cir. 2004) ............................................................. 4, 33

Hope v. Pelzer,

    536 U.S. 730, 122 S. Ct. 2508 (2002) ......................................................... 46

*Howell v. Evans,

    922 F.2d 712 (11th Cir. 1991) ............................................. 40, 41, 43, 47, 54

Kennedy v. Bd. of County Comm'rs for Okla. County,

    2015 U.S. Dist. Lexis 87155 (W.D. Okla. Jul. 6, 2015) .............................. 27

Kingsley v. Hendrickson,

    576 U.S. ___, 135 S. Ct. at 2466, 192 L. Ed. 2d 416 (2015)............ 22, 26, 27

Kruse v. Byrne,

    2013 U.S. Dist. LEXIS 169975 (S.D. Ala. Dec. 3, 2013) ............................ 33

*Kruse v. Williams,

    592 Fed. Appx. 848 (11th Cir. Dec. 4, 2014) ......................................... 49, 50

Lancaster v. Monroe County, Ala.,

    116 F.3d 1419 (11th Cir. 1997) ................................................................. 47

Mandel v. Doe,

    888 F.2d 783 (11th Cir. 1989) ............................................................. 52, 53

McElligott v. Foley,

     182 F.3d 1248 (11th Cir. 1999) ...................................................................... 52, 53

Murrell v. Bennett,

     615 F.2d 306 (5th Cir. 1980) ............................................................................... 24

O'Ferrell v. U.S.,

     253 F.3d 1257 (11th Cir. 2001) ........................................................................... 20

Popoalii v. Corr. Med. Servs.,

     512 F.3d 488 (8th Cir. 2008) ..................................................................... 6, 25, 51

Roberts v. C-73 Med. Dir.,

     2015 U.S. Dist. LEXIS 91072 (S.D. NY Jul. 13, 2015) .............................. 27

Rollins v. TechSouth, Inc.,

     833 F.2d 1525 (11th Cir. 1987) .......................................................................... 23

Samples on behalf of Samples v. Atlanta,

     846 F.2d 1328 (11th Cir. 1988) ........................................................................... 23

Saucier v. Katz,

     533 U.S. 194, 121 S. Ct. 2151 (2001) .............................................................. 46

State Bank of St. Charles v. Camic,

     712 F.2d 1140 (7th Cir. 1983,

     cert. denied, 464 U.S. 995, 104 S. Ct. 491 (1983) ........................................ 39

Taylor v. Adams,

    221 F.3d 1254 (11th Cir. 2000),

    cert. denied, 531 U.S. 1077, 121 S. Ct. 774 (2001) ....................................... 24

Thomley v. Bennett,

    2016 U.S. Dist. LEXIS 14875 (S.D. Ga. Feb. 8, 2016) .......................... 28, 29

Vinyard v. Wilson,

    311 F.3d 1340 (11th Cir. 2002) ....................................................................... 46

Welch v. Valentine,

    2012 U.S. Dist. LEXIS 118559 (M.D. Ga. Jul. 13, 2012),

    adopted, 2012 U.S. Dist. LEXIS 118565 (M.D. Ga. Aug. 22, 2012) ....... 4, 34

Whitley v. Albers,

    475 U.S. 312, 106 S. Ct. 1078 (1986) ........................................................ 26

## STATUTES AND RULES

§ 464.002, Fla. Stat. (2012) ............................................................................ 35

§ 464.003(19), Fla. Stat. (2012) ................................................................ 29, 30

§§ 464.001-464.027, Fla. Stat. (2012), Florida Nurse Practice Act ................. 22, 29

Fed. R. App. P. 32(a)(5) ................................................................................ 55

Fed. R. App. P. 32(a)(6) ................................................................................ 55

Fed. R. App. P. 32(a)(7)(B) ........................................................................... 55

11th Cir. Rule 32-4 ........................................................................................ 55

28 U.S.C. § 1291 ...................................................................................... xi

28 U.S.C. § 1331 ...................................................................................... xi

28 U.S.C. § 1367 ...................................................................................... xi

## **OTHER AUTHORITIES**

Mosby's Medical Dictionary

    8th ed., 2009 ...................................................................... 12

# <u>STATEMENT OF JURISDICTION</u>

The Middle District of Florida's jurisdiction was based on 28 U.S.C. §§ 1331 and 1367. The Eleventh Circuit's jurisdiction is pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

**I. WHETHER THE COURT DID NOT ERR IN GRANTING SUMMARY JUDGMENT TO SCOTT, ROBERTS, AND DENSMORE.**

## PREFACE

**(1)     PARTIES' DESIGNATIONS.**

Plaintiff/Appellant Nam Dang: "Dang" or "Plaintiff;"

Defendant/Appellee Dr. Olugbenga Ogunsanwo, M.D.: "Dr. Ogunsanwo;"

Defendant/Appellee Sheriff Eslinger: "the Sheriff;"

Other Defendants/Appellees: their surnames.

**(2)     PLEADINGS AND OTHER FILINGS.**

Record references will be to the district court document and Pacer page: "(Doc. #, p. #)." This includes medical records.

Deposition page references will generally be to the number on the page itself. If the number is at the page's top and hidden by the Pacer notation, the reference will be "(Doc. #, Pacer p. #)."

References to the Initial Brief will be to the Pacer page number: "(IB, p. #)."

**STATEMENT OF THE CASE**

**I. NATURE OF THE CASE**

The First Amended Complaint ("the Complaint"), of the Plaintiff, Nam

Dang ("Dang"), consisting of seven federal law counts, was filed on March 24,

2014. (Doc. 47.) It made claims of inadequate medical care during his

incarceration as a pretrial detainee at the John E. Polk Correctional Facility ("the

jail") from January 26, 2012, to February 23, 2012, which he alleges violated his

Fourteenth Amendment rights. (Doc. 47, ¶¶ 7, 13.) The Defendants include Donald

F. Eslinger, the Sheriff of Seminole County; Olugbenga Ogunsanwo, M.D.[1]; three

Licensed Practical Nurses ("LPN"); and two Registered Nurses ("RN"). The

Defendants/Appellees herein are Alecia Scott, LPN (Doc. 47, Count V, ¶¶ 88-92;

Sharyle Roberts, LPN (Doc. 47, Count VI, ¶¶ 93-97; and Martha Densmore, RN

(Doc. 47, Count VII, ¶¶ 98-102).

**II. COURSE OF THE PROCEEDINGS AND DISPOSITION BELOW**

On August 18, 2014, these Defendants filed an Answer to the Complaint

asserting affirmative defenses, including qualified immunity. (Doc. 69, p. 6.) On

May 29, 2015, each filed a Motion for Summary Judgment. (Doc. 127-129.) The

Plaintiff filed a consolidated response to these motions on July 6, 2015, and the

Defendants filed Replies. (Doc. 166; Doc. 175-177.) The trial court held a motion

---

[1] Dr. Ogunsanwo is sometimes referred to as "Dr. O."

hearing on July 29, 2015, and on August 25, 2015, granted each of the Defendants' motions. (Doc. 183; Doc. 184.) On September 15, 2015, the Plaintiff filed a Rule 59(e) Motion to Alter or Amend the Judgment, to which the Defendants responded and which was denied by the Court on October 15, 2015. (Doc. 194; Doc. 201.) On October 28, 2015, the Plaintiff filed his Notice of Appeal regarding both these orders. (Doc. 204.)

### III. STATEMENT OF THE FACTS

The Plaintiff's Initial Brief provides a lengthy, biased "introduction" to the statement of facts beginning from the time of his arrest when his mother allegedly told the officers he was "sick." (IB, p. 15.) Then in a "record evidence" section, he delineates "facts" regarding each Defendant (IB, p. 17-35), and information about three witnesses: Dang's mother, his girlfriend, and a cellmate (IB, p. 33-35). Finally, a "summary timeline" is provided. (IB, p. 35-37.) The Defendants note that an excellent day-by-day timeline incorporating the record evidence pertaining to the medical care provided by each Defendant is presented in the order on appeal. (Doc. 184, p. 2-8.) There is little dispute about any of the facts in this case—most of them come from the jail's medical records. (Doc. 130-1-- Note: the medical records are in reverse chronological order—latest date to earliest date.) When each Defendant came into contact with Dang and what care she rendered is not in

dispute, and the court's account in the order is a straightforward unbiased presentation.

Each of these Defendants was an employee of the Seminole County Sheriff's Office, so the care provided was under color of state law. (Doc. 127-1, Scott depo, p. 7; Doc. 128-1, Roberts depo, p. 10; Doc. 129-1, Densmore depo, p. 6.) See Harvey v. Harvey, 949 F.2d 1127, 1130 (11th Cir. 1992); Edwards v. Wallace Community College, 49 F.3d 1517, 1522 (11th Cir. 1995) (person acts under color of state law when she acts with authority possessed by virtue of employment with the state). Also, although the Plaintiff disagrees as to Scott and Roberts, each of the nurses was acting within her discretionary authority when she rendered care to Dang. See Welch v. Valentine, 2012 U.S. Dist. LEXIS 118559, *11-12 (M.D. Ga. Jul. 13, 2012), adopted, 2012 U.S. Dist. LEXIS 118565 (M.D. Ga. Aug. 22, 2012) (prison nurse was performing discretionary function when treating patients); see also Holloman v. Harland, 370 F.3d 1252, 1265 (11th Cir. 2004) (defendant is performing a discretionary function if performing a job-related function through means within her power). Thus, each is entitled to qualified immunity on his claim against her.

