IN THE
UNITED STATES
COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

APPEAL NO. 15-14842-DD

NAM DANG, by and through his
Power of Attorney, VINA DANG,

                              Plaintiff-Appellant,

        vs.

DONALD F. ESLINGER, in his official
capacity as the SHERIFF OF SEMINOLE
COUNTY; OLUGBENGA OGUNSANWO,
M.D.; SANDRA WILT, LPN; BRENDA
PRESTON-MAYLE, RN; ALECIA SCOTT,
LPN; SHARYLE ROBERTS, LPN;
and MARTHA DENSMORE, RN,

                              Defendants-Appellees,

On Appeal from the United States District
Court for the Middle District of Florida
Orlando Division
Case No.: 6:14-cv-37-Orl-31TBS
Gregory A. Presnell, United States District Judge

_____

PETITION FOR REHEARING
EN BANC

_____

Matthew P. Farmer, Esq.                Steven R. Maher, Esq.
501 W. Whiting Street, Suite 501       271 W. Canton Ave., Suite 1
Tampa, FL  33602                       Winter Park, FL 32789
(813)228-0095; FAX(813)224-0269        (407)839-0866; FAX(407)425-7968

COUNSEL FOR APPELLANT

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Appellant, through his undersigned counsel, hereby certifies that the following persons have an interest in the outcome of this case:

1. Bruce Bogan, Esq.

2. Daniel Cotter, Esq.

3. Mr. Nam Dang

4. Ms. Vina Dang

5. D. Andrew Debevoise, Esq.

6. Ms. Martha Densmore

7. Donald Eslinger, Sheriff of Seminole County

8. Matthew Farmer, Esq.

9. Jeffrey Grant, Esq.

10. John Green, Esq.

11. Steven Maher, Esq.

12. Dr. Olugbenga Ogunswano

13. Melissa Powers, Esq.

14. Hon. Gregory Presnell, United States District Judge

15. Ms. Brenda Preston-Mayle

16. Thomas Poulton, Esq.

16. Ms. Sharyle Roberts

17. Ms. Alecia Scott

18. Scott Shelton, Esq.

19. Hon. Thomas Smith, United States Magistrate Judge

20. Melissa Sydow, Esq.

21. Ms. Sandra Wilt

22. Linda LeVines Winchenbach, Esq.

23. Joy Grace Zubkin, Esq.

## STATEMENT OF COUNSEL

I express a belief, based on a reasoned and studied professional judgment, that this appeal involves one or more questions of exceptional importance. According to Rule 35(b)(1)(B), in pertinent part, "[A] petition may assert that a proceeding presents a question of exceptional importance if it involves an issue on which the panel decision conflicts with authoritative decisions of every other United States Court of Appeals that has addressed the issue." FRAP 35(b)(1)(B).

The questions of exceptional importance are as follows:

1. Did the panel's amended opinion erroneously distinguish the United States Supreme Court's decision in *Kingsley v. Hendrickson,* 576 U.S. __, 135 S. Ct. 2466, 192 L. Ed. 2d 416 (2015), which holds that a Fourteenth Amendment claim brought by a pretrial detainee asserting the infliction of excessive force by government officials does not require proof of their subjective state of mind, apply as well to a pretrial detainee asserting he has been subjected by government officials to constitutionally inadequate medical care?

2. Did the panel's amended opinion incorrectly apply *Kingsley's* reference to negligence?

3. Should this petition for rehearing en banc be granted because the panel's refusal to apply *Kingsley* to the Fourteenth Amendment claim of inadequate medical care by a pretrial detainee conflicts with authoritative decisions by the

Second Circuit in *Darnell v. Pineiro,* 849 F. 3d 1060 (2nd Cir. 2017), *reh'g denied,*

(No. 15-2870, May 16, 2017), and the Ninth Circuit in *Castro v. County of Los*

*Angeles,* 833 F. 3d 1060 (9th Cir. 2016)(en banc), *cert. denied,* No. 16-655, __ U.S.

__, 137 S. Ct. 831, 197 L. Ed. 2d 69, 2017 WL 276190 (U.S. Jan. 23, 2017)?

4. Does the United States Supreme Court's recent opinion in *Manuel v. City*

*of Joliet,* 580 U.S. ___, (March 21, 2017), establish for pretrial detainees like  that

constitutional claims previously subject to the Fourteenth Amendment Due Process

Clause  are now governed by the Fourth Amendment?

> */s/   Matthew Farmer_____*
> ATTORNEY OF RECORD
> FOR APPELLANT, NAM DANG

## TABLE OF CONTENTS AND CITATIONS

**I.** *Table of Contents*

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT…………………………………………2

STATEMENT OF COUNSEL……………………………………………4

TABLE OF CONTENTS AND CITATIONS……………………………6

STATEMENT OF THE ISSUES MERITING EN BANC

CONSIDERATION………………………………………………............8

STATEMENT OF THE COURSE OF PROCEEDINGS AND DISPOSITION OF THE CASE…………………………………………………………..9

STATEMENT OF FACTS NECESSARY TO THE ARGUMENT OF THE ISSUES………………………………………………………………… …...12

ARGUMENT AND AUTHORITIES…………………………………..15

CONCLUSION…………………………………………………………24

CERTIFICATE OF COMPLIANCE…………………………………...25

CERTIFICATE OF SERVICE…………………………………………27

COPY OF THE OPINION SOUGHT TO BE REHEARD………………..28

## II. *Citations*

Page(s)

*Castro v. County of Los Angeles,* 833 F. 3d 1060 (9th Cir. 2016)
(en banc), *cert. denied,* No. 16-655, __U.S.__, 137 S.Ct. 831,
197 L.Ed. 2d. 69, 2017 WL 276190
(Jan. 23, 2017)…………………………………………………………5,20,21,24

*Dang v. Sheriff, Seminole County, Florida,*
(No. 15-14842, May 9, 2017)(withdrawn)……………………………………10-11

*Dang v. Sheriff, Seminole County, Florida,* ___F. 3d ___,
(No. 15-14842, Sept. 25, 2017)…………………………………………11,18,19

*Darnell v. Pineiro,* 849 F. 3d 17 (2nd Cir. 2017),
 *reh'g denied* (No. 15-2870, May16, 2017)………………………...…5,22-24

*Farmer v. Brennan,* 511 U.S. 825 (1994)……………………………….…22,23

*Graham v. Connor,* 490 U.S. 386 (1986)…………………………..................17

*Kingsley v. Hendrickson,* 576 U.S. __, 135 S. Ct. 2466,
192 L. Ed. 2d 416 (2015)…………………………………..……..4,8,11,15-24

*Manuel v. City of Joliet,* 580 U.S. ___ (March 21, 2017)……………...5,8,15,19,20

## STATEMENT OF THE ISSUES MERITING EN BANC CONSIDERATION

1. Whether the panel's amended opinion misapplied the United States Supreme Court's decision in *Kingsley v. Hendrickson,* 576 U.S. __, 135 S. Ct. 2466, 192 L. Ed. 2d 416 (2015), which holds that a Fourteenth Amendment claim brought by a pretrial detainee asserting the infliction of excessive force by government officials does not require proof of a subjective state of mind, applies as well to a pretrial detainee asserting he has been subjected by government officials to constitutionally inadequate medical care.