### A. NAM DANG

On December 22, 2011, the Plaintiff, Nam Dang, was involved in an incident with the police in which he testified that he was not arrested, but when

police stopped the car in which he was riding, he was yanked out, slammed to the ground, and had a knee placed on his neck. (Doc. 141, Dang depo, p. 68-70.) Dang never told jail personnel that he started taking large doses of Aleve for his head and neck pain after the December 22, 2011, police incident. (Dang depo, p. 63-66, 82-83.) He also never told jail personnel that he had gone to the Central Florida Regional Hospital emergency room on January 12, 2012, two weeks before his January 26 arrest and incarceration, complaining of headaches, neck pain, dizziness, and fever for the preceding 2½ weeks.[2] Nor did he tell them that the hospital's emergency room personnel had recommended a lumbar puncture be performed to rule out meningitis, but he had refused. (Dang depo, p. 40-41, 82, 115-116; Doc. 137-1, HMR, p. 12-19, 30-31.)[3]

On February 23, 2012, Dang was taken from the jail to Central Florida Regional Hospital. At the hospital emergency room, upon physical exam, his vital signs were normal and his neck was supple. He was alert and oriented times three, and his mental status was lethargic (drowsy). He had no motor or sensory deficits. (Doc. 164-1, HMR, p. 1-2.) After several tests, including an x-ray, some CT scans,

---

[2] At the January 26, 2012 arrest, which led to his incarceration in this matter, the police knocked on the door, were civil, and did not use any force at all. (Dang depo, p. 68-70.)

[3] References to the jail Medical Records (Doc. 130-1) will be abbreviated "JMR." References to the medical records of Central Florida Regional Hospital will be abbreviated "HMR." Hospital records before his incarceration are Doc. 137-1; those starting on February 23, 2012, are Doc. 164-1 and 164-2.

a brain MRI, a lumbar puncture, and blood tests, Dang was diagnosed with

cryptococcal meningitis as shown on the March 3, 2012, note in the record.[4] (Doc.

130-1, JMR, p. 4, 6-7; Doc. 164-1, HMR, p. 1-2, 4; Doc. 164-2, HMR, p. 1-2.)

Cryptococcal meningitis is a serious medical condition. See Popoalii v. Corr. Med.

Servs., 512 F.3d 488, 499 (8th Cir. 2008).

### B. ALECIA SCOTT, LPN

Jail records regarding medical care provided by Scott to Dang appear on

February 9, 10, and 14, 2012. Scott did not actually see Dang on all those dates;

some are file reviews.  Medical records created by her, recording the encounters

with Dang, are in the jail medical records at pages 13 and 15-18. (Doc. 130-1.) In

the records, the correct encounter time is in her note; the computer program often

inserts an incorrect time; her night shift was from 5:30 p.m. to 6:00 a.m. (Doc.

127-1, Scott depo, p. 22-23.) In her deposition, Scott discusses in detail her contact

with Dang and the medical care she provided. (Scott depo, p. 19-39, 54-60.)

### February 9, 2012: 9:00 p.m. (Doc. 130-1, JMR, p. 17-18)

On February 9, a corrections officer called and said Dang had a headache

and asked about bringing him to medical.[5] Scott was in the nurses' station and she

---

[4] The Initial Brief's "timeline" incorrectly states he was diagnosed on February 23, 2012, referencing Document 164-2. (IB, p. 37.) The date of that note providing the diagnosis is March 3; February 23 is just the "date of admission."

[5] Jail personnel generally refer to the medical department as "medical."

took the call. She reviewed his chart, saw that he had seen the doctor, and said to bring him. Thus, she saw him at the clinic as an emergency walk-in at 9:00 p.m. (2100 hours). (Scott depo, p, 17-19.) Two corrections officers escorted Dang to the clinic and he sat on a bench in the waiting area. Scott met with him there because no one else was in the waiting area. An officer remained in the room. She took Dang's vitals, including blood pressure and temperature. His blood pressure was 107/72 and his temperature was 101.5°. She made a written note of the vital signs and typed it into the computer later—such notes are shredded. (Scott depo, p. 23-25, 27; Doc. 130-1, JMR, p. 17.)

Dr. Ogunsanwo, the jail's Medical Director, had prescribed Robaxin and Motrin (Ibuprofen) for Dang, and Scott gave him the medications. (Scott depo, p, 27; Doc. 130-1, JMR, p. 17.) Scott spent about fifteen minutes examining Dang. He told her, "I have this pain in the back of my neck and it's having my head hurting so bad. They drop me and stomp on my head and stuff when I was arrested." (Doc. 130-1, JMR, p. 17.) Scott testified that Dang was upset and angry because he said he needed something for his headache and no one was helping him. She explained that she had given him the prescribed medications. He clenched his fist and squinted his eyes, which she further described in her deposition as biting down on his jaw so that she could see the jaw muscle get tense. These movements appeared to her to be voluntary, and Scott attributed it to anger

or belligerence. (Scott depo, p. 25-26, 54-56; Doc. 130-1, JMR, p. 18.)

Scott gave Dang a range of motion test and her medical note states he had full range of motion to his neck, and there was no swelling or redness. He was ambulatory and appeared to be in no distress. Scott counseled him about drinking plenty of fluids because he was taking Ibuprofen to bring down his fever. (Scott depo, p. 35-36, 54-56; Doc. 130-1,  JMR, p. 18.) She had him remain on the bench another 15-20 minutes for observation. She saw no signs of distress at that time; he seemed calm, and Scott told him he could return to the pod. (Scott depo, p. 27, 30, 56-57.)

Dang walked out the door of medical with the corrections officer, then Scott heard a commotion in the hallway. She went out into the hall, and Dang was sitting with his back up against the wall, one leg straightened out and the other one bent up. The officer said that after they exited the waiting area, Dang threw himself against the wall and slid to the floor. Dang just sat there; he said he was not going back to his cell. Scott told him to get up. She told him that such bizarre behavior was unnecessary, and if he continued to behave that way, she would put him on suicide precaution. Dang then got up without difficulty and walked off with the officer. (Scott depo, p. 29-32; 56-58; Doc. 130-1, JMR, p. 18.)

Because of his behavior, Scott was concerned that Dang might have mental health issues and she prepared a referral of him to D Pod, the location for mental

8

health observation ("MHO"), so he would be seen by mental health personnel. The mental health department ("mental health") is a separate jail section, headed by Dr. Valerie Westhead. (Scott depo, p. 32-33; 59.) The reason the referral does not appear in the medical records may be because she did it by email. (Scott depo, p. 38-39, 41-43.) However, the records show that Dang was seen in the mental health department the next day, February 10, by K. Prichard, who determined he should be housed alone and retained for MHO monitoring for a few days to make sure his behavior remained stable and that his complaints were entirely medical. If there were no further problems, Pritchard said Dang would be released to General Population. (Doc. 130-1, JMR, p. 15-16.) Scott did not have any follow-up conversations with anyone from mental health after referring him. (Scott depo, p. 37.)

**February 9, 2012: 11:45 p.m. (Doc. 130-1, JMR, p. 17-18)**

A few hours later, about 11:45 p.m. (2345 hours) on February 9, Scott went to the pod and checked on Dang to make sure the medications were working and his fever had come down. His temperature had lowered to 97.9°. (Doc. 130-1, JMR, p. 17.) When she visited him in the pod, Dang got up, walked over to her, and spoke with her. He said he was okay. His behavior and appearance were normal, and she did not observe any physical problems. She noted only his temperature in the records as that was her purpose in going to see him. (Scott depo,

p. 28-29; 58-59; Doc. 130-1, JMR, p. 17-18.) Scott did not see Dang again after that encounter. (Scott depo, p. 39.)[6]

**<u>Order to Monitor Blood Pressure and Temperature</u>**

In addition to referring Dang to mental health, Scott also entered an order at approximately 2:33 a.m. on February 10 (the same shift) that his blood pressure and temperature should be checked twice a day for five days. Her medical note states:

> Instructions: BP monitoring physician orders-- *Perform blood pressure checks bid x5 days; *Implement longer monitoring period and dsc if indicated; *Refer to doctor sick call if SBP > 160 or < 100; *bid monitor temp been running a fever.

 (Scott depo, p. 35-37, 59-60; Doc. 130-1, JMR, p. 16-18.) Scott was then off from work until February 14, and when she returned she checked his chart at about 7:42 p.m. to make sure that the blood pressure and temperature checks had been done and that he had been seen by the mental health department. This appears in the records as a "chart review." She did not read the mental health note; she was just making sure he had been seen. (Scott depo, p. 59-60, 68-69; Doc. 130-1, JMR, p. 13.) Dang's blood pressure was never abnormal while he was at the jail and his

---

[6] There is some testimony from Nurse Sharyle Roberts that Scott was present when Roberts provided medical care to Dang on February 20. However, that information does not appear in the medical records, and Scott testified she only saw Dang on the two February 9 encounters. (Scott depo, p. 19.)

temperature was only above 100° that one time—when she saw him on February 9 and was able to get it back down in a few hours with medication. (Scott depo, p. 62-63; Roberts depo, p. 19.)

## C. SHARYLE ROBERTS, LPN

Roberts saw Dang once in the medical department late in the evening on February 20, 2012.[7] (Doc. 130-1, JMR, p. 11-12.) In her deposition, she discusses her contact with Dang and the medical care she provided. (Doc. 128-1, p. 18-30, 44-48.)

### February 20, 2012: 11:15 p.m. (Doc. 130-1; JMR, p. 11-12)

On February 20, 2012, about 11:15 p.m. (2315 hours), Roberts, who was working the night shift, walked into the medical department, and someone told her a call had been received that there was a Code Orange in D Pod. A Code Orange means there is a medical emergency. She immediately started going to D Pod. Some of the other nurses had already gotten there, and she saw Dang being pushed up the D Pod hallway in a wheelchair. (Roberts depo, p. 18-19, 44.)