2. Whether the United States Supreme Court's opinion in *Manuel v. City of Joliet,* 590 U.S. ___(March 21, 2017), establishes that the appropriate constitutional standard that applies to claims by pretrial detainees is the Fourth Amendment, not the Fourteenth Amendment's Due Process Clause.

## STATEMENT OF THE COURSE OF PROCEEDINGS
## AND DISPOSITION OF THE CASE

On January 9, 2014, appellant Nam Dang, the plaintiff below, filed his complaint relating to his pretrial detention at the John E. Polk Correctional Facility located in Sanford, in Seminole County, Florida. (Doc. 47). Count I alleged a municipal liability claim under 42 U.S.C. § 1983 against Donald Eslinger, in his official capacity as the Sheriff of Seminole County, Florida. *Id.* Counts II - VII of Dang's amended complaint alleged liability under 42 U.S.C. § 1983 for the denial of medical care against several of the public health care providers charged with caring for him during his pretrial detention.

Defendants moved for summary judgment. (Docs. 127, 128, 129, 137, 138, 140 and 152). The district court held oral argument on July 29, 2015. Thereafter, by order issued on August 25, 2015, the district court granted summary judgment as to all defendants. (Doc. 184). Addressing the initial prong of the qualified immunity defense, the court concluded that each defendant acted within his or her discretionary authority. (Doc. 184 at 10). The district court then addressed the next prong of the qualified immunity defense, namely the argument that defendant did not violate a constitutional right, here the Fourteenth Amendment right to be free from deliberate indifference to a pretrial detainee's serious medical needs. *Id.* at 11. The court rejected plaintiff's contention that the

Supreme Court's recent decision in *Kingsley,* which held that the Fourteenth standard governing pretrial detainees' claims of excessive force was purely objective, applies to the claim in this case. *Id.* at 11, n. 14.

The district court assumed that Dang had objectively serious medical needs, but determined that there was insufficient evidence that the defendants were deliberately indifferent to those medical needs. *Id.* at 11-18. The court concluded that, "In hindsight and with collective wisdom, it appears that the Jail's medical staff failed to properly diagnose and treat Dang's meningitis. This failure may have been negligent, and its consequence was tragic, but it was not the result of deliberate indifference to Dang's serious medical need." *Id.* at 19. Likewise, the district court granted Sheriff Eslinger's motion for summary judgment, reasoning that, given the court's conclusion that Dang suffered no constitutional deprivation, he cannot demonstrate that municipal policy or custom violated his Fourteenth Amendment rights. *Id.* at 18-19.

On appeal, a panel of this Court affirmed. The court observed that, "As a pretrial detainee, Dang alleges inadequate medical care under the Fourteenth Amendment rather than the Eighth Amendment. Nevertheless, Dang's claims are evaluated under the same standard as a prisoner's claim of inadequate care under the Eighth Amendment." *Dang v. Sheriff, Seminole County,* (11th Cir. May 9, 2017), Slip op. at 10 (quotation omitted). In an accompanying footnote, the panel

noted, "Dang argues that following *Kingsley v. Hendrickson,* 135 S. Ct. 2466, 2475 (2015), a pretrial detainee alleging constitutionally deficient medical care need not show deliberate indifference. But *Kingsley* involved an excessive force claim, and we are not persuaded that its holding extends to claims of inadequate medical treatment due to deliberate indifference." *Id.* at n. 1.

Dang timely filed a petition for rehearing en banc. On September 25, 2017, the panel withdrew its previous opinion, yet affirmed. *Dang v. Sheriff, Seminole County, Florida,* __ F. 3d __ (11th Cir., Sept. 25, 2017). *See* Appendix. The only change was to the *Kingsley* footnote. The panel reasoned that, given that *Kingsley* addressed a pretrial detainee's excessive force claim, *Kingsley* is not "squarely on point" with, and does not "actually abrogate or directly conflict with," Circuit precedent on the constitutional standard involving inadequate medical care. Slip op. at 10, n. 2. Second, the panel reasoned,

even if we were free to consider what, if any, implications *Kingsley* might have for the claims of pretrial detainees involving inadequate medical treatment due to deliberate indifference, *Kingsley* could not help Dang. *Kingsley* itself notes that even when it comes to pretrial detainees, "liability for *negligently* inflicted harm is categorically beneath the threshold of constitutional due process." *Kingsley,* 135 S. Ct. at 2472 (emphasis in original; citations and question marks omitted). In Dang's case, as tragic as the facts are, all we have is, at most, negligence. So regardless of whether *Kingsley* could be construed to have affected the standard for pretrial detainees' claims involving inadequate medical treatment due to deliberate indifference, whatever any resulting standard might be, it could not affect Dang's case.

*Id.*

## STATEMENT OF FACTS NECESSARY
## TO ARGUMENT OF THE ISSUES

The following statement of facts originates in the panel's opinion, with the exception of parenthetical material, which is added. (In addition, Dang respectfully submits that, by adopting the panel's statement of facts, he does not concede that these facts are necessarily stated in the light most favorable to him.)

Nam Dang's health deteriorated while he was a pretrial detainee in the John E. Polk Correctional Facility. Ultimately, he was diagnosed with meningitis, which caused him to suffer multiple strokes resulting in permanent injuries.

On December 11, 2011, police officers stopped Dang's vehicle and temporarily detained him, and he alleged that, before releasing him, they slammed him to the ground and placed a knee on his neck before releasing him. He began experiencing headaches and neck pain, and took large amounts of Aleve for relief. He went to the emergency room one month later, but declined testing for meningitis.

Dang was arrested on January 26, 2012. His mother was present at the time of his arrest, and informed the officers her son was suffering from neck pain and headaches. She was permitted to apply a medicated patch to his neck before he was taken to the jail. Dang's health screen reflected normal vital signs, but no

notation of the neck pain or headaches. On January 29, 2012, however, he advised appellee Nurse Wilt of moderate to severe head and neck pains, a stiff neck, and a possible pinched nerve. Observing minimal pain, she ordered Motrin and a muscle rub, and put in an order for a doctor to prescribe a muscle relaxer.