Roberts had him taken into the medical waiting room area. Dang was conscious. He was not verbal. He was drooling and sliding down in the wheelchair.

---

[7] Roberts' medical notes state she saw Dang at 11:15 p.m. on February 20. The notes carry a date of February 21, because that is when she typed them into the computer. She testified she got off work about 5:30 a.m. or 6:00 a.m. on February 21. (Roberts depo, p. 37.)

Her note shows his vital signs ("vs") as blood pressure 136/85 and temperature 99.0.° She also examined his eyes and the chart reflects "PERRLA," [8] which stands for "pupils equal, round, reactive to light and accommodation." (Roberts depo, p. 22; Doc. 130-1, JMR, p. 12.)

From her observations of him, Roberts believed Dang's actions were voluntary. Her note says he was "attempting to appear passed out." She said this because Dang would slide down in the chair, blinking his eyelids. When the people in the room got quiet, he would open his eyes and look around, then close them again. She observed him do this with his eyes numerous times. Also, he was drooling, but he would wipe his mouth. The note reflects she was told he had done the same thing two weeks before. (Roberts depo, p. 25-26, 45-46; Doc. 130-1, JMR, p. 12.)

Roberts sent a move request memo to the classification department and admitted Dang into the infirmary for observation. When an inmate is admitted to the infirmary by a nurse, it is usually effective for twenty-four hours. (Roberts depo, p. 29-32; Doc. 130-1, JMR, p. 11-12.) Based on her observations, Roberts thought Dang needed a referral to the mental health department and to the medical doctor. She put in orders to house him in medical and did referrals to both the

---

[8] PERRLA: …While performing an assessment of the eyes, one evaluates the size and shape of the pupils, their reaction to light, and their ability to accommodate. If all findings are normal, the abbreviation is noted in the account of the physical examination. Mosby's Medical Dictionary, 8th ed., 2009.

medical and mental health doctors. The note states: "Medical observation order but referred to MH and Dr. Ogunsanwo." (Roberts depo, p. 29-32, 46-47; Doc. 130-1, JMR, p. 12.)

She did not try to contact either doctor at that time, as she did not think it was necessary. She put in the orders for the doctors to follow up with Dang, which they, in fact, did. (Roberts depo, p. 26, 48.)

### D. NURSE BLEDSOE

### February 21, 2012: 7:53 a.m. (Doc. 130-1, JMR p. 10)

Nurse Bledsoe (not a Defendant) assessed Dang the morning after Roberts' encounter with him the night before. She recorded his blood pressure was 116/74 and his temperature was 97.1°. He was alert and oriented times three, and did not voice any complaints. He denied having any urinary problems. She stated he could perform his activities of daily living. (Doc. 130-1, JMR, p. 10.)

### E. VALERIE WESTHEAD, M.D.

### February 21, 2012: 11:50 a.m. (Doc. 130-1, JMR p. 9-10)

On February 21, Dr. Valerie Westhead, the jail's consulting psychiatrist (not a Defendant), evaluated Dang where he was housed in the medical department. The psychiatrist's diagnosis for Dang's behavior of the previous night was an "acute drug reaction," which she termed an "idiosyncratic reaction to muscle relaxants." She cleared him psychiatrically. (Doc. 130-1, JMR, p. 9-10.)

13

Dr. Westhead, an independent contractor who has a contract with the Sheriff's Office to provide the jail's psychiatric services, usually does her mental health evaluations by speaking to the inmate through a mesh screen in the cell door. When she arrived, Dang got up without difficulty and came to speak with her. She observed no behavior of the type that he exhibited when Roberts saw him during the Code Orange, such as the drooling. Dang told her he had a headache, and had taken some medication that made him "feel odd." While she focuses on mental health concerns, Dr. Westhead still observes the patient as a medical doctor. She paid particular attention to Dang's actions because of the information in the referral, and she would be looking for neurological symptoms because of his drooling and appearing to be passed out. She did not see anything from a medical standpoint that would have required Dang being sent to the emergency room or for further medical evaluation of an emergent nature, and she did not think there was a need to consult with Dr. Ogunsanwo. (Doc. 132-1, Westhead depo, p. 12-13, 27-28; 30-33, 58, 63-64.)

If Dr. Westhead had seen an alarming neurological sign, she would have made a note and contacted Dr. Ogunsanwo. Dang had received Robaxin, a muscle relaxant, 12-18 hours before she saw him, so it was out of his system. The Code Orange events would be consistent with an acute drug reaction, which was her impression within a reasonable degree of medical probability. The doctor saw no

neurological problems with Dang and no need for emergency care. She would expect the nurses to rely on her findings and diagnosis in their care and treatment of Dang. She did not observe anything during the encounter that indicated Dang had meningitis. He did not give her any history of a physical encounter with the police or of prior hospitalizations before his incarceration; if he had, she would have documented it. (Westhead depo, p. 51-54, 57-58, 64.)

## F. MARTHA DENSMORE, RN

Densmore saw Dang in the medical department once on February 22 and twice on February 23. (Doc. 130-1, JMR, p. 6-9.) In her deposition, she discusses her contact with Dang and the medical care she provided. (Doc. 129-1, p. 15-21, 45-68, 80-85.)

### February 22, 2012: 8:40 a.m. (Doc. 130-1, JMR, p. 9)

Densmore, a registered nurse, worked a twelve-hour shift, from 5:30 a.m. to 5:30 p.m., as a charge nurse on the day shift in the jail's medical department. (Densmore depo, p. 10, 53.) On February 22, Dang was housed in medical for observation because on February 20, during the night shift, he had been the subject of a Code Orange. The next day, February 21, he had been diagnosed by Dr. Valerie Westhead, as having had "an idiosyncratic reaction to muscle relaxants." (Densmore depo, p. 16; Doc. 130-1, JMR, p. 9.)

Each shift does a daily assessment of any inmate housed in medical during the nurse's rounds. (Densmore depo, p. 18.) When she went on rounds, Densmore took her blood pressure cuff, stethoscope, and thermometer with her and would go into the cell to assess an inmate. She would write down the vital sign information, then enter it into the electronic medical records, usually as soon as she finished rounds. In the note, she records what time she saw the inmate. Before starting her rounds, Densmore looked at the status sheets on the inmates and she got a verbal shift report from the night shift nurse who was going off duty. That nurse told her that Dang had exhibited bizarre behavior and Dr. Westhead had said he was having a reaction to the Robaxin he had been taking. (Densmore depo, p. 20-21, 26-28, 47-48.)

A corrections officer who was assigned to the medical department (the "medical officer") would go with the nurse on rounds. Densmore saw Dang on February 22 at 8:40 a.m., and she did not see him again that day. However, the medical officer, who speaks to the inmates through the cell door, would have seen him hourly. (Densmore depo, p. 18, 28-29.)

When Densmore saw Dang at 8:40 a.m., he was sitting in a "boat" in the cell.[9] This is a bed on the floor made of hard plastic. A mattress is put inside it on

---

[9] Because he was sleeping in a boat in the cell, Dang probably had a roommate, but no roommate was present during Densmore's February 22 examination. (Densmore depo, p. 51-52.)

which an inmate may sleep. He was having difficulty sitting up and being still, and was rocking. Then he rocked over backwards and Densmore took his vital signs. She had been unable to do so while he kept moving. She was with Dang about ten minutes. He was cooperative with her, and his vital signs were within normal limits.  (Densmore depo, p. 17, 51-53; Doc. 130-1, JMR, p. 9.)

In her examination of Dang, Densmore determined he was alert and oriented times three (to person, place, and time). He said he had no gastrointestinal, stomach, or urinary problems. His blood pressure was 118/76 and his temperature was 98.9°. He fell backwards in the boat only once. Dang did not advise her that he had been having headaches and neck pain, and Densmore was not concerned about the rocking and did not contact the doctor because her assessment was that he was likely having withdrawal symptoms. She asked him about the use of drugs, alcohol, or medications, and Dang denied all those things. Before she left the cell, he had sat back up. (Densmore depo, p. 21, 51, 80-83, 86; Doc. 130-1, JMR, p. 9.)

## February 23, 2012: 8:30 a.m. (Doc. 130-1, JMR, p. 8)

When Densmore returned to work on February 23, she again examined Dang on her rounds, this time at 8:30 a.m. During the night, he had been assessed by Nurse Thercier (not a defendant) at 10:45 p.m., and his vital signs were all normal (Doc. 130-1, JMR, p. 8). Densmore received the verbal night shift report from that nurse, and she also reviewed the status sheets. (Densmore depo, p. 54; Doc. 130-1,

17

JMR, p. 8.) At Dang's cell, he walked to the door to meet her. When she took his

vital signs at 8:30, they were stable. (Densmore depo, p. 84; Doc. 130-1, JMR, p.

8.)

However, at this examination, unlike the one the previous day, Dang

complained of having a headache for two weeks and said that his neck hurt. He

told Densmore he was eating and drinking, but his roommate said he only ate a few

bites of food at meals. In addition, Densmore noted that he was pale and had white

patches on his tongue. Primarily, the patches on his tongue would indicate possible

dehydration. When she finished her assessments, Densmore went to Dr.

Ogunsanwo's office and asked him to see Dang because of the headache and neck

complaints, which concerned her. Her medical note reflects that Dang was going to

be "seen by the dr today."  Because Dang was in the infirmary section of the

medical department, he would already be on the list for the doctor to see.

Densmore, however, asked the doctor to see him sooner, and the doctor said he

would. (Densmore depo, p. 54-60; Doc. 130-1, JMR, p. 8.)