Two days later, appellee Dr. Ogunsanwo saw Dang, who complained of headaches and neck pain and stiffness, attributing it to the earlier temporary detention. Dr. Ogunsanwo noted a full range of neck motion, but mild pain. He continued the Motrin and muscle rub, and prescribed the muscle relaxer. Six days later, appellee Nurse Preston-Mayle evaluated Dang, who informed her that he continue to suffer head and neck pain, and also reported vision and hearing problems. From his arrival at the jail 12 days earlier, Dang's weight had now declined from 140 to 132 pounds (or 5.7% of his body weight in fewer than two weeks).

Two days later, appellee Nurse Scott saw Dang, who complained that he had a headache and "no one was doing anything for him." Although she noted that he had full range of motion in his neck, his fever was 101.5 (despite the continued use of Motrin for 11 days). Shortly after leaving the exam room, Dang was observed by Scott on the floor, against the wall. She found his behavior bizarre, and directed him to mental health segregation. She checked on him later and noted that his temperature and appearance were normal.

Nine days later, appellee Nurse Roberts was notified of a "Code Orange" medical emergency regarding Dang. She noticed that he appeared to be passed out and drooling, but believed that his behavior was "voluntary." Roberts had heard from Scott that Dang had engaged in the same behavior "two weeks earlier," (presumably this was the incident in the hallway culminating in the referral to mental health segregation, as this was the only occasion until that point that Scott had been in Dang's presence).

A psychiatrist saw Dang the next day. Although she noted that he continued to have a headache, he felt "odd," and he had a drop in blood pressure, the psychiatrist concluded that he had an unusual reaction to the muscle relaxants, and cleared him psychiatrically.   The following day, appellee Nurse Densmore saw Dang, who was rocking back and forth in his plastic "boat" bed (an extra, hard plastic sleeping surface used when a cell's other beds are occupied). She found that his vitals and appearance appeared normal.

The next morning, Dang informed Densmore of his "two week" (actually, 25 day, from January 29 - February 23, 2012) headache. Noticing that Dang was unsteady when attempting to stand, she requested that Dr. Ogunsanwo see Dang. A few hours passed, and Densmore saw Dang with his head in the cell's toilet, and he was incontinent and very weak. Densmore requested the doctor again, who examined Dang and suspected meningitis. He requested the sheriff's office

to transport Dang to a hospital emergency room immediately, where meningitis was conclusively confirmed several days later.

## ARGUMENT AND AUTHORITIES

This case is appropriate for rehearing en banc under the standard of FRAP 35(b)(1)(A), as a question of exceptional importance exists, given the presence of "an issue on which the panel decision conflicts with the authoritative decisions of every other United States Court of Appeals that has addressed the issue." The issue is whether *Kingsley* applies to pretrial detainees' Fourteenth Amendment claims other than excessive force, including claims of inadequate medical care. Other than the panel decision in this case, two Circuits, the Ninth and Second, have ruled on the issue, and both expressly extend *Kingsley* beyond the narrow context of excessive force claims by pretrial detainees. Indeed, the Second Circuit's opinion extended *Kingsley* to assess detainees' claims relating to conditions of confinement. There are two related issues. The first issue is whether the panel's amended opinion incorrectly applied language in *Kingsley* that addresses negligence. The second issue is whether, after *Manuel v. City of Joliet,* 590 U.S.___ (March 21, 2017), the constitutional standard that applies to pretrial detainees is the Fourth Amendment, not the Fourteenth Amendment's Due Process Clause.

I. The *Kingsley* Opinion

In *Kingsley,* the United States Supreme Court addressed the elements of a Fourteenth Amendment substantive due process claim by a pretrial detainee, as distinguished from an Eighth Amendment claim by a convicted prisoner. As the Court explained, "The question before us is whether, to prove an excessive force claim, a pretrial detainee must show that the officers were *subjectively* aware that their use of force was unreasonable, or only that the officers' use of that force was *objectively* unreasonable." 135 S. Ct. 2466, 2470 (emphasis in original). According to the Court, "We conclude that the latter standard is the correct one." *Id.*

The Supreme Court reasoned that, in determining whether a defendant's physical acts are excessive, the standard is objective, not subjective, and "the defendant's state of mind is not a matter that a plaintiff is required to prove." *Id.* at 2472. (In contrast, the standard for determining whether the defendant intended the act in the first place remains subjective; that is, the plaintiff must prove that the defendant intended the act itself, or was at least reckless. In examples provided by the Court, the defendant would not be liable if his Taser accidentally discharged or if he unintentionally tripped and fell on a detainee, injuring him. *Id.*) The issue, according to the *Kingsley* Court, is "the defendant's state of mind with respect to the proper *interpretation* of the force (a series of events in the world) that the defendant deliberately (not accidentally or negligently) used." *Id.* (emphasis and

parentheses in original).  Considering either an objective standard or a subjective one that takes into account a defendant's state of mind, *Kingsley* is clear; "courts must use an objective standard." *Id.* In short, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 2472-73.

The Court reasoned that the familiar *Graham v. Connor*, 490 U.S. 386, 396 (1989), factors employed in Fourth Amendment excessive force cases apply, but, in the jail setting, a court must account for the "'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Id.* at 2473 (quotation omitted; brackets in original).

The *Kingsley* Court reasoned that precedent leads to the conclusion that "a pretrial detainee can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Id*. The *Kingsley* Court recognized as well that an objective standard protects officials acting in good faith, and courts must take account of legitimate interests in managing a jail, recognizing as "part of the objective reasonableness analysis that deference to policies and practices need to maintain order and institutional security

is appropriate." *Id.* at 2474.

Accordingly, the *Kingsley* Court found that the jury instructions provided in that case were erroneous, as they required a finding of recklessness on the part of the defendants, beyond the sufficient determination of whether their use of force "was unreasonable in light of the facts and circumstances at the time." *Id.* at 2476.  There is no requirement, the Court concluded, that the jury consider the defendants' "subjective reasons for using force and subjective views about the excessiveness of the force."  *Id.* at 2477.

II.  The Panel's Modified Opinion

Following appellant's initial petition for rehearing en banc, the panel modified its opinion by providing a new footnote distinguishing *Kingsley* and stating that *Kingsley* does not apply because petitioner, at most, has established mere negligence. The panel's opinion misapplies this language in *Kingsley*.