**February 23, 2012: 11:15 a.m. (Doc. 130-1, JMR, p. 6)[10]**

About three hours later on February 23, at 11:15 a.m., Densmore checked on

---

[10] Densmore made a typographical error in this note and it should say "11:15 a.m." instead of "11:15 p.m." She saw Dang during her daytime shift of 5:30 a.m. to 5:30 p.m. This error places it in the wrong location in the electronic notes. It should properly appear on page 8 after her 8:30 a.m. note, and before Dr. Ogunsanwo's note of February 23. (Densmore depo, p. 60-61.)

Dang again. There had been a substantial change in his condition, and he was much weaker. Dang could speak very quietly, and did not seem confused, but he was trying to sit up at the toilet and leaning his head on the toilet, spitting into it. He was unable to hold himself up, and had urinary incontinence. His roommate said that when he had tried to eat, he put his face right in the tray. Densmore testified her observations of Dang at that time were nothing like her prior observations. She noted in the medical records that he was less mobile than the day before. On February 22, he had been able to sit up by himself and was just unsteady when he was trying to get up. (Densmore depo, p. 61-63, 84-85, 88; Doc. 130-1, JMR, p. 6.)

Densmore spent about ten minutes with Dang, then went to Dr. Ogunsanwo and asked him to see Dang right away because his condition was worsening. Her note says, "He is going to be seeing the dr." The medical records reflect the doctor saw Dang at 12:07 p.m. and after examination, said "refer ER ASAP." Densmore's February 23, 12:20 p.m. note says the doctor told her to send Dang to the emergency room ASAP, with neurological deficits with complaints of headache and neck pain, to rule out intracranial lesion or meningitis. Densmore called security within the Sheriff's Office to set up the emergency transfer, and also called the hospital's emergency room and Dr. Desai, the jail's hospitalist. (Densmore depo, p. 61, 65; Doc. 130-1, JMR, p. 6-7.)

19

# IV. STANDARD OF REVIEW

The standard of review for an order granting a Motion for Summary Judgment is <u>de novo</u>. <u>O'Ferrell v. U.S.</u>, 253 F.3d 1257, 1265 (11th Cir. 2001). The Court may affirm on any adequate ground, regardless of whether it is the one on which the district court relied. <u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1117 (11th Cir. 1993) (citations omitted).

The standard of review for an order denying a Rule 59(e) Motion to Alter or Amend a Judgment is abuse of discretion. <u>Am. Home Assur. Co. v. Glenn Estess & Assocs., Inc.</u>, 763 F.2d 1237, 1238 (11th Ct. 1985).

# SUMMARY OF THE ARGUMENT

Each of these Defendant nurses, Scott, Roberts, and Densmore, must be considered individually in determining if there is any liability for the care provided to Dang at the jail. Each acted under color of state law and performed actions within her discretionary authority. Dang withheld vital information from the medical personnel about having a history of headaches and neck pain before he came to the jail on January 26, 2012, and about a recent hospital visit because of those symptoms in which a test for meningitis was recommended, but refused by him.

Based on the knowledge each nurse had when she saw Dang, the care she provided was objectively reasonable and did not support an inference that she knew there was a substantial risk of serious harm to him but was deliberately indifferent to providing the needed care. None of the nurses refused to give him medical care or delayed such care. None of them violated Dang's constitutional rights and no established case law would have put them on notice that their actions would do so. Each is entitled to qualified immunity, and the district court was correct to grant them summary judgment. The order on appeal should be affirmed.

# ARGUMENT

## I. THE COURT DID NOT ERR IN GRANTING SUMMARY JUDGMENT TO SCOTT, ROBERTS, AND DENSMORE.

In his Initial Brief, the Plaintiff argues that the district court improperly did not view the evidence and draw inferences in his favor and failed to consider four cases he cited in his response to the Defendants' motions for summary judgment. (IB, p. 41.) At a more basic level, he asserts that after <u>Kingsley v. Hendrickson</u>, 576 U.S. ___, 135 S. Ct. 2466, 192 L. Ed. 2d 416 (2015), the appropriate standard for analysis of an inadequate medical care claim does not include a subjective prong of deliberate indifference, but uses only an objective prong of reasonableness. (IB, p. 42-44.) The Plaintiff also argues that the actions of Scott and Roberts, as Licensed Practical Nurses, violated the Florida Nurse Practice Act, so they were not acting within their discretionary authority and are not entitled to qualified immunity. (IB, p. 50-54.) He does not dispute that Densmore acted within her discretionary authority.

An important point in this case is that Dang must prove the liability of each particular Defendant. "Imputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference. Each individual Defendant must be judged

separately and on the basis of what that person kn[ew]." <u>Burnette v. Taylor</u>, 533 F.3d 1325, 1331 (11th Cir. 2008).

## A. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In making this determination, the court must view the evidence in the light most favorable to the non-moving party. <u>Samples on behalf of Samples v. Atlanta</u>, 846 F.2d 1328, 1330 (11th Cir. 1988). The initial burden of establishing the absence of a genuine issue of material fact rests on the moving party. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986). Once that burden is met, the non-moving party "bears the burden of coming forward with sufficient evidence of every element that he or she must prove." <u>Rollins v. TechSouth, Inc.</u>, 833 F.2d 1525, 1528 (11th Cir. 1987). In order to meet this burden, the non-moving party "must go beyond the pleadings" and establish "specific facts showing that there is a genuine issue for trial." <u>Celotex</u>, 477 U.S. at 324, 106 S. Ct. at 2553.

In the orders on appeal, the trial court specifically noted it was reviewing the facts in a light most favorable to the Plaintiff, and was drawing all reasonable inferences in his favor. (Doc. 184, p. 1 n.1; Doc. 201, p. 3-4.) Citing <u>Beal v. Paramount Pictures, Corp.</u>, however, the court stated it stopped short of accepting

irrelevant facts, mere arguments of counsel, or unsubstantiated factual allegations. (Doc. 201, p. 3-4.) 20 F.3d 454, 458-59 (11th Cir. 1994) (courts are not "constrained to accept all the nonmovant's factual characterizations and legal arguments" on deciding a motion for summary judgment), cert. denied, 513 U.S. 1062, 115 S. Ct. 675 (1994).

### B. STANDARD FOR AN INADEQUATE MEDICAL CARE CLAIM

As a pretrial detainee, Dang's rights are governed by the Fourteenth Amendment, but the standard applied is the same as that of the Eighth Amendment. Cottrell v. Caldwell, 85 F.3d 1480, 1490 (11th Cir. 1996). He must show evidence establishing "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct. 285, 292 (1976). To do this he must demonstrate an objectively serious medical need. See Taylor v. Adams, 221 F.3d 1254, 1258 (11th Cir. 2000), cert. denied, 531 U.S. 1077, 121 S. Ct. 774 (2001). Then he must show the medical provider was aware of the serious medical need, but disregarded the risk of harm by conduct amounting to more than mere negligence. See Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir. 2004) (citations omitted); Estelle, 429 U.S. at 106, 97 S. Ct. at 292; Murrell v. Bennett, 615 F.2d 306, 310 n.4 (5th Cir. 1980) (deliberate indifference must be more than accidental or inadvertent failure to provide adequate medical care). To violate the Eighth Amendment, the medical care

24

provided must be so grossly inadequate that it shocks the conscience. <u>Harris v. Thigpen</u>, 941 F.2d 1495, 1505 (11th Cir. 1991).

A medical need satisfying the objectively serious component "is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." <u>Hill v. Dekalb Reg'l Youth Det. Ctr.</u>, 40 F.3d 1176, 1187 (11th Cir. 1994); <u>see</u> <u>also</u> <u>Popoalii</u>, 512 F.3d at 499-500 (cryptococcal meningitis is a serious medical condition, but plaintiff must show defendant knew of and disregarded the condition). By including in the Statement of Facts that cryptococcal meningitis is "a serious medical condition," and making that citation in their Motions for Summary Judgment, Scott, Roberts, and Densmore are not conceding that the condition was obvious at the time Dang was incarcerated or when the particular nurse provided medical care, or that he had the condition when he was provided medical care by these nurses at the jail. (Doc. 127, p. 8; Doc. 128, p. 8; Doc. 129, p. 8.)

In regard to each of these nurses, Dang must establish that she was aware of facts from which an inference could be drawn that there was a substantial risk of serious harm to him <u>and</u> that she drew the inference. <u>Farmer v. Brennan</u>, 511 U.S. 825, 837, 114 S. Ct. 1970, 1979 (1994) (emphasis supplied). This subjective component of the claim requires proving (1) the nurse's subjective knowledge of a

substantial risk of serious harm to Dang; and (2) her disregard of the risk; (3) by conduct that is more than mere negligence. See Goebert v. Lee County, 510 F.3d 1312, 1326-27 (11th Cir. 2007) (citations omitted). Proof that the nurse "should have perceived the risk, but did not, is insufficient." Campbell v. Sikes, 169 F.3d 1353, 1364 (11th Cir. 1999). He must show that she acted with "obduracy and wantonness, not inadvertence or error in good faith." Adams v. Poag, 61 F.3d 1537, 1543 (11th Cir. 1995) (quoting Whitley v. Albers, 475 U.S. 312, 319, 106 S. Ct. 1078, 1084 (1986)). Finally, he must show that her wrongful conduct caused the constitutional harm. Goebert, 510 F.3d at 1327. The district court correctly applied the deliberate indifference standard in this case. (Doc. 184, p. 11-12.)