Again, *Kingsley* rules that the pretrial detainee in that case was not required to prove the government official's state of mind under the Fourteenth Amendment. Instead, *Kingsley* establishes that the constitutional standard is completely objective, and that a detainee need only demonstrate objective unreasonableness. Certainly, the modified footnote correctly quotes *Kingsley's* admonition that "liability for *negligently* inflicted harm is categorically beneath the threshold of constitutional due process." Slip op. at 10, n. 2, *quoting Kingsley,* 135 S. Ct. at

2472 (emphasis supplied by *Kingsley* court). As petitioner noted, the *Kingsley* court did reason that a subjective standard applies, but only at the initial stage when assessing whether the official's act was intentional. It was in reference to this prong of the *Kingsley* analysis that the Court warned that negligence is insufficient, as unintentional uses of force – the Court offered the examples of officers who tripped over, or inadvertently discharged their Taser at, a detainee – would never constitute a constitutional violation. (In this case, the government officials do not contend that their physical acts were unintentional, that is, equivalent to tripping over a detainee.) Once it is established that the physical act was not purely unintentional, the constitutional standard is simply objective reasonableness.

The modified panel opinion states that, "as tragic as the fact are, all we have is, at most, negligence." Slip op. at 10, n. 2. After *Kingsley*, the constitutional standard is objective reasonableness. Given the virtual, if not actual, equivalence of the negligence and objective unreasonableness standards, petitioner submits that this case should be reversed and remanded for a consideration by a jury whether the officials were objectively unreasonable in their attention to Mr. Dang's serious medical needs.

III. Does *Manuel v. City of Joliet* Establish that the Fourth Amendment Applies?

As discussed above, *Kingsley* establishes that the Fourteenth Amendment

Due Process standard for pretrial detainees in whether jail officials are objectively unreasonable. In so doing, the *Kingsley* Court reasoned that the *Graham* factors for Fourth Amendment claims are the starting point. In *Manuel,* the Court recently held that, at least as to probable cause necessary to justify a seizure of a person, "The Fourth Amendment, this Court has recognizes, establishes 'the standards and procedures' governing pretrial detention." *Manuel,* slip op. at 1. In so holding, the *Manuel* Court squarely rejected the contention that Fourteenth Amendment Due Process applies to the claim by a pretrial detainee that no probable cause supported his seizure and detention. Slip op. at 7 ("The Fourth Amendment, …, establishes the minimum constitutional 'standards and procedures' not just for arrest but for ensuing 'detention.'")

Accordingly, *Manuel's* admonition that the Fourth, not the Fourteenth, Amendment comprises the constitutional standard applying to pretrial detainees as well as arrestees, would apply as well to this case. Yet, *Kingsley's* objective reasonableness standard, rooted in the Fourteenth Amendment, is ultimately indistinguishable from the Fourth Amendment standard articulated in *Manuel.*

IV. Circuit Decisions Conflicting with the Panel's Rejection of *Kingsley*

In *Castro v. County of Los Angeles,* 833 F. 3d 1060 (9th Cir. 2016)(en banc), *cert. denied,* No. 16-655, __ U. S. __, 137 S. Ct. 831, 197 L. Ed. 2d 69, 2017 WL 276190 (U.S. Jan. 23, 2017), the Ninth Circuit Court of Appeals, sitting en banc,

applied *Kingsley* to a pretrial detainee's Fourteenth Amendment claim that jail officials were deliberately indifferent to the risk of attack by another detainee. *Id.* at 1070. The *Castro* court observed that *Kingsley* found a detainee is not required to prove that a "defendant understood that the force used [against a detainee] was excessive, or intended it to be excessive, because the standard is purely objective." *Id.* at 1069.

The *Castro* court observed that *Kingsley* did not address whether the objective standard applies to all types of claims brought by pretrial detainees. *Id.* Yet, the Ninth Circuit reasoned that the objective standard should extend to failure-to-protect claims as well. *Id.* The court observed that Section 1983, for example, contains no state of mind requirement, and the underlying federal constitutional right remains the same, despite the nature of the particular claim. *Id.* at 1069-70. Also, according to the *Castro* court, *Kingsley* broadly considered whether a "challenged governmental action," not just physical force, violated the Fourteenth Amendment. *Id.* at 1070. Jail officials have a constitutional duty to protect pretrial detainees from excessive force from other detainees and officers alike. *Id.* Applying *Kingsley* in the failure-to-protect context, the objective standard adopted by the Ninth Circuit inquires: "Was there a substantial risk of serious harm to the plaintiff that could have been eliminated through reasonable and available measures that the officer did not take, thus causing the injury that the plaintiff

suffered?" *Id.*

The Second Circuit extended *Castro* and *Kingsley* to conditions of confinement, as opposed to excessive force by inmates or guards. In *Darnell v. Pineiro,* 849 F. 3d 17 (2nd Cir. 2017), *reh'g denied* (No. 15-2870, May 16, 2017), the court found that the district court should have applied the *Kingsley* standard to an array of claims brought by pretrial detainees under the Fourteenth Amendment. *Id.* at 30. The *Darnell* court found that *Kingsley* altered the Fourteenth Amendment standard for detainees alleging an array of unsanitary and dangerous jail conditions. *Id.* at 23-26.

The *Darnell* court found that the Fourteenth Amendment standard applicable to pretrial detainees requires proof, first, of an objective deprivation, that is, proof that jail conditions pose an unreasonable risk of serious harm to a detainee's health. *Id.* at 30. Second, a detainee must prove that the government defendant was deliberately indifferent to that condition of confinement. *Id.* at 32. The court reasoned that deliberate indifference in this regard could be defined either subjectively (in the criminal sense), or objectively (in the civil sense). *Id.* A better description of this element of proof is, according to the court, the "*mens rea* prong" or "mental element prong." *Id.*

The *Darnell* court noted that, in *Farmer v. Brennan,* 511 U.S. 825 (1994), the Court concluded that convicted prisoners alleging that prison conditions violate

the Eighth Amendment must prove that prison officials had subjective knowledge of the risk posed by the challenged condition. *Id.* at 33. In other words, it is not enough for a prisoner to prove that the prison official should have perceived the risk, but did not. *Id.* Although *Farmer* did not address the Fourteenth Amendment claims of pretrial detainees, the *Farmer* Court's Eighth Amendment standard, the *Darnell* court observed, has nonetheless been routinely applied to pretrial detainees' claims as well before *Kingsley. Id.*