In Kingsley, a 7th Circuit case, the Supreme Court addressed a pretrial detainee's Fourteenth Amendment excessive force claim against corrections officers. The Court held the plaintiff did not have to show the officer was "subjectively" aware his force was unreasonable, but that the force was "objectively" unreasonable. Kingsley, 135 S. Ct. at 2470. A plaintiff does, however, have to show the officer had "a purposeful, a knowing, or possibly a reckless state of mind." Id. at 2472. Otherwise, the harm is negligently-inflicted, which does not provide a constitutional claim. Id. It must be a deliberate decision to deprive the person of life, liberty, or property. Id. (citing Daniels v. Williams, 474 U.S. 327, 331, 106 S. Ct. 662 (1986) (emphasis in original). (This was not an

issue in <u>Kingsley</u>. <u>Id.</u>) The force's reasonableness is judged from the officer's perspective and knowledge, and the objective standard adequately protects an officer acting "in good faith." <u>Id.</u> at 2474.

The entire <u>Kingsley</u> opinion and its holding were focused on a pretrial detainee's excessive force claim. It did not extend to any other type of Fourteenth Amendment due process claim, and the Court specifically declined to state its possible implications for an Eighth Amendment excessive force claim. <u>Id.</u> at 2476. It is submitted that applying the opinion to a due process claim involving the provision of jail medical care is inappropriate without some indication the Court intended the case to change its prior opinions so broadly. <u>See</u> <u>Agostini v. Felton</u>, 521 U.S. 203, 237, 117 S. Ct. 1997, 2017 (1997) (an opinion of the Court does not by implication overrule earlier precedent which directly controls a case; the Court retains the prerogative to overrule its own decisions).

The district court in this case properly declined to apply <u>Kingsley</u> to a medical care claim, citing <u>Kennedy v. Bd. of County Comm'rs for Okla. County</u>, 2015 U.S. Dist. Lexis 87155 (W.D. Okla. Jul. 6, 2015). (Doc. 184, p. 11 n.14.) The <u>Kennedy</u> case involved the provision of medical care at a jail, and the court applied the deliberate indifference standard. <u>Id.</u> at *4, *4 n.6 ("[<u>Kingsley</u>] does not alter the standard applicable to medical care claims."); <u>see</u> <u>also</u> <u>Roberts v. C-73 Med. Dir.</u>, 2015 U.S. Dist. LEXIS 91072, *8 n.3 (S.D. NY Jul. 13, 2015) (stating <u>Kingsley</u>

27

only applies to excessive force cases and applying the deliberate indifference standard to a jail medical care case).

The Initial Brief cites several cases to support the argument that <u>Kingsley</u> applies to all Fourteenth Amendment pretrial detainee claims. (IB, p. 42-44.) None are from the Eleventh Circuit and none applied <u>Kingsley</u> to decide a Fourteenth Amendment deliberate indifference claim; they only commented about the case in dictum. In <u>Castro v. County of Los Angeles</u>, cited in the brief, the Ninth Circuit Court of Appeals has agreed to rehear the case en banc, with oral argument scheduled for March 2016. 797 F.3d 654, <u>reh. en banc granted</u>, 809 F.3d 536 (9th Cir. 2015), That case involves a pretrial detainee's "failure to protect" claim against two corrections officers and the city. The court applied the deliberate indifference standard, but concurring and dissenting opinions urged the <u>Kingsley</u> objective reasonableness approach for the claim against the city. 797 F.3d at 664-66, 677.

The Eleventh Circuit has not ruled on the proper standard to analyze a pretrial detainee's deliberate indifference claim in light of <u>Kingsley</u>. <u>Thomley v. Bennett</u>, 2016 U.S. Dist. LEXIS 14875, *20 n.7 (S.D. Ga. Feb. 8, 2016). The <u>Thomley</u> opinion applied the deliberate indifference standard to the plaintiff's medical care claim, stating that it applied the standards in place at the time the events occurred. <u>Id.</u> It noted that <u>Kingsley</u> was not established law at that time. <u>Id.</u>

28

at *21 n.7 (citing Bilal v. Geo Care, LLC, 2016 U.S. Dist. LEXIS 10141, *15, *15 n.8, *16 (M.D. Fla. Jan. 28, 2016) (Kingsley applies to excessive force claims; the relevant state of mind for a conditions claim, such as deprivation of medical care, is deliberate indifference) (citations omitted)).

The law of this circuit does not support that an objective reasonableness rather than a deliberate indifference standard applies in this case. Furthermore, as found in many of the cases cited by both parties, a Kingsley-type analysis may produce the same result as that set out in Estelle and Farmer. That is true in this case.

## C. FLORIDA NURSE PRACTICE ACT

The Florida Nurse Practice Act, Florida Statutes §§ 464.001-464.027, defines the "Practice of practical nursing" at § 464.003(19), Fla. Stat. (2012). The Plaintiff asserts that Scott and Roberts, as LPNs, were performing duties in violation of the Act and Sheriff's Office policies and so were not acting within their discretionary duties, and are not entitled to qualified immunity. (IB, p. 13, 50-54.) The actions of Scott to which the Plaintiff points are her evaluation of Dang on February 9 and deciding to send him to mental health segregation for an evaluation without completing a required segregation assessment. (IB, p. 27.) The objected-to actions of Roberts include her evaluation of Dang during the Code Orange incident on February 20. (IB, p. 29.) He states that both Defendants

violated the Act when they were scheduled at the jail as the charge nurse. (IB, p. 27, 53.)

Jail Policy and Procedure § 13.05(III)(D), which the Plaintiff claims the nurses violated, states that "Health care personnel will not perform any tasks beyond those permitted by their credentials." (Doc. 165-2, p. 2.) (IB, p. 51.) The provision does not mention LPNs or RNs, but assuming it applies to an LPN, neither Scott nor Roberts exceeded her statutory duties or the Sheriff's Office LPN job description. (Doc. 164-7.) The job description has an extensive list of duties, including conducting the daily nurse's sick call and providing emergency care to inmates as required. The description states that the duties listed are for illustrative purposes only and the omission of a specific work statement does not necessarily exclude it from being performed by the LPN. The nurse is to perform other duties as assigned or as may be necessary in the efficient and effective performance of the position functions.

Section 464.003(19) provides for an LPN to perform "selected acts, including the administration of treatments and medications, in the care of the ill, injured, or infirm and the promotion of wellness, maintenance of health, and prevention of illness of others under the direction of a registered nurse [or] a licensed physician..." Her decisions must be based on her educational preparation and experience in nursing.

Scott testified that, in 2004, she earned her LPN license from the Americare School of Nursing in Fern Park, and at the time of the deposition, had worked at the John E. Polk Correctional Facility as an LPN for ten years, since 2005. Prior to that, she was employed by a staffing agency which placed her in various state prisons. She has also worked at a county health department and at a nursing home as an LPN. (Scott depo, p. 7-14.) She has been the acting charge nurse at the jail, although it had been about three years since she did that. The Director of Nursing, Sonia Del Castillo, would assign her there when the RNs were unavailable to cover the shift. Nurse Thercier was the usual night shift charge nurse. The typical shift consisted of three LPNs and a charge nurse. (Scott depo, p. 8-9, 44, 48.)

Roberts testified that she worked as an LPN at a Georgia correctional facility from 1991 to 1995, and at the John E. Polk Correctional Facility from 1998 to 2014, when she moved to Virginia. (Roberts depo, p. 10-14.) She was sometimes assigned as her shift's charge nurse, but her main job was as an LPN. She might be scheduled in that position when someone would call in and the jail could not get a replacement. Typically, the charge nurse was an RN. The nurse schedule may show her as the charge nurse, but if someone else came in and did the charge, then it would not be her. (Roberts depo, p. 32, 35.)

Both nurses were well-qualified for their positions and for the actions they performed in providing medical care to Dang. Both were under the supervision of

31

Director of Nursing Del Castillo, an RN, who oversees the nurses' work. (Doc. 144, Del Castillo depo, p. 8, 30.) They would also, of course, be under the supervision of Dr. Ogunsanwo, the jail's Medical Director. Scott administered previously-prescribed medication, took Dang's vital signs, checked the range of motion in his neck, and recorded medical information and her observations, activities provided for in the LPN job description. She did not diagnose him with mental problems or set up a treatment plan; she only referred him for mental health observation so he would be evaluated by that department's personnel. Actions Roberts took in regard to Dang were taking his vital signs, checking whether his eyes were normal, recording medical information and her observations, referring him to the doctors, placing him in the infirmary for observation, and ordering him to be housed in the medical department.

All these nursing activities would easily fall under the broad statutory umbrella of "the promotion of wellness, maintenance of health, and prevention of illness of others," and neither nurse received any criticism for the actions from her supervisors. As an LPN seeing inmates with medical complaints, they are not just "note takers." They may use their training and experience to perform functions intrinsic to providing adequate medical care. The statute provides for an LPN to make decisions.

The Plaintiff reads the statute to require that these broad duties may only be performed under the direction of an RN or a doctor. (IB, p. 53.) The validity of applying an administrative statute such as the Act to the actions of an LPN in determining if her actions were a discretionary function for the purposes of qualified immunity is questionable. See Davis v. Scherer, 468 U.S. 183, 193-94, 104 S. Ct. 3012, 3019 (1984) (officials do not lose qualified immunity because their conduct violates some administrative provision). However, even assuming it may apply, Scott and Roberts were each performing a job-related function through means within her power. See Holloman, 370 F.3d at 1265-66.

The Plaintiff states the court erred in interpreting the statute, contending that whether these nurses' actions were prohibited was an issue of fact on the issue he raised of whether they are entitled to a qualified immunity defense, that should be decided by a jury. The court, however, interpreted the statute and stated that the Act's language did not clearly prohibit LPNs from performing assessments or preparing care plans, and even if they occasionally acted outside the Act's parameters, that did not displace the totality of their conduct which was consistent with LPN duties. (Doc. 184, p. 10 n.12.) The court correctly found that the actions of Scott and Roberts were "well within the bounds of their job description and their delegated authority." (Doc. 184, p. 10.) See Kruse v. Byrne, 2013 U.S. Dist. LEXIS 169975, *26-27 (S.D. Ala. Dec. 3, 2013) (LPN employed by county jail

33

was acting within her discretionary authority when she performed assessments and treated inmates); <u>Welch</u>, 2012 U.S. Dist. LEXIS 118559 at *11 (prison nurse was performing discretionary function when she treated patients).