The *Darnell* court found that *Kingsley* altered the *mens rea* prong for Fourteenth Amendment claims by pretrial detainees. *Id.* Under *Kingsley,* a pretrial detainee need not prove the defendant's state of mind, but only that the use of force was objectively unreasonable. *Id.* at 34. According to the *Darnell* court, after *Kingsley, Farmer* does not apply to Fourteenth Amendment claims of pretrial detainees. *Id.* at 35. According to the Second Circuit, "Unlike a violation of the Cruel and Unusual Punishments Clause, an official can violate the Due Process Clause of the Fourteenth Amendment without meting out any punishment, which means that the Due Process Clause can be violated when an official does not have subjective awareness that an official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm." *Id.* As *Kingsley* held that a jail official's appreciation of his application of excessive force should be viewed objectively, "[t]he same objective analysis should apply to an officer's appreciation

of the risks associated with an unlawful condition of confinement." *Id.*

In sum, according to the *Darnell* court, "the *mens rea* prong of a Fourteenth Amendment deliberate indifference claim may be satisfied objectively, by proof that the "defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Id.* In so doing, the *Darnell* court joined the *Castro* court's conclusion that, "*Kingsley's* broad reasoning extends beyond the excessive force context in which it arose." *Id.* at 36. Because the district court granted summary judgment upon finding that the plaintiffs could not prove subjective deliberate indifference, and did not analyze or apply *Kingsley*, the *Darnell* court reversed and remanded. *Id.* at 38.

## CONCLUSION

In conclusion, this case presents a question of exceptional importance. This question is whether the *Kingsley* Court's holding is limited only to excessive force claims brought by pretrial detainees under the Fourteenth Amendment. Other than the panel decision of this Court, two Circuits have addressed the question, and they have arrived at conclusions contrary to the panel decision. The Second Circuit's *Darnell* decision is particularly significant, as it extends *Kingsley* to pretrial detainees' Fourteenth Amendment claims of unconstitutional conditions of confinement. Accordingly, Nam Dang requests this Court to rehear his appeal en banc, on the authority of FRAP 35(b)(1)(B).

<u>CERTIFICATE OF COMPLIANCE</u>

This petition complies with the word limit of FRAP 35(b)(2)(A) because the petition contains 3,868 words, excluding the pages of the petition exempted by FRAP 32(f). The brief complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6) because this petition has been prepared in a proportionally spaced typeface using Microsoft Word version 14 in 14 point Times New Roman font.

Respectfully submitted,

*/s/ Matthew Farmer*
Matthew P. Farmer
FL Bar No. 0793469
102 W. Whiting St.
Suite 501
Tampa, FL  33602
(813) 228-0095
Fax (813) 224-0269
MattFarmer1@aol.com

&

*/s/ Steven R.  Maher*
Steven R. Maher
The Maher Law Firm P.A.
Fla. Bar No. 887846
271 W. Canton Ave.
Suite 1
Winter Park, FL  32789

(407) 839-0866
((407) 425-7968
smaher@maherlawfirm.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that 15 copies of this brief was furnished by U.S. mail on the 16th day of October, 2017 to U.S. Court of Appeals for the 11th Circuit, 56 Forsyth St., N.W., Atlanta, GA 30303 and a copy was provided electronically the same date to the following counsel:

D. Andrew DeBevoise, Esq.

Thomas W. Poulton, Esq.

Jeffrey K. Grant, Esq.

DeBevoise & Poulton, P.A.

1035 S. Semoran Blvd.

Suite 1010

Winter Park, FL   32792

John M. Green, Jr., Esq.                   Bruce R. Bogan, Esq.

John M. Green, Jr., P.A.                   Hilyard, Bogan & Palmer, P.A.

125 N.E. 1st Avenue                   105 E. Robinson St.

Suite 2                                    Suite 201

Ocala, FL   34470                          Orlando, FL   32801

*/s/ Matthew Farmer*

Matthew Farmer, Esq.

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-14842
_____

D.C. Docket No. 6:14-cv-00037-GAP-TBS

NAM DANG, by and through his Power of Attorney, VINA DANG

                                        Plaintiff - Appellant,

versus

SHERIFF, SEMINOLE COUNTY FLORIDA,
OLUGBENGA OGUNSANWO, M.D.,
SANDRA WILT, RN,
BRENDA PRESTON-MAYLE, RN,
ALECIA SCOTT, LPN,
in their individual capacities, et al.,

                                        Defendants - Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(September 25, 2017)

Before ROSENBAUM, BLACK and SENTELLE,[*] Circuit Judges.[1]

SENTELLE, Circuit Judge:

Nam Dang's health deteriorated while he was a pretrial detainee in the John E. Polk Correctional Facility (the "Jail"). Ultimately, Dang was diagnosed with meningitis, which caused him to suffer multiple strokes resulting in permanent injuries. Dang alleges § 1983 liability against several health care providers for providing inadequate medical care while Dang was in Jail and Seminole County Sheriff Donald Eslinger in his official capacity as Sheriff. The district court granted summary judgment for all the defendants. Dang brought the present appeal. We affirm the judgment.

## I.     BACKGROUND

### A. Facts

On December 22, 2011, officers of the City County Investigative Bureau ("CCIB") stopped Dang's car. Dang alleges the officers pulled him from his vehicle, slammed him to the ground, and put a knee on his neck before ultimately releasing him. After this incident, Dang started experiencing headaches and neck pain, and started taking large doses of Aleve for relief. When the pain continued,

---

[*] Honorable David Bryan Sentelle, United States Circuit Judge for the District of Columbia, sitting by designation.

[1] We withdraw our opinion issued on May 9, 2017, and replace it with this one.

2

Dang went to an emergency room on January 12, 2012.  He declined the recommended testing to rule out meningitis.

On January 26, law enforcement officers arrested Dang.  Dang's mother advised the arresting officers that he was experiencing neck pain and headaches. The officers did not allow Dang's mother to give him any medication, but permitted her to place a medicated patch on his neck before he was taken to Jail. After booking, Dang was asked several questions about his health during his intake screening.  Dang's vitals were normal, and he did not inform the intake officer that he was experiencing neck pain or headaches.

On January 29, Dang was seen by Nurse Sandra Wilt, LPN, pursuant to a "nurse sick call."  Dang advised Wilt that he was experiencing "[m]oderate to severe head and neck pains," possibly a "pinched nerve," and a "[s]tiff neck." After checking Dang's eyes and the range of motion of his neck, Wilt observed that he had minimal pain.  Wilt ordered Motrin and a muscle rub and put in an order for Dang to be seen by a doctor to get a prescription for Robaxin, a muscle relaxant.