A court's statutory interpretation is a legal question reviewed <u>de novo</u> on appeal, and the starting point is the language of the statute itself. <u>Halperin v. Regional Adjustment Bureau, Inc.</u>, 206 F.3d 1063, 1066 (11th Cir. 2000). That an LPN must act under the direction of an RN or a doctor does not mean she may not do whatever is necessary for the patient if the supervisor is not directly standing by. Scott and Roberts did not diagnose Dang and set up a treatment plan for him. Rather, they made decisions based upon their educational preparation and nursing experience, and properly referred him to (1) the mental health department and (2) Dr. Ogunsanwo, so those professionals could provide him with diagnosis and care.

The testimony is clear that Scott and Roberts were not regularly scheduled as the charge nurse; the usual charge nurse was an RN. Both nurses stated they were only called on when the scheduled RN was unable to make it to work. Moreover, the medical department scheduling, with them occasionally serving as the charge nurse, bears no relation to Dang's claim of deliberate indifference. <u>See Bonner v. Chambers County</u>, 2007 U.S. Dist. LEXIS 54550, *76 (M.D. Ala. July 26, 2007) (specific acts not the basis of the § 1983 claim are irrelevant to discretionary authority analysis).

It is the province of the court, not the jury, to interpret a statute. The Defendants found no state or federal case law, or state administrative rules applying § 464.003(19) to the activities of an LPN in a correctional facility or otherwise, and the Plaintiff has not cited any. (IB, p. 50-54.) The Florida legislature's "sole" purpose for the Act was "to ensure that every nurse practicing in this state meets minimum requirements for safe practice." § 464.002. The court's interpretation and application of § 464.003(19) was reasonable. The actions of Scott and Roberts were discretionary functions and the defense of qualified immunity is available to them.

## D. NO KNOWLEDGE OF A SUBSTANTIAL RISK OF SERIOUS HARM TO WHICH THE NURSES WERE DELIBERATELY INDIFFERENT

The Statement of Facts provides a detailed record of the care each nurse provided to Dang. When reviewing their contacts with him and the actions they took, it is important to remember that he withheld potentially helpful information from them. When he complained of a headache and neck pain and associated it with force used by the police at his arrest, he did not say it had been ongoing since an arrest on December 22, 2011, and the medical providers would assume he was speaking of his recent arrest on January 26, 2012. (Scott depo, p. 27-28; Doc. 152-1, Ogunsanwo affidavit, p. 3.) Nor did he tell anyone he had been taking large amounts of Aleve since the December arrest. He testified he did not provide the information because "it was none of their business." (Dang depo, p. 64-65, 68-72,

35

82-84.)

Likewise, Dang did not tell jail personnel about the January 12, 2012, emergency room visit, at which he refused the lumbar puncture to rule out meningitis and left the hospital against medical advice. (Doc. 137-1, HMR, p. 16-19, 30-31.) As an example of his reticence, when he saw Dr. Ogunsanwo on February 1, he told the doctor only that he had headaches and neck pain and the SWAT team had thrown him to the ground during his arrest, without specifying when that arrest occurred. (Dang depo, p. 40-41, 82-83, 115-116.)

Based on the information each nurse had, the medical care she provided to Dang was objectively reasonable. She did not know of a substantial risk of harm, and she provided adequate care for the physical complaints of which she had knowledge.

### (1) ALECIA SCOTT, LPN

Scott was clearly concerned about Dang's symptoms when she saw him on February 9, particularly his above-normal temperature,[11] and took steps to ensure he was okay. She examined him herself and kept him a while for observation,

---

[11] Dr. David Thomas, Defendants' expert, clarified that fever is an elevated body temperature when it is higher than 100° Fahrenheit, as measured by an oral thermometer. (Doc. 134-1, Thomas expert report). Also, see, e.g., Fever: First Aid, Mayo Clinic, (Apr. 15, 2015), http://www.mayoclinic.org/first-aid/first-aid-fever/basics/art-20056685, which states that normal body temperature can range between 97° and 99° Fahrenheit or more, and 100.4° generally indicates a fever.

looked in on him later to check his temperature, and charted an order for his blood pressure and temperature to be monitored twice a day while she was out from work. When she returned from her time off, on February 14, she looked at the chart to make sure he had been monitored and what the results were. As noted in the Statement of Facts, his temperature was never over 100° at any other time.

At deposition, Scott stated the only thing she saw out of the ordinary was Dang's fever, which was brought down quickly with the Ibuprofen. Complaints of headache and neck pain are subjective, and she can only go by his appearance and his behavior. If she had thought there was anything urgent and Dr. Ogunsanwo needed to be contacted, she could have called him on the telephone even during the nighttime hours. Based on her findings that evening, she did not think that was necessary nor did she make a referral to the doctor. (Scott depo, p. 60-61, 66-67.)

Dang had previously been seen, on January 30 (the January 29-30 night shift), by another nurse, Sandra Wilt, who had given him Ibuprofen when he complained of head and neck pain due to being jostled and held in a neck lock by police. (Doc. 130-1, JMR, p. 28.) Dr. Ogunsanwo, who saw Dang on February 1, increased the Ibuprofen dosage and prescribed Robaxin, a muscle relaxant, for the headache and neck pain.[12]  (Doc. 130-1, JMR, p. 27.) Scott knew Dang had been

---

[12] When Dang was examined by the doctor, his temperature was 98.9° and he had a full range of cervical motion with only some mild pain. (JMR, p. 26.)

seen by the doctor already and the Ibuprofen was already prescribed, so she administered it for his fever and pain.

Based on the information she had, Scott had no reason to think that Dang had anything more serious than a headache and neck pain from force used during his January 26, 2012, arrest. She provided adequate care for those symptoms and his fever. His condition did not deteriorate under her care; in fact, a few hours after the exam, when she checked on him in the pod, his fever was under control, he had a normal appearance, and he told her he was better.

Dang appeared in no distress to Scott when he exited the medical department. When she went out into the hall where he was sitting on the floor, and she told him to get up, he did so without difficulty and walked off. However, Scott referred Dang to mental health because she was concerned his problems might not just be physical after his behavior in the hall.

The Plaintiff criticizes Scott for sending him to D Pod for mental health observation ("MHO") and points out that Scott did not do a "segregation assessment" before the transfer, as required by a Sheriff's Office policy. (IB, p. 58.) Martha Densmore, RN, in her deposition, said the policy's purpose is to make sure the inmate will be all right in a cell by himself; it is not used to identify an inmate whose health status is deteriorating. In MHO, a nurse dispensing medication sees the inmate twice a day and is available in D Pod any time a

medical issue comes up. (Densmore depo, p. 32-34; Del Castillo depo, p. 37-38; Doc. 164-12, Jail Policy 10.01, p. 4-5.) Furthermore, K. Pritchard, from the mental health department, saw him the very next day, and it was Pritchard's decision that Dang should remain there for further monitoring. Even if Scott had violated a policy, that is insufficient to establish subjective knowledge of a strong likelihood of serious harm, and also, it does not give rise to a § 1983 claim. See Buzzi v. Gomez, 24 F. Supp. 2d 1352, 1362 (S.D. Fla. 1998) (citing Davis, 468 U.S. at 193-94, 104 S. Ct. at 3019); see cf., Edwards v. Gilbert, 867 F.2d 1271, 1277 (11th Cir. 1989) (citing State Bank of St. Charles v. Camic, 712 F.2d 1140, 1146 (7th Cir. 1983) (even if officers in charge of intoxicated detainee who committed suicide disregarded established procedures, that could not be characterized as deliberate indifference because they had no knowledge he was a suicide risk) (cert. denied, 464 U.S. 995, 104 S. Ct. 491 (1983)).

Based on some Roberts testimony, the Plaintiff also attempts to make an issue of whether Scott was present during the February 20 Code Orange. (IB, p. 59.) Scott does not recall seeing Dang that night, and the medical records do not show any actions by her. The schedule shows she was only scheduled as a medication administration nurse using the "cart" of medications (designated by a "C"). (Scott depo, p. 39-41; Doc. 164-15, p. 4.) The schedule shows several other nurses were on duty with Roberts. (Doc. 164-15, p. 4.)

The actions of Scott, based on the knowledge she had, were those of a reasonable nurse, and no evidence supports that they were not. Her actions were objectively reasonable and were not deliberately indifferent to a known substantial risk of serious harm. Misdiagnosing a patient or failing to make a correct medical judgment as to needed treatment does not constitute deliberate indifference. Howell v. Evans, 922 F.2d 712, 719, 721 n.8 (11th Cir. 1991) (citing Estelle, 429 U.S. at 106, 97 S. Ct. at 292). Scott did not refuse to treat Dang or delay his treatment, and she did not violate his constitutional rights. She should be granted qualified immunity and the order entering summary judgment in her favor should be affirmed.

### (2) SHARYLE ROBERTS, LPN

Roberts saw Dang once, on February 20, during the Code Orange event. (Doc. 130-1, JMR, p. 11-12.) Based on her examination of Dang and her observations of his actions, Roberts thought his actions were voluntary and that he might have a mental health issue. Clearly, she was not indifferent to the possibility he might worsen, as she kept him in the infirmary for observation with an order to move him into the medical department, and made referrals to both the psychiatrist and the medical doctor.