Pursuant to Wilt's order, Dang saw Dr. Ogunsanwo, MD, on February 1.  Dang stated he was experiencing headaches, neck pain, and neck stiffness.  Dang told Ogunsanwo about the incident with the CCIB when he was allegedly "yanked out" of the car and "slammed on the ground."  After performing a physical exam on

Dang, Ogunsanwo noted that Dang had full range of motion in his cervical spine

with mild pain elicited, normal gait, and no neurological deficit.  His temperature

was 98.9.  Ogunsanwo continued Dang on the Motrin and muscle rub ordered by

Wilt and prescribed Robaxin.

On February 7, Brenda Preston-Mayle, RN, evaluated Dang and completed a

History and Physical Health Evaluation.  Dang informed Preston-Mayle about the

incident with the CCIB and that he had been experiencing head and neck pain.  He

also described vision and hearing problems.  Preston-Mayle took Dang's vitals and

noted a temperature of 98.9.  His weight was recorded as 132, eight pounds less

than his intake weight.  Preston-Mayle offered to have Dang see a dental, mental,

or medical health doctor, but Dang declined.

On February 9, Alecia Scott, LPN, saw Dang.  Dang stated he had a headache

and that "no one was doing anything for him."  Scott assessed Dang and checked

his vitals.  She recorded that he had full range of motion to his neck with no

swelling or redness.  Dang was ambulatory and did not appear to be in distress.

However, Dang had a fever of 101.5.  Scott provided Dang with his Motrin and

Robaxin, advised him to drink plenty of fluids, and observed him for 15 to 20

minutes before releasing him to his pod.

Shortly after Dang left the medical unit, Scott went to the hallway and saw

Dang on the floor against the wall.  An officer told Scott that Dang had "snatched

away and slid down on the wall and sat on the floor." Dang did not respond

verbally to the officer's request that he "get up." Scott found Dang's behavior

"bizarre" and told him that if he continued to behave that way, he would end up on

suicide prevention. Dang got up and walked away. Scott later directed Dang to

mental health segregation for observation and directed that his blood pressure be

monitored for five days. Later that night, Scott checked on Dang and noted his

temperature was down to 97.9. His behavior and appearance were normal and she

noticed no problems.

On February 20, Sharyle Roberts, LPN, was notified of a "Code Orange"

medical emergency regarding Dang. Roberts documented that Dang's pupils were

equal and reactive to light, his blood pressure was 136/85, and he had a

temperature of 99. Roberts noted that Dang appeared to be passed out, was

drooling, and exhibited fluttering eye syndrome. Roberts believed the behavior

was voluntary because Dang wiped the drool from his mouth and when the room

was quiet, he "would open his eyes, look around, and then close his eyes again."

Roberts heard from Scott that he had engaged in similar behavior two weeks prior.

Roberts admitted Dang to the infirmary and referred him to both medical and

mental health doctors.

On February 21, Dr. Valerie Westhead, MD, a psychiatrist, conducted a mental

status examination of Dang. Dang had a headache, a drop in blood pressure, and

felt odd, but denied hallucinations, delusions, or mood complaints.  Westhead concluded that Dang had an idiosyncratic reaction to the muscle relaxants but no psychiatric issues.  Westhead cleared Dang psychiatrically.

On February 22, Martha Densmore, RN, saw Dang during her morning rounds. Dang was rocking back and forth in his hard plastic "boat" bed, but Densmore was able to check his vitals and determined they were normal.  Densmore testified that he was alert, oriented, and voiced no complaints.

The next morning, Dang informed Densmore of his two-week headache.  After observing that Dang had white patches on his tongue, a 99-degree temperature, and was unsteady when he attempted to stand, Densmore requested that Ogunsanwo see Dang.  A few hours later, Densmore observed Dang with his head in the toilet trying to spit.  He was incontinent and very weak.  Densmore asked Ogunsanwo to see him right away.  Ogunsanwo examined Dang and suspected he could have meningitis.  Ogunsanwo directed that Dang be transported to the ER via a sheriff's patrol car, where he was diagnosed with meningitis several days later.

### B. Procedure

Dang filed suit alleging § 1983 liability against the Jail's health care providers (excluding Westhead) for providing inadequate medical care and against Seminole County Sheriff Donald Eslinger in his official capacity as Sheriff for employing the customs that resulted in the alleged inadequate care.  The district court granted

summary judgment for the defendants.  The court held, *inter alia*, that Dang's

constitutional right to medical care was not violated because—even assuming a

serious medical need—the health care providers were not deliberately indifferent

to Dang's needs.  In light of the determination that Dang suffered no constitutional

deprivation, the court found no basis for supervisor liability against the Sheriff.

The court denied Dang's subsequent motion to amend its judgment pursuant to

Rule 59(e).  Dang appealed.

## II. DISCUSSION

### A. Standard of Review

We review a grant of summary judgment *de novo*.  *Kingsland v. City of Miami*,

382 F.3d 1220, 1225 (11th Cir. 2004).  Summary judgment is appropriate where

"there is no genuine dispute as to any material fact and the movant is entitled to a

judgment as a matter of law."  Fed. R. Civ. P. 56(a).  We "view the evidence and

all factual inferences therefrom in the light most favorable to the party opposing

the motion.  All reasonable doubts about the facts should be resolved in favor of

the non-movant."  *Clemons v. Dougherty Cty.*, 684 F.2d 1365, 1368–69 (11th Cir.

1982) (citations omitted).

### B. Qualified Immunity

Qualified immunity protects government officials if "their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable

person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

"The purpose of this immunity is to allow government officials to carry out their

discretionary duties without the fear of personal liability or harassing litigation, . . .

protecting from suit all but the plainly incompetent or one who is knowingly

violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)

(internal quotation marks and citations omitted).

   1.  Discretionary Authority

  To be entitled to qualified immunity, a public official "must first prove that he

was acting within the scope of his discretionary authority when the allegedly

wrongful acts occurred." *Id.* (internal quotation marks and citations omitted).  An

official acts within his discretionary authority if his actions (1) were undertaken

"pursuant to the performance of his duties," and (2) were "within the scope of his

authority." *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988); *see also*

*Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004) (noting that an official

acts within his discretionary authority if he "perform[s] a legitimate job-related

function . . . through means that [are] within his power to utilize").