On the next shift (February 21), Nurse Bledsoe saw Dang about 7:53 a.m. and recorded normal vital signs and that he was alert and oriented times three (to

person, place, and time) and could perform his activities of daily living. (Doc. 130-1, JMR, p. 10.) It was also on February 21 that Dr. Westhead, the jail's consulting psychiatrist, evaluated Dang where he was housed in the medical department and cleared him psychiatrically. Her diagnosis for Dang's behavior of the previous night was an "acute drug reaction," which she termed an "idiosyncratic reaction to muscle relaxants." (JMR, p. 9-10.) [13]

Based on the information she had, the medical care Roberts provided to Dang was objectively reasonable. She did not know of a substantial risk of serious harm, and she provided adequate care for the physical complaints of which she had knowledge. His condition did not deteriorate under her care, as shown by his encounters the next day with Nurse Bledsoe and Dr. Westhead, when he had returned to normal functioning. If Roberts was mistaken in her belief that Dang's actions were voluntary, that would just be a misdiagnosis of his condition, which is not a constitutional violation. See Howell, 922 F.2d at 719. Furthermore, if she was mistaken, she still was not indifferent to his medical needs and placed him under close observation, making referrals to the doctors.

---

[13] It is unclear what the Plaintiff is insinuating about Dr. Westhead and her examination of him, but he takes issue with the court's acceptance of her testimony. (IB, p. 30 n.11.) The doctor, a non-party, subcontracted mental health provider to the Sheriff's Office, had no motive to place false information in the jail's medical records. She saw Dang about 11:50 a.m., after Nurse Bledsoe had already seen him about 7:53 a.m. and had noted Dang was alert and oriented x 3 with no fever and no complaints. (Doc. 130-1, JMR, p. 9-10.)

One of Dang's criticisms of Roberts is that she did not actually call the doctor the evening of February 20. (IB, p. 60.) However, she held him in the infirmary, where a doctor is required to see the inmates daily, regardless of whether there is a request. (Densmore depo, p. 22, 59-60.)

He also criticizes Roberts because she worked the night shift on February 21, but there is no record of her seeing Dang. (IB, p. 61-62.) He was, however, in the infirmary, where he would be observable, and there is no record of him making any complaints during the night. Nevertheless, he contends that he "languished," suffering in his cell that night, although he provided no deposition or affidavit testimony to that effect. Testimony is provided from Anthony Laird, who was his cellmate "at some point," and Sarah Agurkis, his girlfriend who visited him in jail for about fifteen minutes on February 19 (at least she "believes" it was the 19th). (Doc. 164-18, Laird affidavit; Doc. 164-19, Agurkis depo, p. 35.)

Mr. Laird's declaration, mostly a litany of complaints about his own medical care, makes some allegations about Dang's behavior, but he does not recall when Dang was housed in the same medical cell for a short time. The Plaintiff has referenced the declaration in regard to Dr. Westhead's exam on February 21[14] and nurse Densmore's exam on February 23, and now, in regard to Roberts' schedule on February 20 and 21. (Doc. 166, Plaintiff's Response to Motions for Summary

[14] No cellmate was present when Dr. Westhead saw Dang or when Densmore saw him on February 22. (Westhead depo, p. 105; Densmore depo, p. 51-52.)

Judgment, p. 17 n.15, p. 18; IB, p. 30 n.11.) In fact, nothing ties the declaration to any date relevant to the case's issues. Ms. Agurkis does not provide any observations of Dang, but only relates his hearsay statements to her about how he was feeling. (Agurkis depo, p. 34-37.) These documents do not provide a reasonable inference about the Plaintiff's condition on February 21 or at any other time.

The actions of Roberts, based on the knowledge she had, were those of a reasonable nurse, and no evidence supports that they were not. Her actions were objectively reasonable and were not deliberately indifferent to a known substantial risk of serious harm. Misdiagnosing a patient or failing to make a correct medical judgment as to needed treatment does not constitute deliberate indifference. Howell, 922 F.2d at 719, 721 n.8. She did not refuse to treat Dang or delay his treatment, and she did not violate his constitutional rights. Roberts should be granted qualified immunity and the order entering summary judgment in her favor should be affirmed.

### (3) MARTHA DENSMORE, RN

Densmore saw Dang once on February 22 and twice on February 23, the day he was taken to the hospital. Densmore had Dr. Westhead's February 21 diagnosis of a drug reaction before she saw Dang on February 22 at 8:40 a.m., and would have taken it into account in her assessment of him. Except for some weakness

when trying to sit up, her examination of Dang that morning was within normal limits, and he was sitting up when she left the cell. She thought he might be exhibiting withdrawal symptoms, which was not unreasonable given Dr. Westhead's recent diagnosis. (Densmore depo, p. 21, 51, 80-83, 86; Doc. 130-1, JMR, p. 9.)

Dang did not reveal his headache and neck pain to Densmore on February 22, and based on the information she had, the medical care Densmore provided to Dang that day was objectively reasonable. She did not know of a substantial risk of harm, and she provided adequate care for the physical complaints of which she had knowledge. Dang was functioning normally when seen by Dr. Westhead. Densmore's decision not to refer him to Dr. Ogunsanwo at that time was borne out by the later assessment of the February 22 night shift nurse that his vital signs were normal. (Doc. 130-1, JMR, p. 8.)

When Densmore saw Dang at 8:30 a.m. on February 23, his vital signs were normal and he walked to the door. However, when he told her about his neck pain and having a headache for two weeks, and she observed other concerning symptoms, she went to the doctor's office and personally asked him to see Dang. (Densmore depo, p. 54-60; Doc. 130-1, JMR, p. 8.) This was an objectively reasonable response to the symptoms of which Densmore became aware. Then, when she saw him at 11:15 a.m. with much more troubling symptoms and with a

substantial change in his condition from the earlier exam, she asked the doctor to see him right away. After his exam, Dr. Ogunsanwo had her make the arrangements for Dang to be transported to the hospital. (Densmore depo, p. 61, 65; Doc. 130-1, JMR, p. 6-7.)

The Plaintiff voices little specific criticism of Densmore beyond reiterating his position that the district court failed to give proper weight to his allegations. (IB, p. 62-64.) He has asserted in prior pleadings that she should have called 911 instead of going to the doctor. Densmore testified that nurses may not call 911 if the doctor is present. The court correctly stated this did not rise to the level of deliberate indifference. (Doc. 166, p. 18; Densmore depo, p. 62; Doc. 184, p. 16.)

If, when advised of the ongoing headaches and neck pain and seeing Dang's worsened condition on February 23, Densmore became aware of a substantial risk of serious harm, she clearly was not indifferent to his need for medical care. She immediately asked the medical doctor to examine him, which was an objectively reasonable and appropriate response. Her actions were those of a reasonable nurse, and no evidence supports that they were not. She did not refuse to treat Dang or delay his treatment, and she did not violate his constitutional rights. Densmore should be granted qualified immunity and the order entering summary judgment in her favor should be affirmed.

## E. NURSES HAVE QUALIFIED IMMUNITY

"[Q]ualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002). One inquiry of the analysis is whether the plaintiff's allegations, construed in the light most favorable to the plaintiff, establish a constitutional violation. Hope v. Pelzer, 536 U.S. 730, 736, 122 S. Ct. 2508, 2513 (2002) (citing Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001)). If a constitutional right has been violated, another inquiry is whether the right violated was "clearly established." Saucier, 533 U.S. at 201, 121 S. Ct. at 2156. Both elements must be satisfied for an official to lose qualified immunity. Brown v. City of Huntsville, 608 F.3d 724, 734 (11th Cir. 2010). Scott, Roberts, and Densmore were each acting within her discretionary authority. Thus, the burden of proof is upon the Plaintiff to establish that qualified immunity is not appropriate. Vinyard, 311 F.3d at 1346.

None of these nurses, who must be considered separately, violated Dang's constitutional rights and no established law would have put them on notice that their actions would do so. The reasonableness of a nurse's actions is evaluated based on the law established in earlier court decisions and contemporary medical standards, and on the information she possessed when the conduct occurred. See

Howell, 922 F.2d at 719; <u>Lancaster v. Monroe County, Ala.</u>, 116 F.3d 1419, 1424 (11th Cir. 1997). The Plaintiff has made no argument that the nurses' care was unreasonable under contemporary medical standards.

In <u>Howell v. Evans</u>, the prison doctor knew the prisoner had a pre-incarceration diagnosis of asthma, yet during the day, starting at 9:15 a.m., he prescribed lesser treatments than the necessary steroids for the prisoner's increasingly serious condition, and the prisoner died at 5:00 p.m. 922 F.2d at 716, 721, 721 n.8. The plaintiff (the decedent's widow) contended that the doctor should have known the patient's condition could deteriorate at any moment. <u>Id.</u> at 721. She claimed that greater treatment was needed as the patient's condition eroded, and the doctor's failure to respond correctly amounted to deliberate indifference. <u>Id.</u> The court, however, granted the doctor qualified immunity, stating that errors in medical judgment will rarely constitute deliberate indifference. <u>Id.</u> at 721 n.8, 722. Assuming, <u>arguendo</u>, that these Defendant nurses made errors in medical judgment, that does not mean they were deliberately indifferent to Dang's need for care, which they provided in a reasonable manner based on the information they had.

In the 1995 <u>Adams v. Poag</u> case, the court noted that challenges to discretionary conduct must be evaluated individually, because the deliberate indifference inquiry is fact-specific. 61 F.3d at 1544. In <u>Adams</u>, it was known that

the deceased inmate had asthma. The plaintiffs (the inmate's surviving parents) had a medical expert who opined that the inmate was given inappropriate medical treatment for his condition, however, the court granted summary judgment to all the defendants.