   All of the health care providers acted within the course and scope of their

discretionary authority in providing care to Dang.  While Dang concedes that three

of the health care providers acted within their discretionary authority in caring for

him, he argues that the LPNs—Wilt, Scott, and Roberts—did not.  However, the

Seminole County Sheriff's Office required the LPNs to, *inter alia*, complete

"physical assessments on inmates in accordance with medical protocol" and

conduct "daily nurse's sick call." This is consistent with the Florida Nurse

Practice Act, which provides that LPNs perform "selected acts, including the

administration of treatments and medications, in the care of the ill, injured, or

infirm" and "the promotion of wellness, maintenance of health, and prevention of

illness of others under the direction of a registered nurse [or] a licensed

physician . . . ." Fla. Stat. § 464.003(19). Indeed, Dang alleges in his complaint

that "[a]t all times material hereto" each LPN "was acting under the color of state

law within the course and scope of her employment . . . and was empowered by the

state of Florida to provide nursing services . . . ." Each LPN acted within the scope

of her delegated authority, so each exercised discretionary authority in caring for

Dang.

## 2. Constitutional Violation

 "Once the defendant establishes that he was acting within his discretionary

authority, the burden shifts to the plaintiff to show that qualified immunity is not

appropriate." *Lee*, 284 F.3d at 1194. A court evaluating a claim of qualified

immunity must "determine whether the plaintiff has alleged the deprivation of an

actual constitutional right at all, and if so, proceed to determine whether that right

was clearly established at the time of the alleged violation." *Conn v. Gabbert*, 526 U.S. 286, 290 (1999).

As a pretrial detainee, Dang alleges inadequate medical care under the Fourteenth Amendment rather than the Eighth Amendment. *See Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1306 (11th Cir. 2009); *Goebert v. Lee Cty.*, 510 F.3d 1312, 1326 (11th Cir. 2007). Nevertheless, Dang's claims are evaluated under the same standard as a prisoner's claim of inadequate care under the Eighth Amendment. *Goebert*, 510 F.3d at 1326. To prevail on his § 1983 claim for inadequate medical treatment, Dang must show (1) a serious medical need; (2) the health care providers' deliberate indifference to that need; and (3) causation between the health care providers' indifference and Dang's injury. *Id.*[2]

a. Serious Medical Need

_____

[2] Dang argues that following *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2475 (2015), a pretrial detainee alleging constitutionally deficient medical care need not show deliberate indifference. We cannot and need not reach this question. First, *Kingsley* involved an excessive-force claim, not a claim of inadequate medical treatment due to deliberate indifference. Therefore, it is not "squarely on point" with and does not "actually abrogate or directly conflict with," *United States v. Kaley*, 579 F.3d 1246, 1255 (11th Cir. 2009) (citations and quotation marks omitted), our prior precedent identifying the standard we apply in this opinion to Dang's claim. Second, even if we were free to consider what, if any, implications *Kingsley* might have for the claims of pretrial detainees involving inadequate medical treatment due to deliberate indifference, *Kingsley* could not help Dang. *Kingsley* itself notes that even when it comes to pretrial detainees, "liability for *negligently* inflicted harm is categorically beneath the threshold of constitutional due process." *Kingsley*, 135 S. Ct. at 2472 (emphasis in original; citations and quotation marks omitted). In *Dang*'s case, as tragic as the facts are, all we have is, at most, negligence. So regardless of whether *Kingsley* could be construed to have affected the standard for pretrial detainees' claims involving inadequate medical treatment due to deliberate indifference, whatever any resulting standard might be, it could not affect Dang's case.

A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187 (11th Cir. 1994)). In either case, "the medical need must be one that, if left unattended, poses a substantial risk of serious harm." *Id.* (citations, internal quotations marks, and alteration omitted). As did the district court, we assume for purposes of summary judgment that Dang demonstrated a serious medical need.

  b. Deliberate Indifference

  To establish deliberate indifference, Dang must prove (1) subjective knowledge of a risk of serious harm; and (2) disregard of that risk (3) by conduct that is more than mere negligence. *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999). Subjective knowledge of the risk requires that the defendant be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099–1100 (11th Cir. 2014). "[I]mputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference. Each individual defendant must be judged separately and on the basis of what that person kn[ew]." *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008) (citations omitted).

11

Case: 15-14842    Document: 88    Date Filed: 09/23/2017    Page: 12 of 15

An official disregards a serious risk by more than mere negligence "when he [or she] knows that an inmate is in serious need of medical care, but he [or she] fails or refuses to obtain medical treatment for the inmate." *Lancaster v. Monroe Cty., Ala.*, 116 F.3d 1419, 1425 (11th Cir. 1997), *overruled on other grounds by LeFrere v. Quezada*, 588 F.3d 1317, 1318 (11th Cir. 2009).  Even when medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs.  *See Harris v. Coweta Cty.*, 21 F.3d 388, 393–94 (11th Cir. 1994) (citing *Brown v. Hughes*, 894 F.2d 1533, 1537–39 (11th Cir. 1990)).  Further, "medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference." *Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir. 1989) (citations omitted).  However, medical treatment violates the Constitution only when it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986) (citation omitted).

Dang alleges that each health care provider was aware of Dang's "symptoms consistent with meningitis" and "knew that meningitis was a serious and life-threatening condition that warrants immediate medical treatment."  Nonetheless, Dang claims, each provider "ignored clear signs and symptoms of Nam Dang's serious medical needs and life-threatening condition which prevented Nam Dang

from timely getting the critical medical care he required . . . ."  We consider those claims as to each defendant.

i.  Nurse Wilt

Wilt encountered Dang on one occasion, January 29, 2012, when he informed Wilt of his "moderate to severe head and neck pains," "strain[ed] neck muscle," "possible pinched nerve," and "stiff neck."  Wilt did not ignore Dang's symptoms, but performed an assessment by checking his eyes and the rotation of his neck. After the assessment, Wilt ordered that Dang take Motrin and a muscle rub before referring him to Dr. Ogunsanwo.  Dang argues that Wilt should have taken his vital signs, but does not suggest why that was necessary or would have been helpful. Indeed, Dang's vitals were taken 36 hours later with normal results.  The failure to take Dang's vitals under these circumstances cannot be said to be so grossly incompetent or inadequate as to "shock the conscience."  *Rogers*, 792 F.2d at 1058. Wilt was responsive to Dang's complaints and provided treatment she deemed appropriate at that time.  Wilt did not violate Dang's constitutional rights and is therefore entitled to qualified immunity.

ii.  Nurse Preston-Mayle

Dang alleges that Preston-Mayle was deliberately indifferent to his medical needs during their encounter on February 7, 2012, when Dang informed her of his head and neck pain as well as vision and hearing problems.  Dang alleges that

13

Case: 15-14842 Document: 88 Date Filed: 09/23/2017 Page: 24 of 15

Preston-Mayle failed to recognize Dang's symptoms and returned him to general population without attempting "to further evaluate his deteriorating condition." But Preston-Mayle took Dang's vitals, which were within normal range. She noted that Dang was coherent, alert, oriented, and even joked with her. In short, Dang presented no signs that were "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Goebert*, 510 F.3d at 1326. Nevertheless, Preston-Mayle offered to send Dang to a medical doctor, which he declined. The undisputed evidence shows that Preston-Mayle was not deliberately indifferent to Dang's medical needs and is therefore entitled to qualified immunity.