The nurse defendant in <u>Adams</u> saw the inmate on four occasions; twice she provided him with a prescribed medication and twice, detecting no respiratory distress, she returned him to the dormitory without administering any medication or alerting other medical personnel. <u>Id.</u> at 1547. The plaintiffs' expert stated that failure to alert a doctor to his condition was grossly inadequate. <u>Id.</u> The court, however, pointed out that the nurse never declined to see the inmate, and on both occasions she evaluated him and made the medical determination that his condition did not require the notification of other personnel. <u>Id.</u>

Ultimately, the allegations against the nurse were that she "failed to recognize and treat [the inmate's] progressively deteriorating condition." <u>Id.</u> at 1548. However, the record did not support that she recklessly failed to detect the inmate's deteriorating condition, and at most, the claim was for medical malpractice. <u>Id.</u> In this case, the Defendant nurses reasonably treated Dang based on the knowledge they had. When Densmore was given the additional long-term headache and neck pain information during her February 23 shift and Dang's

condition deteriorated, she alerted the doctor emergently, which resulted in his going to the hospital.

Although not acceptable as prior established law, Kruse v. Williams, in which the events occurred in 2010, is instructive. 592 Fed. Appx. 848 (11th Cir. Dec. 4, 2014) (per curiam). In that case, the inmate had a previous diagnosis of Addison's disease which the jail in Alabama knew about. On July 8, the nurse, an LPN, saw him with complaints of vomiting and dehydration, checked on him several times during the night, and provided him with prescribed nausea medicine and clear liquids. His nausea and vomiting appeared controlled at 9:45 p.m., but at 1:30 a.m. he was dead from Addison's disease. Id. at 850-51.

The appellate court affirmed the summary judgment granted to the nurse. Id. at 859. Based on her evaluation of the inmate and her observations of him, she made the medical determination that he did not require additional treatment at a hospital. Id. at 857. Medical treatment may violate the Constitution only when it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Id. at 858 (quoting Harris, 941 F.2d at 1505).

The nurse in Kruse promptly evaluated all the symptoms of which she was aware, and the inmate did not appear to be rapidly deteriorating. Id. The opinion compared that case to Adams in stating the care provided, if subpar, did not rise

above a medical malpractice claim. <u>Id.</u> at 859. To extend the case's findings to the case at bar and assuming, <u>arguendo</u>, that the care provided by any of these nurses was "subpar," that is insufficient to establish deliberate indifference in violation of the Fourteenth Amendment. <u>See</u> <u>id.</u>

The Defendants' expert, Renee Dahring, an Advanced Practice Registered Nurse with extensive correctional facility experience, said it was unfortunate Dang chose to withhold important medical information from the jail personnel, but his expressed complaints were taken seriously and he was not denied access to medical care. He had no risk factors for cryptococcal meningitis;[15] his symptoms waxed and waned, and he had occasional short term symptoms which seemed to resolve spontaneously. Ms. Dahring stated the record showed no deliberate indifference to Dang's medical needs in the treatment provided to him. (Doc. 150-5, Dahring expert report, p. 1, 4-5.)

None of the nurses violated Dang's rights, and no established case law would have given her notice that her actions would do so. Similar cases such as <u>Adams</u> and <u>Howell</u> would not have put her on such notice. Each is entitled to qualified immunity and a summary judgment.

---

[15] Dang was not HIV positive. (Doc. 130-1, JMR, p. 23.) Dr. Robert Cohen, Plaintiff's expert, has made numerous cryptococcal meningitis diagnoses and all were HIV positive. (Doc. 133, Cohen depo, p. 19, 21-22, 24, 28.)

The 2008 Eighth Circuit <u>Popoalii</u> case, in which several prison nurses were defendants, actually involved a prisoner that contracted cryptococcal meningitis. The prisoner was incarcerated with a previous, possibly incorrect, diagnosis of viral encephalitis. <u>Popoalii</u>, 512 F.3d at 491. Either at that time, or during her incarceration, she developed meningitis. <u>Id.</u> The court stated the condition is "an uncommon fungal infection, primarily associated with HIV positive…individuals," and noted, "[the plaintiff] was not HIV positive and had no known risk factors associated with the infection," and "[the condition] is difficult to diagnose." <u>Id.</u> at 491, 500. The plaintiff complained of headaches and was given Ibuprofen, and the nurses examined her regularly, taking her vital signs. <u>Id.</u> at 493-495. She also complained of vision problems, and the nurses performed eye tests and neurological function tests. <u>Id.</u> She was often in administrative confinement for actions such as screaming, and was placed on suicide watch for banging her head on the wall. <u>Id.</u> at 493.

The Eighth Circuit stated the medical defendants were no more than grossly negligent. <u>Id.</u> at 500. The plaintiff had none of the risk factors for meningitis and, although she received citations for behavior resulting from the meningitis, the record did not show the defendants knew her behavior was a result of a serious medical condition. <u>Id.</u>

The Plaintiff complains that the court did not address his cited cases in the order on appeal.[16] (IB, p. 41, 50, 67.) However, the facts in those cases are not materially similar to those in this case, in which the nurses provided objectively reasonable and adequate care to Dang based on the knowledge each had. For example, in Carswell, an appeal from a jury verdict in the plaintiff's favor, the court found there was sufficient evidence for the finding of deliberate indifference where the evidence of his dramatic weight loss and the notice of it from the public defender and jail staff members showed the defendants had knowledge of a need for medical attention which they failed to provide. In Ancata, which concerned a motion to dismiss, the complaint stated a medical indifference claim where the plaintiff alleged that medical personnel refused to send him to any outside specialists without a court order and his agreement to bear the costs, despite recommending the evaluations, thus intentionally refusing to provide care they believed necessary, and providing only aspirin as treatment.

Mandel approved the directed verdict entered by the trial court in the plaintiff's favor on the deliberate indifference issue. A physician's assistant, the medical provider at the prison road farm, refused to order an x-ray of the plaintiff's leg, injured when he jumped off the bed of a truck, despite the fact he was virtually

---

[16] Carswell v. Bay County, 854 F.2d 454 (11th Cir. 1988); Ancata v. Prison Health Services, 769 F.2d 700 (11th Cir. 1985); Mandel v. Doe, 888 F.2d 783 (11th Cir. 1989); McElligott v. Foley, 182 F.3d 1248 (11th Cir. 1999).

unable to walk, never referred him to the supervising doctor at the jail, and provided only aspirin and muscle relaxers as treatment.[17] In McElligott, the doctor only provided stomach medication for the inmate's continuing abdominal pain and, when pre-incarceration medical records revealed the inmate's previous severe abdominal pain, dramatic weight loss, and possible cancer diagnosis, the doctor only ordered a CT scan and a chest x-ray. McElligott distinguished Adams and Howell, both of which have facts more similar to the instant case. McElligott, 182 F.3d at 1259.

As the court pointed out in its order denying the Plaintiff's Motion to Alter or Amend the Judgment, it is not obligated to address every cited case of a litigant. It further stated "the linchpin of decisions in [the Plaintiff's cited cases] was the defendants' awareness of the prisoner's serious and deteriorating condition coupled with their deliberate disregard for the prisoner's need for adequate medical care…" (Doc. 201, p. 3-4) (emphasis in original). The court stated those circumstances were not established in this case and the cases were factually distinguishable. (Doc. 201, p. 4.)

---

[17] There was also evidence of prior deliberate indifference by the physician's assistant to other prisoners. Mandel, 888 F.2d at 789-90.

53

## CONCLUSION

Objectively, the actions taken by each Defendant were those of a reasonable nurse based on the knowledge she had. If a reasonable nurse would have known that the information she had should compel a medical action, but she recklessly refuses to provide or delays providing the proper treatment, this may constitute deliberate indifference. See Howell, 922 F.2d at 720, 720 n.7 (indifference, or lack of attention, is similar to negligence; "deliberate" indifference requires "recklessly ignoring the medical situation in the face of information that a reasonable person would know requires action"). No evidence supports that any of the nurses' actions and decisions were objectively unreasonable under the circumstances. None of them were deliberately indifferent to a known substantial risk of serious harm to Dang. Thus, none violated his rights, and no established case law would have given them notice that their actions would do so.

The district court was correct to enter summary judgment for Scott, Roberts, and Densmore. The order on appeal should be affirmed, as well as the order denying the Motion to Alter or Amend the Judgment. (Doc. 184; Doc. 201.)

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

This Answer Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,150 words, excluding the parts of the brief exempted by 11th Cir. R. 32-4. It complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Word for Mac 2011 in 14 point Times New Roman type.

LINDA L. WINCHENBACH

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 7th day of March, 2016, the original and 6 copies of the foregoing Answer Brief of Appellees were provided by U.S. Mail to the Office of the Clerk, Eleventh Circuit Court of Appeals, 56 Forsyth Street NW, Atlanta, Georgia 30303 and also electronically filed using the CM/ECF system, which will send notice of electronic filing to the following: Melissa H. Powers, The Maher Law Firm, P.A., 631 W. Morse Blvd., Suite 200, Winter Park Florida 32789, Matthew P. Farmer, Farmer & Fitzgerald, 102 W. Whiting Street, Tampa, Florida 33602, D. Andrew DeBevoise, Thomas W. Poulton, Jeffrey K. Grant, DeBevoise & Poulton, P.A., 1035 S. Semoran Blvd., Suite 1010, Winter Park, Florida 32792, Bruce R. Bogan, Melissa Sydow, Hilyard, Bogan & Palmer, P.A., 105 E. Robinson Street, Suite 201, Orlando, Florida 32801.

LINDA L. WINCHENBACH
Fla. Bar No. 0749249
John M. Green, Jr., P.A.
125 NE First Avenue, Ste 2
Ocala, FL 34470
Tel: (352) 732-9252
Fax: 888-545-7282
Attorneys for Appellees, Scott, Roberts and Densmore