### iii. Nurse Scott

Dang alleges that Scott was deliberately indifferent to his medical needs during their encounter on February 9, 2012, when Dang told her of his headaches and neck pain. Scott assessed Dang and took his vitals. When she saw that Dang had a fever of 101.5, she administered his prescribed medication. After administering the medication, she held Dang in the infirmary for observation for at least fifteen minutes, advised him to drink fluids, and put in orders for his blood pressure to be monitored for five days. When Dang slid to the floor after leaving the infirmary, Scott became concerned about potential medical health issues and referred him to "DPod" for mental health observation, where nurses would see him twice daily. Scott followed up with Dang later that evening to check his temperature, which

was back within the normal range.  At that time, Dang stated that he was okay and his behavior and appearance were normal.  Scott's care does not "shock the conscience"; indeed, Dang's symptoms improved under her care.

Dang takes issue with the fact that Scott "mov[ed] him to segregation without instituting the segregation assessment protocol."  But it is not clear how this assessment would have shed light on Dang's condition or prompted additional care, and the evidence suggests that such assessments are not used to identify and assess the health of detainees.  A violation of Jail policy does not in itself rise to the level of deliberate indifference.  *See Andujar v. Rodriguez*, 486 F.3d 1199, 1204 n.5 (11th Cir. 2007).  Dang also alleges that Scott was present for the Code Orange on February 20, 2012, a fact that is in dispute.  But even if Scott was present for that encounter, she was not deliberately indifferent for the reasons explained below.  Scott is therefore entitled to qualified immunity.

iv.    Nurse Roberts

During the Code Orange on February 20, 2012, Roberts observed Dang appearing unconscious, drooling, non-verbal, and unable to sit up.  Roberts assessed Dang, noting that his vitals were normal and his pupils were equal and reactive to light.  Although Roberts may have incorrectly believed Dang's behavior was voluntary, "mere negligent" misdiagnosis is not a constitutional violation. *Howell v. Evans*, 922 F.2d 712, 719 (11th Cir. 1991).  And despite her belief, she

Case: 15-14842  Document: 88  Date Filed: 09/25/2017  Page: 26 of 15

admitted Dang to the infirmary where he would be seen by both medical and

mental health doctors.  Based on this undisputed evidence, Roberts was not

deliberately indifferent to Dang's medical need.

Dang asserts that Roberts failed to check him that night, leaving him to

"languish[]" in his cell and suffer additional harm.  Although Dang was observable

in the infirmary, there is no evidence that he made any complaints or that his

condition deteriorated.  Dang points to the testimony of his former cell-mate,

Anthony Laird, and his girlfriend, Sarah Agurkis, in support of his claim that his

condition deteriorated in his infirmary cell that night.  However, Laird's affidavit is

not clear on dates, and Dang references it in regard to events on February 20, 21,

and 23.  And Agurkis testified that she "believe[s]" she visited him on February

19, so any direct observations she made cannot support his claims regarding

February 21.

Because Roberts was not deliberately indifferent to Dang's medical need, she

is entitled to qualified immunity.

v.     Nurse Densmore

Densmore examined Dang on February 22, 2012.  Although he exhibited

weakness, Dang was sitting up and Densmore noted that his vitals were normal and

he was alert and oriented.  Dang did not voice complaints about his pain.  The next

day, after observing that Dang had white patches on his tongue, a 99-degree

temperature, and was unsteady on his feet, Densmore requested that Ogunsanwo see Dang.  When, a few hours later, Densmore observed Dang with his head in the toilet, incontinent and weak, she requested that Ogunsanwo see Dang immediately. Far from ignoring Dang's medical need, Densmore referred Dang to a medical doctor, and then ensured that the doctor came immediately when Dang's condition worsened.  Densmore's decision not to take further action under these circumstances, even in the light most favorable to Dang, was not a constitutional violation.  Densmore is therefore entitled to qualified immunity.

vi.    Doctor Ogunsanwo

Ogunsanwo first interacted with Dang on February 1, 2012, when Dang complained of headaches and neck pain.  When the results of Dang's physical exam were normal, Ogunsanwo continued Dang on Motrin and a muscle rub and prescribed a muscle relaxant for his pain.  Dang seems to have abandoned any challenge relating to Ogunsanwo's actions on February 1, but regardless, his undisputed actions were reasonable and do not support a finding of deliberate indifference.

Ogunsanwo next interacted with Dang on February 23, 2012.  After examining Dang, Ogunsanwo immediately directed him transported to the ER in a patrol car. The only issue that Dang raises before us is that he remained in the infirmary for over 40 minutes before being transported to the hospital, but he cites no relevant

Case: 15-14842 Date Filed: 09/23/2017 Page: 18 of 19

evidence in support of his conclusion.  Evidence suggests that there was about a 15-minute delay in Dang's transport.  In this context, a 15-minute delay is not a constitutional violation.  *See Harris*, 21 F.3d at 393-94.

Dang also suggests that Ogunsanwo indirectly learned of Dang's deteriorating condition on February 13, 2012, when he approved an order for blood pressure checks due to Dang's fever.  Fever, Dang claims, is inconsistent with Ogunsanwo's initial diagnosis of muscular skeletal pain and indicates a more serious condition.  But even assuming Ogunsanwo knew Dang had a one-time fever, his actions were not deliberately indifferent.  *See Farmer*, 511 U.S. at 838 (finding no liability for "an official's failure to alleviate a significant risk that he should have perceived but did not").

Because Ogunsanwo was not deliberately indifferent to Dang's medical needs, he is entitled to qualified immunity.

## C. Supervisor Liability

Dang argues that the policies and practices of Donald Eslinger, Sheriff for Seminole County, caused the violation of his constitutional right to adequate medical care.  In light of the Court's determination that there was no constitutional deprivation, there is no basis for supervisor liability.  *See Gish v. Thomas*, 516 F.3d 952, 955 (11th Cir. 2008); *Beshers v. Harrison*, 495 F.3d 1260, 1264 n.7 (11th Cir.

Case: 15-14842 Document: 88 Date Filed: 09/25/2017 Page: 19 of 19

2007).  Accordingly, the district court's grant of the Sheriff's motion for summary judgment is affirmed.

### III. CONCLUSION

For the reasons set forth above, the district court's decision granting the defendants' motions for summary judgment is affirmed.